UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ZIVIE TAMAM, YONA TAMAM, ASIF TAMAM,
NIR TAMAM, SIMHA TAMAM, NOA TAMAM,
ETGAR TAMAM, MORDECHAI TAMAM, ACHIEZER
NITU, BARUCH MORDECHAI NITU, YEHUDA
NITU, TOVAH HODAYAH NITU, ECATERINA
NITU, MIHAELA ADRY, COCA TABIB, DANIELA
CRISTINA SURCEL, NAFTALI ICZKOVITZ, PESAH
PISAHOV, CHALOM BENSIMON, RIVKA (RUBY)
BEN SHIMON, DANIEL BEN SHIMON, OSNAT BEN
SHIMON, MESHULAM DAMTI, SHOSHANA DAMTI,
BORIS FELDMAN, LUBA FELDMAN, NETA BEIT
HALACHMI, LIRON FELDMAN, SOFIA LAPIDUS,
ALEKSANDER LAPIDUS, PAVEL LAPIDUS,
ALEXANDRE LAPIDOUS, TEREZ LEVI, ALMOG LEVI,
ELINOR MANZORA, LOTEM MANZORA, LIDAR
MANZORA, NAVA MANZORA, MAAYAN
MANZORA, HAGIT BEN ABU, MORAG BEN ABU,
SHEMTOV BEN ABU, MEITAR BEN ABU, YOSEF BEN
ABU, EFRAT BEN ABU, RUT KADOSH, SIMI EDRI,
SHARON BEN ABU, SIDO ZRIBI, BIYIDA ZRIBI,
RACHELA ZRIBI, DINA AZRAN, SIMHA DANA,
AMNON ZRIBI, MORDEKHAY ZRIBI, ISRAEL ZARIBI,
EMIL CHAYAT, JOZEF HASHLOM, MARWAN
ZUBIDAT and ADAN ZUBIDAT

               Plaintiffs,

             v.

FRANSABANK SAL,
BANQUE LIBANAISE POUR LE COMMERCE,
BANK OF BEIRUT SAL,
BANQUE LIBANO-FRANÇAISE SAL,
MIDDLE EAST AFRICA BANK, and
JOHN DOES 1-100,

               Defendants.

**<u>AMENDED COMPLAINT</u>**
**<u>JURY TRIAL DEMANDED</u>**

**08-CV-6156 (JFK)**



1.    Plaintiffs Zivie Tamam, Yona Tamam, Asif Tamam, Nir Tamam, Simha Tamam,

Noa Tamam, Etgar Tamam, Mordechai Tamam, Achiezer Nitu, Baruch Mordechai Nitu, Yehuda

Nitu, Tovah Hodayah Nitu, Ecaterina Nitu, Mihaela Adry, Coca Tabib, Daniela Cristina Surcel, Naftali Iczkovitz, Pesah Pisahov, Chalom Bensimon, Rivka (Ruby) Ben Shimon, Daniel Ben Shimon, Osnat Ben Shimon, Meshulam Damti, Shoshana Damti, Boris Feldman, Luba Feldman, Neta Beit Halachmi, Liron Feldman, Sofia Lapidus, Aleksander Lapidus, Pavel Lapidus, Alexandre Lapidous, Terez Levi, Almog Levi, Elinor Manzora, Lotem Manzora, Lidar Manzora, Nava Manzora, Maayan Manzora, Hagit Ben Abu, Morag Ben Abu, Shemtov Ben Abu, Meitar Ben Abu, Yosef Ben Abu, Efrat Ben Abu, Rut Kadosh, Simi Edri, Sharon Ben Abu, Sido Zribi, Biyida Zribi, Rachela Zribi, Dina Azran, Simha Dana, Amnon Zribi, Mordekhay Zribi, Israel Zaribi, Emil Chayat, Jozef Hashlom, Marwan Zubidat and Adan Zubidat (hereafter "Plaintiffs"), allege the following upon information and belief, except for allegations specifically concerning the Plaintiffs or their counsel, which allegations are made upon Plaintiffs' personal knowledge. Plaintiffs' information and belief is based upon, *inter alia*, Plaintiffs' counsel's investigation, which included, without limitation, review and analysis of publicly available United States ("U.S."), Israeli, and United Nations reports, news articles, media reports, academic journals, public policy center publications, and contemporaneous police and medical reports.

## NATURE OF THE ACTION

2. Each Plaintiff's claim in this Action arises out of Defendants FRANSABANK SAL, BANQUE LIBANAISE POUR LE COMMERCE ("BLC BANK"), BANK OF BEIRUT SAL, BANQUE LIBANO-FRANÇAISE SAL, MIDDLE EAST AFRICA BANK ("MEAB") and JOHN DOES 1-100's (referred to herein collectively as "Defendants" or the "Banks") knowing, intentional, reckless, and/or willfully blind conduct, through which Defendants conspired with and aided and abetted the terrorist organization Hizbullah by providing it with financial and banking services. Each Bank conspired with and aided and abetted Hizbullah to

provide it with financial services in furtherance of numerous criminal acts in violation of the laws of nations, customary international law and U.S. and New York state penal statutes.

3. Plaintiffs further allege that Defendants' conduct substantially assisted Hizbullah in perpetrating criminal acts in violation of international law that caused direct injury to Plaintiffs. Defendants' conduct furthered Hizbullah's criminal acts perpetrated in blatant derogation of the laws of nations, customary international law, federal and state common law, and U.S. federal and state penal statutes, including the laws of the State of New York.

4. Defendants' illegal conduct, which substantially assisted Hizbullah's systematic, murderous attacks against innocent civilians for the purpose of intimidating a civilian population, violated the law of nations in derogation of the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350, and was both a cause in fact and proximate cause of the direct and indirect injuries suffered by each Plaintiff.

5. As alleged in greater detail *infra*, Hizbullah is a terrorist organization based in Lebanon that was established in 1982. Its stated mission is to establish an Islamic state and to destroy the State of Israel, including its Jewish citizens, residents, and visitors. Hizbullah has pursued this mission through a variety of means, including attacks on civilian targets. Hizbullah also considers the United States its enemy; prior to September 11, 2001, Hizbullah was responsible for more American deaths than any other terrorist organization in the world.

6. As a result of its mission, conduct, and activities, the United States has designated Hizbullah a Specially Designated Terrorist ("SDT"), Foreign Terrorist Organization ("FTO"), and Specially Designated Global Terrorist ("SDGT").

7. The United States is not alone in designating Hizbullah a terrorist organization. Canada, the Netherlands, and Israel have designated Hizbullah a terrorist organization, the

3

United Kingdom and Australia have designated Hizbullah's "External Security Force" a terrorist organization, and the European Parliament passed a non-binding resolution recognizing "clear evidence" of "terrorist activities by Hizbullah."

8.     Hizbullah is particularly notorious for using missiles to terrorize, maim, and murder Israeli civilians.  Throughout the 1990s and continuing to the present day, Hizbullah has launched thousands of missiles at Israeli towns, villages, and cities.

9.     In the summer of 2006, Hizbullah bombarded Israeli civilians with missiles it fired from southern Lebanon (hereafter "Israel-Hizbullah Conflict" or "the 2006 Conflict"). Significantly, Hizbullah knew that the vast majority of missiles it launched that killed or injured civilians, including the named Plaintiffs herein, could not be targeted with meaningful precision. As such, Hizbullah, and by extension the Defendants, intended, knew, or consciously or recklessly disregarded that the missile launches were designed to terrorize and murder Israeli civilians.

10.     As specifically alleged herein, the Defendants knew or consciously avoided knowing that Hizbullah explicitly urged Israeli citizens of Arab descent to flee from the Israeli city of Haifa lest they be accidentally killed in the missile onslaught.  As such, Hizbullah's statements, and the Defendants' knowledge or conscious avoidance thereof, demonstrate not only an intention and conspiracy to kill Israelis generally, but a more specific, genocidal plan to exterminate Jewish citizens or residents of Israel.

11.     As alleged in greater detail herein, each Plaintiff was killed or injured as a result of Hizbullah's activity in 2006 and Defendants' substantial, intentional, knowing, reckless, or willfully blind assistance thereof.

12. At all times relevant to this action, Hizbullah conducted its logistical, military, governmental, and political operations through a large network of departments, divisions, agencies, charities, and fundraising organizations.

13. Each Defendant herein intentionally, knowingly, recklessly, or with willful blindness provided services to one of Hizbullah's most infamous and lethal fundraising organizations, the Islamic Resistance Support Organization ("IRSO"), an entity specifically tasked by Hizbullah's leadership with raising funds explicitly dedicated to terror activities.

14. At all times relevant hereto, Defendants maintained correspondent banking relationships with various U.S. banks.

15. At all times relevant hereto, each Defendant was obligated to, and represented that it did, in fact, comply with relevant anti-money laundering, counter-terror finance, and "Know Your Customer" functions.

16. As detailed herein, application of these standards demonstrates that each Defendant knew, or was willfully blind to the fact, that IRSO's activities violated customary international law and federal and state laws in the United States.

17. On information and belief, Defendants processed funds and cleared U.S. dollars for IRSO's direct benefit through the United States in this District.

18. Hizbullah's and IRSO's illegal conduct could not have succeeded absent Defendants' intentional or knowing participation.

19. Despite knowledge of Hizbullah's and IRSO's purposes and Hizbullah's status as an FTO and SDGT, Defendants provided banking services to Hizbullah and IRSO directly by transmitting funds into IRSO's accounts. The funds Defendants collected were solicited by

Hizbullah and IRSO through television and website advertisements publicized throughout the Middle East that sought financial support for Hizbullah's attacks on Israel.

20. IRSO was not the only Hizbullah entity the Defendants provided substantial assistance to. Specifically, FRANSABANK SAL also provided services to Al-Jarha Association ("the Wounded Association") and Al-Manar. And JOHN DOES 1-100 provided services to Al-Mua'assat al-Shahid ("the Martyrs Foundation"), Jihad Al-Bina, Yousser Company For Finance and Investment (a/k/a "Yousser"), Bayt al-Mal, and Al-Manar (as alleged in greater detail herein).

21. Despite knowing or consciously avoiding the fact that the Wounded Association, the Martyrs Foundation, Jihad Al-Bina, Yousser, Bayt al-Mal, and Al-Manar were part of and/or affiliated with Hizbullah, the Defendants discussed in paragraph 20 maintained accounts, provided services, and collected funds for them.

22. Defendants provided Hizbullah with substantial assistance intentionally, knowingly, recklessly, and/or with willful blindness.

23. Each Defendant named herein: (a) committed tortious acts in concert or pursuant to a common design with Hizbullah; or (b) knew or consciously avoided knowing that Hizbullah's conduct was a breach of duty yet provided Hizbullah with substantial assistance or encouragement; or (c) gave substantial assistance to Hizbullah in accomplishing its tortious result and each Defendant's conduct, separately considered, breached duties to the Plaintiffs.

24. Defendants' illegal, substantial assistance to Hizbullah was longstanding, and at times shrouded by international money transfer services such as "SWIFT" or "CHIPS" described more specifically *infra*. But Defendants' conduct was clear: providing Hizbullah with regular, systemic, and unfettered access to U.S. currency, thus enabling Hizbullah to rapidly access funds

to purchase missiles and other weapons that could terrorize civilians, support Hizbullah operatives and facilitate Hizbullah's efforts to exterminate both the Israeli nation-state, and specifically target Israel's Jewish citizens, residents, and visitors.

25. These are plain violations of customary international law that also violate federal and state laws of the United States.

26. Defendants' conduct substantially assisted Hizbullah in its general goals and IRSO's specific, violent objectives. Defendants intentionally, knowingly, recklessly, or with willful blindness provided substantial assistance to Hizbullah, and, as such, are liable to each Plaintiff for his or her injuries.

## JURISDICTION AND VENUE

27. This Court has jurisdiction over this action pursuant to the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350.

28. Defendants are subject to personal jurisdiction pursuant to New York's long arm statute, N.Y. Civ. Prac. L. & R. § 302 and Fed. R. Civ. P. 4(k).

29. Defendants performed tortious acts via funds transfers through correspondent banks in New York, and Defendants engaged in substantial conduct in connection with the schemes detailed herein in furtherance of their conspiracy in New York.

30. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (d) because each Defendant is an alien, and a substantial part of the events or omissions giving rise to each Plaintiff's claim occurred in this District, including the correspondent banking that facilitated Hizbullah's conduct by conferring it with readily accessible United States currency.

## THE PARTIES

### A.   PLAINTIFFS

31. All of the named Plaintiffs herein are citizens of the State of Israel. Each

7

Plaintiff's injury was the foreseeable result of missile attacks deliberately launched by Hizbullah against civilian targets in Israel from July 12, 2006 through August 30, 2006. Specific details concerning each Plaintiff's injuries are alleged at paragraphs 202 through 317 *infra*.

## B.    DEFENDANTS

### 1.    FRANSABANK SAL

32.    Defendant FRANSABANK SAL was established in Beirut in 1921 and provides a broad range of retail, commercial, corporate, investment and international banking services to local and international clients.

33.    FRANSABANK SAL transmits the majority of its U.S. dollar wire transfers through two U.S. correspondent banks, BANK OF NEW YORK, One Wall Street, New York, N.Y. 10286, and JP MORGAN CHASE BANK, 4 New York Plaza, New York, N.Y. 10004.

### 2.    BANQUE LIBANAISE POUR LE COMMERCE ("BLC BANK")

34.    Defendant BANQUE LIBANAISE POUR LE COMMERCE ("BLC BANK") was established in 1950 and operates 34 branches in Lebanon.

35.    In August 2007, 97.52% of BLC BANK's capital was acquired by FRANSABANK SAL.

36.    BLC BANK transfers the majority of its U.S. dollar wire transfers through three U.S. correspondent banks, WACHOVIA BANK, 11 Penn Plaza, New York, N.Y. 10001, BANK OF NEW YORK, One Wall Street, New York, N.Y. 10286, and JP MORGAN CHASE BANK, 4 New York Plaza, New York, N.Y. 10004.

### 3.    BANK OF BEIRUT SAL

37.    Defendant BANK OF BEIRUT SAL is one of Lebanon's leading commercial banks, operating in six countries and offering a large range of retail banking services.

38. BANK OF BEIRUT SAL ranks in the top ten of the roughly fifty-five banks currently operating in Lebanon in terms of total assets and profitability. BANK OF BEIRUT SAL transfers the majority of its U.S. dollar wire transfers through three correspondent banks, AMERICAN EXPRESS BANK, LTD., Bank Account #28134, with a principal office located at World Financial Center, 200 Vesey Street, New York, N.Y. 10281, JP MORGAN CHASE, Bank Account #400-228661, with a principal office located at 270 Park Avenue, New York, N.Y. 10017, and BANK OF NEW YORK, Bank Account #890-0097-906, with a principal office located at One Wall Street, New York, N.Y. 10005.

## 4. BANQUE LIBANO-FRANÇAISE SAL

39. Defendant BANQUE LIBANO-FRANCAISE SAL, one of the leading private commercial banks in Lebanon, was established in 1930 as a branch of the French Bank, the Compagnie Algériemede Crédit et de Banque. In 1967, BANQUE LIBANO-FRANCAISE SAL became established under Lebanese law. BANQUE LIBANO-FRANCAISE SAL offers a broad range of retail banking services, including commercial, corporate, retail, investment, private and correspondent banking.

40. BANQUE LIBANO-FRANCAISE SAL ranks in the top ten of the roughly fifty-five banks that currently operate in Lebanon in terms of total assets. BANQUE LIBANO-FRANCAISE SAL transmits the majority of its U.S. dollar wire transfers through correspondent banks, BANK OF NEW YORK, with a principal office located at One Wall Street, New York, N.Y. 10005, and CITIBANK, with a principal office located at 399 Park Avenue, New York, N.Y. 10043.

## 5. MIDDLE EAST AFRICA BANK

41. MIDDLE EAST AFRICA BANK has five locations in Lebanon including its

head office in Beirut. During the relevant period (2003-2006), MIDDLE EAST AFRICA BANK transmitted its U.S. dollar wire transfers through its correspondent banking relationship with WACHOVIA BANK.

### 6.    JOHN DOES 1-100

42.    The true names, residences and capacities, whether individual, corporate or otherwise, of Defendants John Does 1 through 100 (collectively, the "Does") are presently unknown to Plaintiffs, who therefore sue those Defendants under such fictitious names. The Does are other financial institutions or their agents that conspired with or aided and abetted the named Banks and/or Hizbullah. In doing the things hereinafter alleged, each of the Does was acting within the course and scope of such agency and with the intent, knowledge, consent and approval of the Defendants and/or Hizbullah. Each of the Does are responsible in some manner for the acts alleged herein and for the damages that each Plaintiff sustained. Plaintiffs will amend this Complaint to show the true names and capacities of the Does when they are ascertained.

43.    At all times relevant hereto, each Defendant conspired with, acted in concert and actively participated with, and/or aided and abetted Hizbullah in committing the wrongful acts alleged in this Complaint. At all times relevant hereto, each of the Defendants intended, knew, or consciously or recklessly avoided knowing, that the other Defendants and/or Hizbullah were engaged or intended to engage in conduct that violated each Plaintiff's rights and also violated customary international, federal, state or common law.

## FACTUAL ALLEGATIONS

## I. HIZBULLAH: A TERORIST ORGANIZATION FROM ITS INCEPTION

### A. CREATION AND GENOCIDAL MISSION

44. Hizbullah first emerged during the Lebanese civil war in the early 1980s as a militia comprised of Shia followers of the Ayatollah Ruhollah Musawi Khomeini. Its members were trained, organized and funded by a contingent from the Iranian Revolutionary Guard.

45. Hizbullah's aims and goals were published in February 1985 in a letter entitled "The Hizbullah Program."

46. With respect to Israel, the Hizbullah Program states:

We see in Israel the vanguard of the United States in our Islamic world. It is the hated enemy that must be fought until the hated ones get what they deserve.... our struggle will end only when this entity is obliterated. We recognize no treaty with it, no cease fire, and no peace agreements, whether separate or consolidated. (Emphasis added.)

### 1. Hizbullah's Relationship With Iran, A State Sponsor Of Terrorism

47. The United States designated Iran a state sponsor of terrorism on January 19, 1984.

48. From Hizbullah's inception, it has had an uninterrupted relationship with Iran. The Hizbullah Program states: "We are the sons of the *umma* – the party of God the vanguard of which was made victorious by God in Iran....We obey the orders of one leader, wise and just, that of our tutor and *faqih* who fulfills all the necessary conditions: Ruhollah Musawi Khomeini."

49. According to the U.S. State Department's report, "Country Reports on Terrorism 2007," Iran has provided aid and support to Hizbullah for more than 20 years. That fact is further documented by the U.S. State Department report, "Patterns of Global Terrorism: 1988,"

which states: "Tehran also supports – and exerts significant influence over – the extremist Shia Hizballah movement's kidnapping of Westerners in Lebanon. Iran provides Hizballah with money, weapons, and training and has approved - and in some instances may have encouraged - its seizing of some Western hostages."

50.     According to the U.S. State Department report "Patterns of Global Terrorism: 1985," Hizbullah owes its inspiration and origin to Iran. The report notes: "The fundamentalist Shi'a faction Hizballah in Lebanon … [is] among the most active Iranian-backed groups that conducted international terrorism in 1985."

51.     According to the U.S. State Department report "Patterns of Global Terrorism: 1984," Hizbullah receives "political indoctrination, training, and financial and materiel support from Iranian Revolutionary Guardsmen based in the Syrian-controlled al Biqa (Bekaa) Valley of eastern Lebanon."

52.     In 2007, the United States Treasury Department designated the Iranian Revolutionary Guard Corps–Qods Force an SDGT because it provides support for Hizbullah and other terrorist groups.

53.     The U.S. State Department report "Country Reports on Terrorism 2007" states:

The Qods Force has a long history of supporting Hizballah, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hizballah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah and has assisted Hizballah in rearming.

54.     The report further notes that Hizbullah "receives training, weapons, and explosives, as well as political, diplomatic, and organizational aid from Iran."

12

## 2.    Hizbullah's Relationship With Syria, A State Sponsor Of Terrorism

55.    The United States designated Syria a state sponsor of terrorism on January 29, 1979.

56.    According to the U.S. State Department report, "Country Reports on Terrorism 2007": "Syria has also continued to provide political and material support to Hizballah since that group's creation."

57.    A 1992 U.S. State Department report stated that "areas of Lebanon's Bekaa Valley under Syria's control provide sanctuary for a wide variety of groups engaged in terrorism, including … Hizballah."

58.    Moreover, Syria has allowed Iran to land planes in Damascus where military supplies are unloaded for transfer to Hizbullah. According to the U.S. State Department report "Patterns of Global Terrorism: 2001", "Damascus served as the primary transit point for the transfer of Iranian-supplied weapons to Hizballah," and Hizbullah "has been a strong tactical ally in helping Syria advance its political objectives in the region."

## 3.    Hizbullah's Terrorist Attacks Before 2006

59.    Since its founding, Hizbullah has committed multiple acts of violence and terrorism, including but not limited to the:

a.    July 19, 1982 kidnapping of American University president David S. Doge in Beirut.

b.    April 18, 1983 car bomb attack on the United States Embassy in Beirut in which 63 people were killed.

c.    October 23, 1983 truck bomb attack on the U.S. Marine barracks where American military personnel stationed in Beirut were serving as part of a peace-keeping force in which 241 American military personnel were killed. A separate attack against the French military compound in Beirut killed 58 people.

d.    September 20, 1984 car bomb attack on the U.S. Embassy annex in Beirut in which two Americans and 22 others were killed.

e.    March 16, 1984 kidnapping and murder of William Buckley, a CIA operative working at the U.S. Embassy in Beirut.

f.    April 12, 1984 attack on a restaurant near the U.S. Air Force Base in Torrejon, Spain in which eighteen U.S. servicemen were killed and 83 people injured.

g.    December 4, 1984 terrorist hijacking of a Kuwait Airlines plane in which four passengers were murdered, including two Americans.

h.    June 14, 1985 terrorist hijacking of TWA Flight 847. The hijackers severely beat passenger Robert Stethem, a U.S. Navy diver, before killing him and dumping his body onto the tarmac at the Beirut airport. Other passengers were held as hostages before being released on June 30, 1985.

i.    December 31, 1986 kidnapping and murdering of three Lebanese Jews, under the alias Organization of the Oppressed on Earth, which had previously taken responsibility for killing four other Jews since 1984.

j.    February 17, 1988 kidnapping of Col. William Higgins, a U.S. Marine serving with a United Nations truce monitoring group in Lebanon. Hizbullah later murdered him.

k.    March 17, 1992 bombing, with the help of Iranian intelligence, of the Israeli Embassy in Buenos Aires that killed 29 people and injured over 200.

l.    July 18, 1994 bombing of the Jewish community center in Buenos Aires – again with Iranian assistance – that killed 86 people and injured over 200.

m.    November 28, 1995 bombardment of towns in northern Israel with volleys of missiles aimed at Israeli civilians.

n.    March 30, 1996 bombardment of northern Israeli towns with 28 missiles. A week later, Hizbullah fired 16 additional missiles, injuring 36 Israelis.

o.    August 19, 1997 bombardment of northern Israel with dozens of missiles aimed at Israeli civilians.

p.    December 28, 1998 bombardment on northern Israel with dozens of missiles aimed at Israeli civilians.

q.    May 17, 1999 bombardment on northern Israel with dozens of missiles aimed at Israeli civilians.

r.      June 24, 1999 bombardment on northern Israel, killing 2 people.

s.      Oct. 7, 2000 attack on an Israeli military post, raid of Israel, and kidnapping of three Israeli soldiers. The soldiers were later presumed dead. In mid-October, Hezbollah leader Sheikh Sayyed Hassan Nasrallah announced Hizbullah had also kidnapped an Israeli businessman. In 2004, Israel freed over 400 Arab prisoners in exchange for the businessman and the bodies of the three soldiers.

t.      April 9, 2002 launching of missiles into northern Israeli town. This assault comes amidst almost daily Hizbullah attacks against Israeli troops on the internationally recognized border between Lebanon and Israel.

u.      August 10, 2003 firing of shells that kill a 16-year-old Israeli boy and wound other Israelis.

## B.    HIZBULLAH'S LEADERSHIP

60.     Sheikh Subhi al-Tufayli and Abbas al-Musawi helped establish Hizbullah in

1982. Al-Tufayli was Hizbullah's first Secretary General, from 1989 until 1991. Both Al-

Musawi and Al-Tufayli were strong opponents of the existence of the State of Israel, as attested

to by the following statements:

a.      . . . wipe out every trace of Israel in Palestine . . . the cancer of the Middle East. (Statement by Al-Musawi as reported by Middle East International, November 8, 1991.)

b.      . . . we know that we will not triumph in one or even several years but have prepared for a battle of centuries [to eliminate Israel]. (Statement by Al-Tufayli to an audience at Al-Musawi's funeral in 1992 as quoted in The Politics of the Western Hostage Crisis, New York, St. Martin Press, 1997, pg. 57.)

c.      If the whole world makes peace with Israel, Hizb'allah will continue to fight Jews – even if Israel withdraws from south Lebanon. The peace documents will be torn up, there will be no normalization with the enemy, and the resistance will continue. (Statement by Al-Tufayli as quoted in The Politics of the Western Hostage Crisis, New York, St. Martin Press, 1997, pg. 57.)

61.     In 1992, after Al-Musawi's death, Sheikh Sayyed Hassan Nasrallah became

Hizbullah's leader and Secretary General. At all relevant times, he has remained in that position.

15

Nasrallah has repeatedly publicly proclaimed his mission to destroy Israel, his hatred of Jews, and his willingness to employ terrorist tactics.

### 1.   Nasrallah's Mission To Destroy Israel

62.   Nasrallah's goal of destroying Israel is documented by his public statements:

a.   We regard the Israeli entity as an imperialist frontal military base injected into the heart of the Arab and Islamic worlds. This is a society of warfare, a military society of warriors, men and women alike. There is no civilian society in this entity. (Broadcast on the Hizbullah television network Al-Manar, discussed more fully below, on December 27, 1997.)

b.   I wish to draw your attention to the threat posed by this entity which has robbed Palestine; this cancerous tumor, this vile microbe, an entity that knows no limits, that spreads out wherever Israelis are, wherever there is a remnant from the Talmud or where a Jewish rabbi once sat… Hope is rising for the fulfillment of the divine promise to eradicate this cancerous plague. . . . (Emphasis added.) (Broadcast on Al-Manar on May 7, 1998.)

c.   On Al-Quds Day, I reaffirm to you that Israel will be eliminated one day, God willing. (Jerusalem Day rally in 1999.)

d.   One of the central reasons for creating Hizbullah was to challenge the Zionist program in the region. Hizbullah still preserves this principle, and when an Egyptian journalist visited me after the liberation and asked me if the destruction of Israel and the liberation of Palestine and Jerusalem were Hizbullah's goal, I replied: 'That is the principal objective of Hizbullah, and it is no less sacred than our [ultimate] goal. The generation that lived through the creation of this entity is still alive. This generation watches documentaries and reads documents that show that the land conquered was called Palestine, not Israel.' We face an entity that conquered the land of another people, drove them out of their land, and committed horrendous massacres. As we see, this is an illegal state; it is a cancerous entity and the root of all the crises and wars and cannot be a factor in bringing about a true and just peace in this region. Therefore, we cannot acknowledge the existence of a state called Israel, not even far in the future, as some people have tried to suggest. Time does not cancel the legitimacy of the Palestinian claim. (Interview on Egyptian television as reported by the *Middle East Quarterly*, Fall 2002.)

e.   All great disasters that have befallen the region originate from the existence of Israel. As long as there is a state and its name is Israel, these disasters will persist. This is a cancerous presence in the region. If we ignore the presence of a cancer in our body, we may discover it when it is too late…Some people regard cancer as influenza…When a cancer is discovered, it must be dealt with courageously, and

it must be eradicated. Part of this body and part of this blood must be sacrificed in order for this body to recover. . . . (Broadcast on Al-Manar April 9, 2000).

f.      We have liberated the south [Lebanon], next we'll liberate Jerusalem. (Stated in 2000 as reported by *The Washington Post*, July 16, 2006.)

g.      We all have an extraordinary historic opportunity to finish off the entire cancerous Zionist project, which has been threatening our region and nation for fifty years. (Speech at conference held in April 2001 in Tehran.)

## 2.      Nasrallah's Hatred Of Jews

63.     Nasrallah has not attempted to disguise his hatred of Jews:

a.      If they (Jews) all gather in Israel, it will save us the trouble of going after them worldwide. (*Daily Star*, October 23, 2002.)

b.      If we searched the entire world for a person more cowardly, despicable, weak and feeble in psyche, mind, ideology and religion, we would not find anyone like the Jew. Notice, I do not say the Israeli. (*The New Yorker*, October 14, 2002.)

c.      . . . grandsons of apes and pigs . . . Allah's most cowardly and greedy creatures. (Characterizing Jews on Al-Manar, February 3, 2006.)

## 3.      Nasrallah's Willingness To Employ Terrorist Tactics

64.     Nasrallah's acceptance of terrorism as a legitimate means of aggression is also

well documented:

a.      . . . put a knife in your shirt, then get close to an Israeli occupier and stab him. (*Nightline*, October 19, 2000.)

b.      Suicide attacks shake the enemy from within, they plunge him into an existential crisis, and thus prepare the ground for victory; these acts are completely legitimate, since there are no innocent civilians in Israel; rather they all are occupiers and accomplices to crime and massacre. (Statement broadcast on Al-Manar TV, September 14, 2001.)

c.      Martyrdom operations - suicide bombings - should be exported outside Palestine. I encourage Palestinians to take suicide bombings worldwide. Don't be shy about it. (*Washington Times*, December 6, 2002.)

d.      We do not want to . . . leave our homeland to Israel . . . . Therefore, we are not interested in our own personal security. On the contrary, each of us lives his days

and nights hoping more than anything to be killed for the sake of Allah. (Al-Manar TV, February 18-19, 2005.)

e. . . . our nation's willingness to sacrifice their blood, souls, children, fathers, and families is an advantage over the Jews who guard their lives. (Al-Manar TV, on May 23, 2006.)

65. Clearly, Nasrallah's statements unambiguously reflect Hizbullah's genocidal mission.

## C. HIZBULLAH'S NETWORK

66. After its founding, Hizbullah evolved into a multifaceted, sophisticated, highly organized, politically powerful, and well-financed terrorist organization.

67. Hizbullah now resembles a multinational corporate or governmental entity, with departments, agencies, branches, in-house banking, insurance, and other financial services, and media outreach. Its estimated enterprise value is worth billions of U.S. dollars.

68. Hizbullah's network consists of a multitude of departments that assist its leadership in carrying out its mission, and include, but are not limited to, entities that are tasked with: (1) terrorist and paramilitary activities; (2) social services and "charitable" activities; (3) general fundraising; (4) construction and infrastructure; (5) financial and insurance services; and (6) media services. Although Hizbullah's entire network is relevant, certain Hizbullah-controlled entities are particularly germane to this action, especially the Islamic Resistance Support Organization ("IRSO") noted *supra*.

### 1. Islamic Resistance Support Organization ("IRSO"): Part of Hizbullah's Military Department

#### a. General Background

69. IRSO, officially known in Arabic as *Hay'at Da'am al-Muqawama al-Islamiya fi Lubnan*, is a Hizbullah-controlled charity fund specifically used to solicit and collect donations

in support of Hizbullah's violent and unlawful activities, including the attacks that killed or injured Plaintiffs.

70.     IRSO is headed by Husayn al-Shami, a senior Hizbullah leader who has served as a member of Hizbullah's Shura Council and as the head of several Hizbullah-controlled organizations.

71.     IRSO was established in 1989 to professionalize Hizbullah's fund-raising campaigns.   The money collected is earmarked primarily for the purchase of weapons for Hizbullah terrorist-operations.   Funds are raised in Lebanon and Muslim communities – especially Shi'ite – around the world, mainly in the Gulf States and western countries.

72.     IRSO collects considerable sums of money in Lebanon from both private and public places, including businesses, mosques, educational institutions, gas stations, shopping centers and road blocks. Although it places thousands of collection boxes in Lebanon where people (especially Shi'ites) congregate and carries out national fund-raising campaigns, it also solicits contributions internationally, utilizing the international banking system.

73.     A pamphlet uncovered by Israel during the 2006 Conflict that is at the heart of this Action states: "The resistance collection box is small and placed inside the house so that all members of the family will sense the importance of participating in supporting the resistance by contributing."

74.     IRSO also plays an important role in shaping the hearts and minds of the younger generation. IRSO's intention is to instill in Lebanese youth the principles of Hizbullah's radical Islamic ideology, the concept of jihad against Israel and the struggle against the United States and the West according to the Shi'ite Islamic ideology exported by Iran to Lebanon.

75.     Some of its activities are coordinated with other Hizbullah institutions. Al Shami

also heads Bayt al-Mal, a Hizbullah-operated company that serves as a bank, creditor, and investment arm for Hizbullah generally, and reports directly to Nasrallah.

76.     Bayt a-Mal in turn employs another Hizbullah-controlled entity, Yousser Company for Finance and Investment, to secure loans and finance business deals for Hizbullah companies (as discussed more fully *infra*).

> b.     *Defendants Provide Financial Services To IRSO In Furtherance Of Hizbullah's Criminal Acts*

77.     Throughout the relevant time period from January 2003 through August 2006, all of the named Defendants maintained accounts, collected and distributed funds and provided other financial services to IRSO.  These accounts included:

> a.     **FRANSABANK SAL** - Cheiah Branch (a/k/a Al-Shiyah).
> Account number: 252010/69283021.

> b.     **BANQUE LIBANO-FRANÇAISE SAL** - Hreik Neighborhood (حارة
> حريك). Account number: 657409.17 or 17-657409.

> c.     **BLC BANK -** Al-Shiyah (الشـــياح)
> Account number: 04-02-461100-401670.

> d.     **BANK OF BEIRUT SAL** (formerly Beirut Riyad Bank) - Al-Ghabiri
> Branch (a/k/a Al-Ghobeiri).  Account number:  465000-01-46.

> e.     **MIDDLE EAST AFRICA BANK -** Account number: 10680.

78.     Defendants had full knowledge or conscious disregard of IRSO's mission, activities, and criminal conduct.

79.     In an article dated July 22, 2003, Avi Jorisch of the Washington Institute, cautioned the banking industry that Hizbullah uses its television station to raise money in support of its terror campaign by requesting wire transfers be sent to certain Lebanese banks:

> In a macabre twist on the telethon format perfected by U.S. charities, al-Manar, Hizballah's official twenty-four-hour global television station, croons for cash during commercial breaks and informs viewers worldwide how to donate money

to promote terrorism. Al-Manar has asked donors to make deposits into accounts in four Lebanese banks.

80.    Indeed, the article identified FRANSABANK SAL, BLC BANK, and BANK OF

BEIRUT SAL as three out of the four aforementioned Lebanese banks, and even provided the

bank account numbers used as a repository for wire transfers.

81.    U.S. Treasury Department Under Secretary Stuart Levey noted in testimony

before Congress that IRSO does not conceal its activities:

> While some terrorist-supporting charities try to obscure their support for violence, **IRSO makes no attempt to hide its true colors**. IRSO's fundraising materials present donors with the option of sending funds to equip Hizbullah fighters <u>or to purchase missiles that Hizbullah uses to target civilian populations. IRSO works to inflict suffering rather than alleviate it</u>. (Emphasis added.)

82.    A July 25, 2006 report that aired on MSNBC demonstrates that: (1) Hizbullah

used U.S. currency to support its activities; and (2) often did so in a naked and obvious fashion,

including its appeals for donations. During the MSNBC broadcast, an NBC reporter contacted a

number advertised on Al-Manar, the Hizbullah-owned and controlled Lebanese television

network, posing as a prospective Hizbullah donor:

> NBC: I want to donate money to the Mujahideens [Hizbullah resistance], is this the right number?

> Hizbullah Facilitator: You have to send to The Lebanese-French Bank [Defendant Banque Libano-Française SAL].

> NBC: Do you have the number?

> Hizbullah Facilitator: <u>There is an account number. You deposit the money and wire it to the Lebanese French Bank</u>. (Emphasis added.)

> NBC: How can I know that this is accurate? I'm so worried to deposit the money, can you tell me and confirm that this money will be sent to the Mujahideen?

Hizbullah Facilitator: Yes, sure.

NBC: And where are you from?  Are you from the bank or no?

Hizbullah Facilitator: No.  I'm from the resistance.

NBC: How would we know? I'm so worried when I deposit the money it will reach Mujahideen.

Hizbullah Facilitator: You go to the bank and deposit the money, and they will wire it to the Lebanese French Bank.  You have to go the bank.  Where are you calling from?

NBC: I am from America.

Hizbullah Facilitator: You have to go to the bank – any bank.

NBC: That for sure will reach the Mujahideen?

Hizbullah Facilitator: For sure.  Do not mention resistance or anything like that.  If you do, they won't wire them.

NBC: Thank you - God be with you.  Bye bye.

Hizbullah Facilitator: You are welcome.  God be with you.[1]

83.    IRSO and Al-Manar have co-produced propaganda infomercials leaving no doubt about IRSO's affiliation with Hizbullah or IRSO's activities on behalf of the "resistance."

84.    The U.S. Treasury Department released a statement on August 29, 2006 further explaining IRSO's use of Hizbullah television to get out its message and raise money:

> Hizbullah uses IRSO to solicit donations in support of its terrorist activities. Specifically, IRSO solicits funds for Hizbullah through advertisements broadcast on Hizbullah's al-Manar television station.  IRSO has identified itself to prospective donors as one and the same as Hizbullah.

---

[1]    Available at http://www.msnbc.msn.com/id/14015377

22

85.     Furthermore, the Treasury Department released a copy of IRSO's donation form that allows a donor to specify the program the donation should be directed toward. Indeed, Defendants knew or consciously avoided knowing that IRSO openly offered prospective donors the opportunity to earmark funds toward different types of terrorist activities including the acquisition of missiles and ammunition and payments to terrorists. Both English and Arabic copies of IRSO's donation program are appended hereto as Exhibit A and Exhibit B.

86.     Each Defendant knew, or consciously or recklessly avoided knowing, that IRSO's activities were, and are conducted, for the specific and intentional purpose of fostering Hizbullah's violent and unlawful activities, including explicitly soliciting funds to purchase missiles to launch at Israeli civilians. Neither IRSO nor its Hizbullah overlords has ever attempted to disguise IRSO's role in Hizbullah's network.

### 2.     The Wounded Association: Part of Hizbullah's Social Services Department

#### a.     General Background

87.     Muasassat Al-Jarha Association, also known as the Wounded Association or the Charitable Society for the Help of the Wounded and Crippled of the War in Lebanon (hereafter "the Wounded Association"), is one of Hizbullah's social service organizations that caters to terrorists who are wounded and disabled in the course of their violent activities.

88.     Founded in 1989, and located in Beirut's southern suburbs, the Wounded Association provides services to approximately 3,000 men, women and children. When a terrorist is hurt, the Wounded Association pays some or all of his medical bills, including trips abroad for any needed surgery or therapy.

89. Additionally, the Wounded Association purchases, furnishes and equips homes for disabled terrorists that need them. Occasionally, the Wounded Association also provides terrorists with a nurse or maid.

90. The Wounded Association provides Hizbullah terrorists a monthly stipend, and provides classes in language, computer, artisan and vocational skills.

91. The Wounded Association also subsidizes university fees and provides interest-free loans for those fighters interested in starting their own businesses.

92. The Wounded Association even provides matchmaking services by introducing injured operatives to women seeking to honor and support Hizbullah's mission by dating "resistance fighters."

93. The Wounded Association is an example of a Hizbullah entity that recruits people to join Hizbullah's terror campaign against Israel by providing significant benefits to those that are injured during the course of violent attacks.

> b. *Defendants FRANSABANK SAL And JOHN DOES 1-100 Provide Financial Services To The Wounded Association In Furtherance Of Hizbullah's Criminal Acts*

94. Throughout the relevant time period from January 2003 through August 2006, Defendants FRANSABANK SAL and JOHN DOES 1-100 maintained accounts, collected and distributed funds and provided other financial services to the Wounded Association.

95. Defendants knew the nature of, intended to support, and/or were willfully blind to, the Wounded Association's activities because it advertised its services in an effort to attract and encourage potential Hizbullah terrorists.

96. By intentionally, knowingly or with willful blindness maintaining bank accounts and providing other necessary financial services to the Wounded Association, Hizbullah's social

service arm, Defendants assisted Hizbullah in attracting and encouraging more people to engage in Hizbullah's terrorist attacks.

97.     FRANSABANK SAL maintained an account for the Wounded Association with account number: 805458023.

### 3. The Martyrs Foundation: Part of Hizbullah's General Fund Raising Department

#### a. General Background

98.     Al-Mua'assat al-Shahid, also known as Boniad-e Shahid, Bonyad Shahid, The Martyrs Foundation Charitable Social Society, Al-Shahid Social Association, and Ashaheed Foundation (hereafter "the Martyrs Foundation"), is another organization associated with and controlled by Hizbullah.

99.     The Martyrs Foundation was established in Lebanon in 1982 and provides death benefits to the families of deceased terrorists through a sponsorship program. Sponsors may choose to support one or more people depending upon the size of the donation, and the Martyrs Foundation allegedly opens up a bank account in the recipient's name(s).

100.    The Martyrs Foundation was established to guarantee stipends for the families of Hizbullah fighters who die in battle. It also purports to open bank accounts for the "martyrs" children.

101.    Martyrs Foundation officials have close ties to Hizbullah's leadership and other charitable fronts within the Hizbullah network. For example, Qasem Aliq, a United States designated terrorist and Hizbullah official, is the former director of the Martyrs Foundation and current director of Jihad al-Bina (part of the Construction Department as discussed below).

102.    The Martyrs Foundation was established to increase fighters' willingness to risk death. Its website states that one of the Martyrs Foundation's purposes is to spread the culture of

jihad and martyrdom and preserve the sanctity of the "martyrs." The website also explicitly

states that the Martyrs Foundation supports the Islamic Resistance in Lebanon.

103.    The Martyrs Foundation sponsors a health program that provides support and

health services for the families of "martyrs," especially elderly parents.

104.    The Martyrs Foundation also purports to provide educational assistance to the

children of "martyrs."

105.    Despite the Martyrs Foundation's nominally charitable purpose, the United States

Treasury Department has detailed its dangerous objectives:

> The Martyrs Foundation is an Iranian parastatal organization that channels
> financial support from Iran to several terrorist organizations in the Levant,
> including Hizballah … To this end, the Martyrs Foundation established branches
> in Lebanon staffed by leaders and members of these same terrorist groups. The
> Martyrs Foundation branches in Lebanon has also provided financial support to
> the families of killed or imprisoned Hizballah … In addition to fundraising
> responsibilities, senior Martyrs Foundation officials were directly involved in
> Hizballah operations against Israel during the July-August 2006 conflict.

> b.    *Defendants JOHN DOES 1-100 Provide Financial Services To The
> Martyrs Foundation In Furtherance Of Hizbullah's Criminal Acts*

106.    Throughout the relevant time period from January 2003 through August 2006,

John Doe Defendants 1-100 maintained accounts, collected and distributed funds and provided

other material financial services to the Martyrs Foundation.

107.    The Martyrs Foundation has direct ties to the United States through a fundraising

branch office called the Goodwill Charitable Organization ("GCO"), located in Dearborn,

Michigan.

108.    GCO is a Hizbullah front organization that reports directly to the Martyrs

Foundation's leadership in Lebanon. Hizbullah recruited GCO leaders and has maintained close

contact with GCO representatives in the United States. GCO has provided financial support to Hizbullah directly and through the Martyrs Foundation.

109. Hizbullah's leaders have instructed its United States members to send their contributions to GCO. Since its founding, GCO has raised a significant amount of money for the Martyrs Foundation and consequently Hizbullah.

110. John Doe Defendants 1-100 knew the nature of, intended to support, and/or were willfully blind to the Martyrs Foundation's activities because its website states that one of its purposes is to spread the culture of jihad and martyrdom and preserve the sanctity of the "martyrs." The website also states that the Martyrs Foundation supports the Islamic Resistance in Lebanon.

111. John Doe Defendants' 1-100 conduct materially assisted the Martyrs Foundation's activities by providing an international repository to collect donations and distribute benefits for Hizbullah terrorists.

### 4. Jihad Al-Bina: Part of Hizbullah's Construction Department

#### a. General Background

112. Jihad Al-Bina is a Lebanon-based construction company formed and operated by Hizbullah. Although it receives direct funding from Iran, it is run by Hizbullah members, and is overseen by Hizbullah's Shura Council.

113. Speaking about the organization, U.S. Treasury Department Under Secretary Levey stated: "Hizballah operates Jihad Al-Bina for its own construction needs as well as to attract popular support through the provision of civilian construction services . . . We will take action against all facets of this deadly terror group."

114.     Jihad Al-Bina has used deceptive means to seek funding for projects from international development organizations. In cases when intended solicitation targets were thought to object to the group's relationship with Hizbullah and the Iranian government, the organization has applied in the name of proxies not publicly linked to Hizbullah. Hizbullah has used Jihad al-Bina to raise funds for the terrorist organization and to bolster Hizbullah's standing by providing construction services in southern Lebanon.

> b.     *JOHN DOES 1-100 Provide Financial Services To Jihad Al-Bina In Furtherance Of Hizbullah's Criminal Acts*

115.     Throughout the relevant time period from January 2003 through August 2006, John Doe Defendants 1-100 maintained accounts, collected and distributed funds and provided other material financial services to Jihad Al-Bina.

116.     John Doe Defendants 1-100 knew the nature of, intended to support, and/or were willfully blind to Jihad Al-Bina's activities because it is one of the largest construction companies in Lebanon. Furthermore, its website illustrates its ties to Hizbullah and support of the "martyrs" and resistance objectives.

117.     Jihad Al-Bina has also publicized its cause by posting banners on damaged buildings stating: "USA destroys and Jihad al-Bina rebuilds" (As reported by *The Times of London Online Edition* on May 21, 2007.)

118.     John Doe Defendants' 1-100 conduct materially assisted Jihad Al-Bina's activities by providing an international repository to collect donations and distribute benefits for Hizbullah terrorists.

### 5.     Yousser Company for Finance and Investment: Part of Hizbullah's Treasury Department

119.     According to Treasury Department Under-Secretary Levey, Yousser: "function[s]

28

as Hizballah's unofficial treasury, holding and investing its assets and serving as intermediaries between the terrorist group and mainstream banks." As noted below, Yousser was designated as a terrorist organization by the United States on September 7, 2006.

120. Throughout the relevant time period from January 2003 through August 2006, John Doe Defendants 1-100 maintained accounts, collected and distributed funds and provided other material financial services to Yousser.

121. John Doe Defendants 1-100 knew the nature of, intended to support, and/or were willfully blind to Yousser's activities because, on information and belief, Yousser's activities involved a high volume of transactions due to its role as a Hizbullah lender or Hizbullah's internal "house bank," serving as a go between for the organization and commercial banks.

### 6. Al-Manar Television & Al Nour Radio: Part of Hizbullah's Media Department

122. Hizbullah controls its own satellite television network, Al-Manar (the "beacon"), and radio station, Al-Nour.

123. Headquartered in Beirut, Lebanon, Al-Manar began terrestrial broadcasting in 1991 and satellite broadcasting in 2000.

124. Hizbullah was one of the first terrorist organizations to create a television station to be used as an operational weapon.

125. Hizbullah uses Al-Manar to raise money, recruit volunteers for future terrorist attacks and incite hatred against the United States and Israel.

126. Al-Manar's programming is vehemently anti-America and anti-Israel. Nasrallah, who oversees Al-Manar's budget, frequently appears on the station, advocating violence toward both countries.

127. Al-Manar's programming includes children's shows glorifying suicide bombers, videos calling for jihadists to kill Coalition soldiers in Iraq, and strong anti-American and anti-Semitic material - including the infamous "blood libel" falsely accusing Jews of slaughtering Christian children to make food for the Passover holiday.

128. Al-Manar promotes "resistance" and "jihad," and justifies suicide bombings. In fact, Al-Manar frequently airs suicide bombings and the videotapes that the bombers make immediately before their attacks.

129. Al-Nour, Hizbullah's radio station, serves as one of Hizbullah's major news outlets for propaganda, including Nasrallah's messages of hate.

130. Headquartered in Beirut, Lebanon, Al-Nour was established in 1988. Its stated objectives include steering the Lebanese population toward the support of the resistance and protecting their national interests by exposing the "plans of Zionist imperialism."

131. Under Secretary Levey, in speaking about Al-Nour and Al-Manar, stated: "Any entity maintained by a terrorist group – whether masquerading as a charity, a business, or a media outlet – is as culpable as the terrorist group itself."

132. The United States Treasury Department issued a press release identifying Hizbullah's use of Al-Manar and Al-Nour to publicize its terrorist objectives and solicit support for its causes:

Al Manar and al Nour have supported fundraising and recruitment efforts by Hizbullah. Al Manar raised funds for Hizbullah through advertisements broadcast on the network and an accompanying website that requested donations for the terrorist organization. As recently as late 2005, Hizbullah-affiliated charities aired commercials on al Manar, providing contact information and bank account numbers for donations. Moreover, Hizbullah Secretary General Nasrallah publicized an invitation for all Lebanese citizens to volunteer for Hizbullah military training on al Manar and al Nour.

30

133. Because Al-Manar and Al-Nour openly and brazenly broadcast Hizbullah and its network of charitable fronts' objectives, Defendants knew or consciously avoided knowing that their decision to provide necessary banking services to these Hizbullah-controlled entities would result in acts that violated, *inter alia*, customary international law.

134. In fact, the following two Defendants maintained bank accounts for Al-Manar and/or its parent media company:

      a.    **BLC BANK** - Al-Ghobeiri Branch.
             Account No.: 1802461114018300009.

      b.    **BANK OF BEIRUT SAL** – Mazraa Branch.
             Account No.: 79131-3

## II.   THE UNITED STATES DESIGNATES HIZBULLAH AND ITS NETWORK TERRORISTS

135. The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") Public Law 104-132, empowers the United States Secretary of State to designate an entity a Foreign Terrorist Organization (an "FTO") when the Secretary determines that (1) the entity is foreign; (2) it engages in terrorist activity; and (3) the terrorist activity threatens the security of the United States or its nationals.

136. An FTO designation carries serious consequences. For example, the Secretary of the Treasury may require financial institutions to freeze the entity's assets, the organization's members and representatives can be barred from entering the United States, and anyone who knowingly provides "material support or resources" (including any donation of money) to the individual or entity may be prosecuted and imprisoned. The purpose of these provisions is to deny terrorist organizations access to or support from the United States.

137. On October 8, 1997, by publication in the Federal Register (62 F.R. 52650), Hizbullah was designated an FTO. The designation was recertified every two years through

2004, when recertification as an FTO was no longer required pursuant to the Intelligence Reform and Terrorism Prevention Act of 2004.

138.    In addition to these FTO designations, Presidents Clinton and Bush issued executive orders pursuant to the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, which authorized additional terrorist designations.

139.    On January 23, 1995, President Clinton signed Executive Order 12947, naming ten Palestinian organizations Specially Designated Terrorists ("SDT"), stating "the grave acts of violence committed by foreign terrorists that disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."  SDT designations are specifically oriented toward persons (individuals and entities) who threaten to disrupt the Middle East peace process.

140.    The following Hizbullah-related individuals and entities have been designated SDTs pursuant to Executive Order 12947 on the following dates:

a.    Hizbullah
       Designated: January 23, 1995.

b.    Hassan Nasrallah (Hizbullah leader)
       Designated: January 24, 1995.

c.    Subhi Tufayli (former Hizbullah leader)
       Designated: January 24, 1995.

d.    Imad Mughniyah (senior Hizbullah terror commander)
       Designated: January 24, 1995.

e.    Sheikh Muhammad Husayn Fadlallah (Hizbullah ideological figure)
       Designated: January 24, 1995.

141.    On September 23, 2001, President Bush invoked IEEPA to name Specially Designated Global Terrorists ("SDGT"), under Executive Order 13224, which blocks the property and prohibits transactions with persons who commit, threaten to commit, or support

terrorism.  Pursuant to Executive Order 13224, the definition of persons includes individuals and

entities.  The Secretary of the Treasury designated Hizbullah an SDGT on October 31, 2001.

142.    The following Hizbullah-related individuals and entities have been designated

SDGTs pursuant to Executive Order 13224 on the following dates:

a.    Ali Atwa (TWA hijacker)
      Designated: October 12, 2001.

b.    Hassan Izz-al-Din (TWA hijacker)
      Designated: October 12, 2001.

c.    Imad Mughniyah (Senior Hizbullah terror commander)
      Designated: October 12, 2001.

d.    Hizbullah
      Designated: October 31, 2001.

e.    Al-Manar (Hizbullah Television)
      Designated: March 23, 2006.

f.    Al-Nour Radio (Hizbullah Radio)
      Designated: March 23, 2006.

g.    Lebanese Media Group (Parent Company of Al-Manar and Al Nour)
      Designated: March 23, 2006.

h.    IRSO (Terror Fundraising Department)
      Designated: August 29, 2006.

i.    Husayn al-Shami (IRSO, Terror Funraising Department)
      Designated: September 7, 2006.

j.    Bayt al-Mal (Hizbullah Treasury)
      Designated: September 7, 2006.

k.    Yousser Company for Finance and Investment (Hizbullah Banking)
      Designated: September 7, 2006.

l.    Jihad al-Bina (Construction Department)
      Designated: February 20, 2007.

m.    Qasem Aliq (Jihad Al-Bina, Construction Department)
      Designated: July 24, 2007.

n.    Ahmad al-Shami (The Martyrs Association)
      Designated: July 24, 2007.

o.    The Martyrs Foundation (Social Services Department)
      Designated: July 24, 2007.

p.    Al-Qard al-Hassan (Hizbullah Micro-Credit Organization)
      Designated: July 24, 2007.

q.    Goodwill Charitable Organization (U.S. fundraising branch of the Martyrs
      Foundation) Designated: July 24, 2007.

143.    In addition to the United States, several other countries have designated Hizbullah

a terrorist organization. For example, Canada, the Netherlands, and Israel have designated

Hizbullah a terrorist organization, the United Kingdom and Australia have designated

Hizbullah's "External Security Force" a terrorist organization, and the European Parliament

passed a non-binding resolution recognizing "clear evidence" of "terrorist activities by

Hizbullah."

144.    The United States Treasury designations were based upon each entity's open and

notorious support, assistance, aid, and services as part of Hizbullah's network, with each entity

fully intending to facilitate Hizbullah's violations of customary international law, as well as

United States federal and state law.

145.    The illegal conduct which resulted in each entity's designation was conduct that

each Defendant intended to support, knew of, and/or consciously or recklessly avoided knowing.

## III.    DEFENDANTS INTENTIONALLY, KNOWINGLY, OR WITH CONSCIOUS OR RECKLESS DISREGARD PROVIDED U.S. CURRENCY TO HIZBULLAH SUBSTANTIALLY ASSISTED HIZBULLAH IN COMMITTING VIOLATIONS OF INTERNATIONAL LAW

146.    During the relevant time period, from January 2003 through August 2006,

Defendants knew or consciously avoided knowing that Hizbullah financed and supported its

operational, military, "charitable" and other activities primarily in U.S. currency.

147.    Over the past thirty years, economic and political instability in Lebanon has led to its economy becoming closely intertwined with the U.S. dollar. Specifically, Lebanon follows a fixed exchange rate economic regime, with the value of the Lebanese pound pegged to the U.S. dollar.

148.    At all relevant times hereto, Lebanon's economy is widely known to be semi-officially "U.S. dollarized." U.S. dollars are accepted in Lebanon as legal tender alongside the Lebanese pound and can be withdrawn from Lebanese banks and A.T.M.s. According to a report available on www.nowlebanon.com, "[t]hree-quarters of all deposits with Lebanese banks are in the US currency."

149.    Accordingly, as a result of the realities of the Lebanese economy, Defendants, and Hizbullah, were at all times relevant hereto, dependent on regular, systemic access to dollar-clearing services primarily located in the United States, including exploitation of their correspondent banking relationships in this District.

150.    All checks in U.S. Currency are cleared in Lebanon through the Central Bank of Lebanon (the "CBL"). As stated on the CBL's website:

Cheques are the most important medium used for non-cash payments on account of their simplicity of use. In fact, they account for more then 90% of total value of cashless transactions, namely, cheques and payment by cards. All banks operating in Lebanon are bound to participate in the Clearing Houses established at the BDL's head office and at most of its branches and the cost of operating the Clearing Houses is met by the participating banks. Cheques are cleared in Lebanese pounds and in 3 major foreign currencies: the US dollar, the pound sterling and the European currency, the Euro, as specified by Basic Decision No.7158 of 10th November 1998. Out of the total value and volume of cheques cleared in foreign currencies, USD cheques account for almost 100% which reflects the importance of the US currency in economic and financial transactions in Lebanon. (Emphasis added.)

151.     In addition to CBL's services for interbank exchanges, many other international payments, including payments received and/or transmitted by Defendants on Hizbullah's behalf, proceed through correspondent banking relationships in the United States. As the CBL website states, "International transfers not executed through the BDL are transacted primarily through correspondent banking relationships. The payment instructions are mainly transmitted via SWIFT, and in the case of banks with a foreign presence, through their proprietary networks." (Emphasis added.)

152.     By way of background, a correspondent account for a foreign bank is any account designated to receive deposits from, make payments or other disbursements on a foreign bank's behalf, or handle other financial transactions relating to the foreign bank.

153.     Banks offering foreign correspondent banking services are obligated to develop risk-based procedures to manage money laundering and other compliance risks. The New York Clearing House Association LLC and Wolfsberg AML Principles for Correspondent Banking are generally considered industry standards that banks must apply when providing foreign correspondent banking services for customers.

154.     As alleged in paragraphs 32 through 43 above, at all relevant times Defendants maintained correspondent banking relationships with the following banks based in this District: WACHOVIA BANK, BANK OF NEW YORK, JP MORGAN CHASE BANK, AMERICAN EXPRESS BANK, LTD., and CITIBANK.

155.     Under both the standard terms for correspondent banking agreements with U.S. banks, as well as applicable legal requirements, Defendants, like all Lebanese banks, were obligated to apply "Know Your Customer" ("KYC") and Anti Money Laundering ("AML") scrutiny to their customers. These obligations existed at all times during the relevant period.

36

In addition, in accordance with applicable United States, New York, and international regulatory guidance, on information and belief, Defendants responded to questionnaires required by their correspondent banks, in which Defendants stated that their KYC and AML protocols complied with all applicable standards. Defendants were required to respond to said questionnaires in order to provide proper certification as mandated by 31 U.S.C. §§ 5318(j) and 5318(k) as added by §§ 313 and 319(b) of the U.S.A. PATRIOT Act of 2001.

156. Each Defendant also knew, or consciously avoided knowing, that the certifications that it provided to its correspondent banks were intended to ensure that it did not engage in illegal activity via its correspondent banking relationships. Each Defendant also knew that, pursuant to 31 U.S.C. § 5318, the U.S. Secretary of the Treasury or the U.S. Attorney General could issue a summons or subpoena to any foreign bank maintaining a correspondent account in the United States and request records related to such correspondent account, including records maintained outside of the United States relating to the deposit of funds into the Banks.

157. KYC refers to the regulatory compliance mandate imposed on financial service providers to implement a Customer Identification Program ("CIP") and perform due diligence checks before doing business with a person or entity.

158. KYC fulfils a risk mitigation function, and one of its key requirements is checking that a prospective customer is not listed on any government lists for wanted money launderers, known fraudsters or terrorists.

159. In order to comply with KYC obligations, banks, including Defendants, must, *inter alia*:

> a. verify that customers are not or have not been involved in illegal activities such as fraud, money laundering or organized crime;
>
> b. verify a prospective client's identity;

37

        c.      maintain proof of the steps taken to identify the customer's identity; and

        d.      establish whether a prospective customer is listed on any sanctions lists in connection with suspected terrorist activities, money laundering, fraud or other crimes.

160.    As alleged above, during the relevant period, Defendants were also obligated to engage in AML compliance both under domestic Lebanese law and as a condition of their respective correspondent banking agreements in the United States.

161.    At all relevant times, Defendants were also obligated to comply with laws and regulations concerning countering terrorist financing. ("CTF compliance"). Examples of such laws include but are not limited to:

        a.      United Nations Security Council Resolution 1373 (2001);

        b.      The USA Patriot Act of 2001; and

        c.      U.S. Executive Order 13224 (2001).

162.    Each Defendant touted the fact that it actively engaged in KYC and AML procedures intended to thwart money laundering and counter-terror finance. Defendants made such statements on their internet websites, in annual reports, and in other media.

163.    For example, BLC BANK's website states:

BLC Bank has developed detailed AML procedures to be adopted by all staff members in order to ensure that all our businesses are vigilant in detecting and preventing potential money laundering and suspicious activities. These procedures include, among others, the warning signs of money laundering, the new relationships and account opening procedures, the cash transactions procedures, the inward/outward transfers procedures, the maintenance of anti-money laundering watch list, the correspondent banking procedures, monitoring and reporting of suspicious transactions, as well as a training awareness procedures to keep staff abreast of latest methods of fighting money-laundering through seminars, workshops and other means.

164. In fact, Defendants publicly boasted about the specific organizational measures purportedly in place to capture and quarantine terror finance. For instance, BLC BANK's website advertises that it maintains a Compliance Committee, Head of Compliance, Internal Audit Department, and Branch Compliance Officers. Furthermore, BLC BANK details the alleged review of KYC protocols that each of these departments, persons, or committees perform. On information and belief, other of the Banks made materially similar representations, or in fact maintained materially similar departments, committees, or employees.

165. In addition, according to FRANSABANK SAL's 2006 Annual Report, it claims to have set up a sophisticated anti-money laundering team, stating "[i]n order to avoid implicating FRANSABANK SAL Group in risks relative to money-laundering operations or terrorist financing, the Compliance Unit was established within the Group." Furthermore, claims to "[a]dopt [the] latest appropriate technological tools, and rise [sic] awareness among Bank's employees regarding the strict implementation of preventive measures against money laundering and terrorist financing."

166. Defendants also claimed that their KYC, AML and counter-terror finance activities were guided by standards such as the Financial Action Task Force ("FATF") and its Forty Recommendations. The FATF is an inter-governmental body whose purpose is the development and promotion of national and international policies to combat money laundering and terrorist financing. The FATF's "Forty Recommendations" provide a set of counter-measures against money laundering covering the criminal justice system and law enforcement, the financial system and its regulation, and international co-operation.

167. For example, BANQUE LIBANO-FRANCAISE SAL'S 2006 Annual Report points out that it keeps abreast of the latest information and uses various resources to protect against money laundering:

> A regular updating of KYC (Know Your Customer) procedures and the definition of sensitivity criteria. . . . .Perfecting the use and procedures of the AML identification system aimed at monitoring atypical account movements in order to improve AML process management. The regular updating of international lists of suspects' names through the FATFN information system which contains an important data base of suspected people involved in terrorism or bearing financial embargo measures is available for the branch network and commercial units.

168. Likewise, according to the BANK OF BEIRUT SAL's 2004 Annual Report:

> A key component of the risk management process is the fight against financial crime. This includes the anti-money laundering process in place across the Bank. There are Branch Compliance Officers, the Head Office Compliance Officer and the Compliance Unit, acting and monitored by a Bank Anti-Money Laundering Committee through relevant reporting. The monitoring and reporting covers the full spectrum of anti-money laundering responsibilities as follows:
>
> • Ensuring the required "Know Your Customer" procedures are implemented.
>
> • Transaction monitoring in order to identify suspicious incidents that may indicate money-laundering activities. Documentation requirements are met to support information requests from the regulators, (Special Investigation Commission and Banking Control Commission).
>
> • Training and competence assessments of the Bank's staff.

169. Importantly, Lebanon is a member of the Middle East and North Africa Financial Action Task Force ("MENAFATF"). In 2004, MENAFATF expressly adopted the FATF'S Forty Recommendations.

170. Furthermore, during the relevant period, Defendants and their correspondent banks were obligated to comply with New York Penal Law §§ 470.21, 470.22, 470.23, and 470.24, which explicitly criminalizes money laundering and financial transactions in support of terrorism.

40

171. Many of the funds transmitted by Lebanese banks, including those transmitted by Defendants on Hizbullah's behalf, flow through the SWIFT payment system.

172. "SWIFT," an acronym for the Society for Worldwide Interbank Financial Telecommunication, is a worldwide financial messaging network. The SWIFT network enables banks and other financial institutions to exchange messages securely and reliably.

173. The SWIFT network does not actually effectuate funds transfers; financial institutions, including Defendants, must still maintain international correspondent banking relationships for financial transactions.

174. The majority of international interbank messages, including those received by Defendants during the relevant period, utilize the SWIFT network.

175. Other transactions performed by Defendants for Hizbullah's benefit may have been processed through the "CHIPS" system.

176. "CHIPS" is an acronym for the Clearing House Interbank Payments System. CHIPS is the main privately held clearing house for large-value transactions in the United States, settling well over U.S. $1 trillion a day in around 250,000 interbank payments.

177. Together with the Fedwire Funds Service (which is operated by the Federal Reserve Banks), CHIPS forms the primary U.S. network for large-value domestic and international U.S. dollar payments and holds a market share of approximately 96%.

178. CHIPS is owned by financial institutions. Any banking organization with a regulated U.S. presence may become a CHIPS owner and participate in the CHIPS network. As of 2006, CHIPS had approximately 46 members.

179. At all times relevant hereto, Defendants' correspondent banks in this District were owners of, and participants in, CHIPS.

180. Because, as alleged above, Lebanon's economy was heavily "U.S. dollarized" during the relevant period, Defendants knew or consciously or recklessly avoided knowing that Hizbullah openly and notoriously utilized U.S. currency to maintain its popularity and power amongst the Lebanese population, fund its militia, and finance its terrorist activities.

181. As such each Bank intended, knew, or consciously or recklessly avoided knowing that:

   a. its conduct constituted the commission of tortious acts in concert or pursuant to a common design with Hizbullah; or

   b. it gave substantial assistance or encouragement to Hizbullah in its illegal and violent conduct; or

   c. it gave substantial assistance to Hizbullah in accomplishing its tortious result and each Defendant's own conduct, separately considered, breached duties to the Plaintiffs.

## IV.   HIZBULLAH'S 2006 MISSILE ATTACKS ON CIVILIAN TARGETS IN ISRAEL

182. On July 12, 2006, Hizbullah operatives crossed over from southern Lebanon into Israel and ambushed an Israeli military ("IDF") patrol. As a result of the ambush, three Israeli soldiers were killed, two Israeli soldiers were wounded and two other Israeli soldiers were kidnapped. This attack led to the thirty-four day Conflict between Israel and Hizbullah forces. According to the Israeli Police, during these thirty-four days (July 12th-August 14th), Hizbullah fired approximately 3,900 missiles at Israeli civilian population centers.

183. At the same time that Hizbullah attacked the IDF patrol on July 12, 2006, it fired a barrage of missiles from southern Lebanon at the Israeli municipalities of Shetula, Shomra,

Zar'it and other communities located in northern Israel. During the course of the day, Hizbullah fired missiles at additional towns, including Nahariya, Rosh Pina and Safed.

184. As previously alleged, the July 2006 attack was not the first time Hizbullah targeted Israeli civilians. Indeed, its July 12, 2006 activities merely reflected an escalation of its prior missile terror campaign.

185. As a result of the missiles Hizbullah fired at civilian targets from July 12 through August 14, 2006, forty-three Israeli civilians were killed and several hundred were injured, many of them, like Plaintiffs, seriously.

186. During the 2006 Conflict, Hizbullah principally deployed standard 122 millimeter (referring to diameter) Iranian built missiles possessing a 20 kilometer range.

187. Hizbullah knew that these missiles could not be targeted with any true degree of precision. Nevertheless, it deliberately and intentionally launched them at civilian targets within Israel.

188. Furthermore, on information and belief, Defendants knew, or consciously or recklessly disregarded knowing that: (1) Hizbullah employed such weapons; and (2) the services each Defendant supplied Hizbullah and Hizbullah-controlled entities substantially assisted Hizbullah's ability to obtain and fire such missiles.

189. Hizbullah also used other types of missiles during the 2006 Conflict, including the 122 millimeter enhanced-range missile (with a 30 kilometer range), the 220 millimeter Uragon missile (with a 65-70 kilometer range), the 240 millimeter Falaq-1 missile (with a 10.5 kilometer range), the 240 millimeter Fajr-3 missile (with a 43 kilometer range), and the 302 millimeter Khyber-1 missile (with a 90 kilometer range). All of these missiles have more powerful payloads than the standard 122 millimeter Iranian-built missile but, like that weapon, lack any

meaningful guidance system. Hizbullah, nevertheless, deliberately and intentionally launched them at civilian targets within Israel.

190.    Moreover, on information and belief, Defendants knew, or consciously or recklessly disregarded knowing that: (1) Hizbullah employed such weapons and (2) the services each Defendant supplied Hizbullah and Hizbullah-controlled entities substantially assisted Hizbullah's ability to obtain and fire such missiles.

191.    On August 9, 2006 – in the midst of the 2006 Conflict – Nasrallah issued a statement concerning the missile attacks that made it explicitly clear that Hizbullah intended to specifically target Israeli Jews:

> To the Arabs of Haifa, I have a special message. We have grieved and we are grieving for your martyrs and wounded people. I beg you and turn to you asking you to leave this city. I hope you will do so. Over the past period, your presence and your misfortune made us hesitant in targeting this city, despite the fact that the southern suburbs [of Beirut] and the rest of the heart of Lebanon were being shelled, whether Haifa was being shelled or not. Please relieve us of this hesitation and spare your blood, which is also our blood. Please leave this city. (Emphasis added.)

192.    On July 17, 2006, Hizbullah fired over fifty missiles toward the upper and eastern Galilee. One of these missiles hit the northern wall of the Rebecca Sieff Hospital in Safed. As a result of that attack, five patients, two doctors and two other hospital employees were injured.

193.    On July 28, 2006, a Hizbullah missile struck the city of Nahariya's hospital, which is located three kilometers east of the center of Nahariya.

194.    Hizbullah made abundantly clear through statements aired on Al-Manar and communiqués sent to news organizations that it was intentionally and deliberately firing missiles at civilian towns and cities in Israel.

195. Each Defendant knew, or consciously or recklessly disregarded knowing, that Hizbullah had announced its intention to target Israeli civilians with indiscriminate missile attacks absent warning, and did, in fact, launch such attacks.

196. Throughout the 2006 Conflict, Hizbullah also issued lists of Israeli villages, towns and cities that had been struck by its missiles, in order to boast about the efficacy of its daily missile attacks.

197. Importantly, in its communiqués detailing the day's 'military' activities, Hizbullah listed the predominantly Jewish towns it claimed to have hit with missiles, but routinely omitted the names of majority Arab populated communities that it had also hit.

198. Indeed, in certain cases Nasrallah apologized when Arab-Israeli communities were hit and expressed condolences to the families of Arab-Israeli victims of missile fire. However, Nasrallah never apologized, and indeed touted, Hizbullah's attacks on predominantly Jewish towns and villages in Israel.

199. During the first two and a half weeks of the 2006 Conflict, approximately 1,600 missiles were fired at northern Israel. A large number of these missiles were fired at large civilian population centers such as Haifa, Safed, and Nahariya. During this time period, in addition to the fifteen civilians already referenced, four civilians were killed either during an attack or as the result of an attack.

200. Hizbullah's missile attacks on Israeli civilians continued for over a month until a ceasefire was put in place by the U.N. Security Council on August 14, 2006.

201. Below, Plaintiffs provide specific details concerning each missile attack that gave rise to their claims herein. All Plaintiffs are citizens of the State of Israel, and all of their injuries

are the direct result of missile attacks deliberately launched by Hizbullah against civilian targets in Israel between July 12, 2006 and August 30, 2006.

## A. JULY 13, 2006 MISSILE ATTACK

202. Rubin Razvan Nitu (33 years-old), was murdered on July 13, 2006, while riding his bicycle in Safed, a city in Israel's Galilee region.

203. He was on his way to visit his children when a missile Hizbullah launched struck him.

204. Rubin was gravely injured by the initial blast and died several hours later in the hospital.

205. Rubin was survived by four children, Plaintiffs: Achiezer Nitu (8 year-old boy), Baruch Mordechai Nitu (7 year-old boy), Yehuda Nitu (5 year-old boy), and Tovah Hodayah Nitu (4 year-old girl).

206. Rubin is also survived by his mother, Plaintiff Ecaterina Nitu, and three sisters, Plaintiffs: Mihaela Adry, Coca Camilia Tabib, and Daniela Cristina Surcel.

207. Plaintiff Coca Camilia Tabib was the first family member to receive a telephone call from the police regarding the attack. In the middle of the night on July 14, 2006, the police informed her that her brother had been murdered in a missile attack. Although the police asked her to drive north to Safed to identify her brother's body, she and her husband felt that doing so during the missile bombardment was unsafe. The authorities agreed to transport Rubin's body to the Israeli Institute of Forensic Pathology in Jaffa for identification. Coca telephoned her sister Daniela, who agreed to travel to Jaffa to identify the body.

208. Daniela called her other sister, Mihaela, and informed her of their brother's death. Daniela then picked up Mihaela, and together they proceeded to the Forensic Institute. At

approximately 3:00 a.m. an ambulance containing their brother's body arrived, but Daniela and Mihaela had to wait several hours until the Institute opened before they could identify Rubin's body.

209. Coca wanted to tell her mother the horrible news in person but because Ecaterina Nitu had a history of heart problems, Coca stopped at the local medical clinic so a nurse could accompany Coca to her mother's home. The nurse advised Coca to initially tell her mother that Rubin was injured, and not killed, in order to soften the blow of the news. Coca followed the nurse's advice. When Coca finally informed her mother that Rubin was dead, Ecaterina Nitu started to shout and nearly collapsed. As a result, the nurse administered a sedative to Ecaterina.

## B. JULY 14, 2006 MISSILE ATTACK

210. Naftali and Yehudit Iczkovitz resided in the small town of Moshav Meiron.

211. Their daughter Ayelet, son-in-law Pesah Pisahov, and grandchildren resided in Nahariya, a town that had come under constant missile attacks from Hizbullah in July 2006.

212. On the evening of Friday, July 14, 2006, Naftali and Yehudit were hosting their son Israel and his girlfriend, Ayelet and Pesah Pisahov and their four grandchildren Omer, Roni, Nimrod and Bareket Pisahov in Moshav Meiron.

213. While Naftali and Yehudit were sitting in their living room with their grandchildren Omer and Roni, a Hizbullah missile crashed into the room killing Yehudit, age 58, and her grandson Omer, who was 7 years-old, and injuring Naftali and Roni.

214. Plaintiff Naftali Iczkovitz watched helplessly as his wife of 36 years and his grandson died in front of his eyes. Naftali also sustained physical injures and was transported to the hospital where he received treatment. As a result of the attack Naftali suffers from tinnitus and burns on his fingers.

47

215.    Plaintiff Pesah Pisahov, the father of Omer and Roni, was also in the home at the time of the attack. After he heard the crash of the missile he came running into the living room, where he found his son and mother-in-law dead, and his daughter and father-in-law injured.

## C.    JULY 16, 2006 HAIFA TRAIN DEPOT MISSILE ATTACK

216.    A missile launched by Hizbullah struck the Haifa Train Depot on July 16, 2006, killing eight men, including: Shmuel Ben Shimon (41 years old); Asael Damti (39 years old); David Feldman (27 years old); Dennis Lapidus (24 years old); Reuven Levy (46 years old); and Shlomi Manzora (34 years old).

## THE BEN SHIMON FAMILY

217.    Shmuel Ben Shimon worked at the Haifa Train Depot as a mechanic and supervisor. He was murdered on his first day back at work after taking two weeks off following the birth of his second son.

218.    Plaintiffs Chalom Bensimon[2] and Rivka (Ruby) Ben Shimon are Shmuel's parents.

219.    On the morning of July 16, 2006, Rivka and Chalom heard municipal warning sirens and went down to the shelter in their building. After a few minutes in the shelter, Rivka called Shmuel on his cellular phone. He answered and said good morning to her. After those first two words, there was silence. Rivka tried desperately to reach him again on his phone, but when that failed, Chalom left the shelter and took a taxi to the Train Depot. Chalom could not learn any information at the Train Depot so he proceeded to Rambam Hospital, where he was informed that Shmuel had died.

---

[2]      Chalom Bensimon's last name is spelled differently than the rest of his family in this Complaint to conform with his passport.

48

220.    Plaintiffs Daniel Ben Shimon and Osnat Ben Shimon are the brother and sister of Shmuel Bensimon.

221.    Like his brother Shmuel, Daniel Bensimon worked for the Israel Railways Company. He traveled to work every day by train, but on the day of the attack he arrived at the station late and missed his train to work.

222.    After the attack, Daniel received a telephone call from Shmuel's wife, who was concerned that Shmuel had not answered his cellular phone. Daniel called friends who also worked for the Railway Company, but he could not get a clear answer as to what, if anything, had happened to his brother. Daniel went to get a car, and drove to his parents' home. On the way there, his sister Osnat telephoned him and told him that she, their father, and Shmuel's wife were at Rambam Hospital. She explained that they had been instructed to drive to the Israeli Institute of Forensic Pathology in Jaffa to identify Shmuel's body.

223.    After speaking to Osnat, Daniel continued to his parents' home, where he waited with his mother until his father, sister, and sister-in-law returned from Rambam Hospital. Then he proceeded with his father and sister-in-law to identify Shmuel's body, while Osnat waited with their mother at his parents' home.

224.    On the morning of July 16, 2006, Osnat, who was on vacation, had woken up later than usual. Turning on the television, she saw news of missile attacks, and unsuccessfully tried calling her brother's cell phone. She kept calling Shmuel, and also tried calling her parents and her brother, Daniel. She also called Shmuel's wife, but could not get through as the line was busy. Osnat finally reached her sister-in-law, and they went to Rambam Hospital. On the way there, her father called and told her that Shmuel had died.

## THE DAMTI FAMILY

225.    Asael Damti (39 years-old), an employee of the Israel Railways Company, was murdered on July 16, 2006.

226.    Plaintiffs Meshulam Damti and Shoshana Damti are Asael Damti's parents. At the time of the attack Meshulam and Shoshana were in Asael's apartment, which provided a view of the Train Depot.

227.    When Meshulam saw the explosions and heard the loud booming sounds of the missiles hitting the Depot, he turned on the television and saw a report that implied that the missile strike had caused fatalities.    Shortly after viewing the reports about the attacks, Meshulam's brother-in-law, who had another nephew that worked at the Depot, came to the apartment. Meshulam's brother-in-law said nothing, but Meshulam understood by his brother-in-law's presence that Asael was dead.

228.    Eventually, a railway company official came to the apartment and formally notified the family of Asael's death. Although Meshulam told Shoshana, "We lost our child," she did not believe him.    Shoshana was holding Asael's baby when she heard the news from the railway official, at which point Shoshana inadvertently dropped the baby.

## THE FELDMAN FAMILY

229.    David Feldman, an employee of the Israel Railways Company, was murdered on July 16, 2006, two weeks before his 28th birthday.

230.    Plaintiffs Boris Feldman and Luba Feldman are David Feldman's parents. Plaintiffs Neta Beit Halachmi and Liron Feldman are David Feldman's sister and brother.

231.    Luba Feldman works at the blood bank at Rambam Hospital in Haifa.  On the
morning of the attack, Luba heard that missiles had fallen at the Haifa Train Depot, where her
son worked, and that many of the survivors were being routed to Rambam Hospital.

232.    Since the Hizbullah missile barrages had begun in early July, David had called his
mother every day at 10:00 am.  When Luba did not hear from David on the morning of the
attack, she tried to contact him, but was unable to reach him.  She became extremely upset and
began to cry.  Her supervisor tried to calm her down and told her she needed to continue
working.

233.    After the attack, Luba reviewed each of the seventeen test tubes of blood samples
that identified the names of the injured and determined that David's name was not there.  She
also checked forty-two additional test tubes that had no names identifying them, looking for
David's A- blood type, but none of the tubes matched his type.  Luba made further inquiries at
Rambam Hospital and was informed that some of the wounded had been taken to two other
hospitals.  Her co-workers called the two other hospitals for her, but could not locate David at
either hospital.  Luba returned to the lab and tried to keep working, but could not stop crying.
Eventually Luba was escorted into a room where she was met by a social worker and a doctor,
and she finally learned that David was dead.

234.    Neta Beit Halachmi also works at Rambam Hospital in Haifa.  On the day of the
attack, the day care center that her child attends was closed by the authorities due to the risks
from the missile attacks.  As a result, Neta was at home that morning.

235.    At approximately 9:00 am, Neta heard the explosion.  Therefore, she went to the
bomb shelter in her building, where she was told that missiles had landed near the Train Depot.
She tried to call David, but her cell phone network had been knocked out.  She was able to speak

with her mother on a cordless phone that a neighbor had brought to the shelter, and her mother told Neta that David had been injured. After she hung up with her mother, Neta realized that she knew no details about her brother's injuries, so she called her mother back. Her mother then informed Neta that David was dead and asked Neta not to tell her father.

236.    Boris Feldman was at his home in Kiryat Yam on the morning of July 16, 2006, and heard the explosion(s) at the Train Depot. Because David used to call every morning, but had not done so that day, Boris tried to reach David, though without success.

237.    Luba asked Boris to go to the hospital. Boris went to pick up Neta at her home on his way to Rambam Hospital. When he arrived at Neta's home, she asked him to come in and sit down.

238.    Neta then told her father that David had been killed. Boris's son-in-law drove Boris and Neta to Rambam Hospital where they met Luba and Liron.

239.    At the time of the attack Liron Feldman was serving in the Israeli Army. When Liron heard about the attack he started calling his mother. Liron's commanding officer eventually received a call with instructions to bring Liron directly to Rambam Hospital in Haifa. After Liron arrived at the hospital, the family drove to the Israeli Institute of Forensic Pathology in Jaffa to identify David's body.

## THE LAPIDUS FAMILY

240.    Dennis Lapidus was 24 years old when he was murdered on July 16, 2006.

241.    Dennis worked at the Train Depot in Haifa and had only begun his employment there three months prior to the attack.

242.    Plaintiffs Sofia Lapidus and Aleksander Lapidus are Dennis Lapidus' parents. Plaintiffs Pavel Lapidus and Alexandre Lapidous[3] are Dennis Lapidus' brothers.

243.    After Sofia Lapidus heard about the attack at the Train Depot, she tried unsuccessfully to contact Dennis by phone.

244.    Pavel was on active duty in the Israeli army at the time of the attack. He received a message from a friend that attacks had taken place that morning but could not learn more information.

245.    When Pavel finally located a television, he discovered that the attack had taken place at the Train Depot in Haifa. He called his family, and learned that no one could reach Dennis. Eventually he was informed that Dennis had probably been injured and taken to Rambam Hospital in Haifa.

246.    Upon learning this information, Pavel called his commanding officer and stated that he had to go to Rambam Hospital. On his way there, Pavel called the hospital to get some information about his brother's condition. After he identified himself, his call was placed on hold. When a person whom he believed was a hospital employee finally got on the phone, Pavel told the person that he was driving hurriedly to the hospital. In response, he was told not to rush and instead to go directly to his parents' home so that his mother would not be alone when she heard the news. Pavel immediately understood that Dennis was dead.

247.    Eventually, Pavel arrived at his parents' house and told Sofia that he was bringing her to the hospital. Because Sofia had previously suffered two heart attacks, her family was afraid to break the news to her. It was not until they reached the Israeli Institute of Forensic Pathology in Jaffa that Sofia realized that Dennis was dead.

---

[3]    Alexandre Lapidous' last name is spelled differently than the rest of his family in this Complaint to conform with his passport.

248.     Aleksander Lapidus was at work when he heard about the attack. After hearing the news, he started driving north toward Haifa. Aleksander called Dennis, but received no answer. He then telephoned his wife, Sofia, and finally Pavel, who told Aleksander that he had received permission to come home from the army. When Aleksander heard this, he realized that something terrible had happened. After several more telephone calls to Pavel, Aleksander finally learned that Dennis had been killed. He arranged to meet up with his family, and together they proceeded to the Israeli Institute of Forensic Pathology in Jaffa to identify Dennis's body.

249.     Alexandre Lapidous was at home watching television when he heard that there had been an attack on the Train Depot in Haifa. He tried calling Dennis but there was no answer. Alexandre continued to call and after a while the phone appeared to have been answered, but only noise could be heard.

250.     Alexandre's wife, Ola, then received a phone call from her sister-in-law Stella, who told her that the family was heading to the Israeli Institute of Forensic Pathology in Jaffa.

251.     Ola began to cry, at which point Alexandre took the phone from her and spoke to Pavel's wife, who told him that Dennis had been killed and his mother had not been told of that fact. Since Alexandre lives in relatively close proximity to the Institute, he was the first to arrive and waited for about an hour for the rest of his family to arrive.

## THE LEVI FAMILY

252.     Reuven Levi, an employee of the Israel Railways Company, was 46 years old when he was murdered on July 16, 2006.

253.     Plaintiffs Terez and Almog Levi are Reuven Levi's widow and 15 year-old son.

254.     Terez was at home with Almog at the time of the attack, watching television together, when they recognized Reuven's body being covered with a plastic bag.

## THE MANZORA FAMILY

255.    Shlomi Manzora, an employee of the Israel Railways Company, was 34 years old when he was murdered on July 16, 2006.

256.    Plaintiff Elinor Manzora is Shlomi Manzora's widow. Plaintiffs Lotem Manzora and Lidar Manzora are Shlomi Manzora's surviving 5 year-old and 3 year-old daughters.

257.    Elinor Manzora, together with her daughters, was at her parents' home in Kiryat Ata, when she heard the municipal siren followed by an explosion. She brought Lotem and Lidar to the bomb shelter and began to make telephone calls, but Shlomi did not answer his phone.

258.    For four hours she did not know what had happened to him. Elinor's father eventually drove her to Rambam Hospital to see if they could find out any information about Shlomi. When she arrived at the hospital and gave them her name and Shlomi's name, Elinor was taken to a private room. The nurse asked her if she wanted a sedative and then told her she was very sorry. At that moment Elinor understood that Shlomi was dead. A doctor then administered a sedative to Elinor.

259.    Plaintiff Nava Manzora is Shlomi Manzora's mother. Plaintiff Maayan Manzora is Shlomi Manzora's sister.

260.    Nava Manzora worked close to the Train Depot and heard the explosion on the morning of July 16, 2006. Maayan Manzora was at work when she heard that there had been an attack on the Train Depot.

261.    After the attack, Nava called Maayan and told her that she was afraid that Shlomi had been killed. Nava then went to Rambam Hospital. At the hospital, Nava did not find Shlomi and was unable to get more information. Nava then called Maayan again and asked her to come

to the hospital. After Maayan arrived at the hospital, Nava and Maayan went to look for Shlomi at the Israeli Institute of Forensic Pathology in Jaffa. A few days after the attack another Hizbullah missile struck Nava's house.

## D.    JULY 26, 2006 MISSILE ATTACK

262.    On July 26, 2006, Plaintiff Jozef Hashlom was at work in Kiryat Motzkin at the time that rockets launched by Hizbullah struck Kiryat Motzkin.

263.    Jozef heard the first warning sirens and started to run to the bomb shelter at his place of work. On his way to the shelter, two Hizbullah launched missiles landed in close proximity to him. The first missile struck and then suddenly without an additional warning siren, a second missile struck. The second missile landed a few meters away from him and as a result of the impact he flew backwards and was hit by shrapnel.

264.    Jozef was separated from the point of impact by a row of cars that stood between him and where the missiles landed. The entire row of cars caught fire and the cars separated him from the full force of the attack, otherwise he does not know if he would be alive today.

265.    As a result of the attack, two of Jozef's artificial front teeth broke. Jozef was also hit by shrapnel in his shoulder which causes him constant pain.

266.    As a result of the shrapnel, Jozef suffers from limited mobility in his right shoulder. Jozef also has difficult raising his arm and it is also impossible for him to raise his arm up to his face. He also has difficult moving his arm from right to left.

267.    From the time of the attack up until today, Jozef receives treatment for both his debilitated physical condition and for the emotional trauma he continues to suffer.

268.    Jozef suffers from strong nightmares and wakes up during the night. He has no peace and quiet and it is difficult for him to sleep.

269.    Jozef sees a psychiatrist regularly.

270.    Jozef suffers from headaches and frequently feels like the room is spinning.

271.    Jozef has stopped driving a car.

272.    Jozef suffers from PTSD and continually relives the trauma from that day. He still sees burning cars and blood and hears the screaming of those who were injured around him.

### E.    AUGUST 3, 2006 MISSILE ATTACK ON ACCO

273.    The following people were injured or killed in a Hizbullah missile attack on the City of Acco near a building on Avraham Ben Shoshan Street: Albert Ben Abu (41 years old), Aryeh Tamam (51 years old), Tiran Tamam (39 years old), Simha Tamam  (36 years old), Zivie Tamam (50 years old), Noa Tamam (9 years old), Mazal Zribi (15 years); and Shimon Zribi (44 years old).

### THE BEN ABU FAMILY

274.    Albert Ben Abu was murdered on August 3, 2006.

275.    Plaintiff Hagit Ben Abu is Albert Ben Abu's widow.  Plaintiffs Morag Ben Abu (16 year-old girl), Shemtov Ben Abu (14 year-old boy), Meitar Ben Abu (12 year-old girl), Yosef Ben Abu (5 year-old boy), and Efrat Ben Abu (3 year-old girl) are Albert Ben Abu's five surviving children.

276.    On August 3, 2006, the city of Acco came under Hizbullah missile fire.  The Ben Abu family heard the warning sirens, left their third floor apartment, and descended into the shelter beneath their apartment building.  Albert, Hagit, Yosef, and Efrat, were all in the shelter together.  After the attack appeared to have ended, Albert left the crowded shelter for some air and to survey the damage.

277. At that time, a second missile exploded outside their building. Albert was badly injured but survived the initial explosion. Hagit found Albert lying in a pool of his own blood and she tried to help him until he was evacuated to the Hospital. Albert Ben Abu died of his injuries later that day.

278. Plaintiff Rut Kadosh is Albert Ben Abu's sister. On August 3, 2006, Rut was in Netanya and heard on the news that missiles had hit Acco. She called her sister-in-law Hagit, who told her that Albert had been injured and taken to the hospital. Rut later learned that Albert had died of his injuries.

279. Plaintiff Simi Edri is Albert Ben Abu's mother. Plaintiff Sharon Ben Abu is a brother of Albert Ben Abu. Simi Edri and her son Sharon were together in Simi's home in Acco at the time of the missile attack.

280. When the attack began they took refuge in the stairwell of her building because the building had no bomb shelter. Rut had called Simi and told her mother that Albert had been injured and taken to the hospital for treatment. Simi and Sharon later learned that Albert had died of his injuries.

## THE TAMAM FAMILY

281. Aryeh Tamam was 51 years old and his brother Tiran Tamam was 39 years old when they were murdered in the attack.

282. Plaintiffs Zivie Tamam, Noa Tamam (9 year-old girl), and Etgar Tamam (11 year-old boy) are Aryeh Tamam's widow, daughter, and son, respectively.

283. Aryeh and Tiran were in a shelter in their mother's building during the initial missile attack. They came out after the attack ended and were hit by a second missile attack. After the explosion, both Aryeh and Tiran remained alive, but Aryeh struggled to breathe. Tiran

managed to speak to his brother Mordechai, who had run to his side after the blast. Tiran told Mordechai that he was badly wounded and that he was afraid he was going to die.

284.    Plaintiff Simha Tamam is the 36 year-old sister of Aryeh and Tiran Tamam. At the time of the attack, Simha was at her mother's home. Simha went down into the shelter with the rest of her family.

285.    After the first missile barrage stopped, she and her brothers came out of the shelter for air. Simha was critically injured in the second barrage that killed two of her brothers. When Simha was first taken to the hospital the extent of her injuries was not obvious.

286.    Eventually doctors realized that Simha had suffered massive internal injuries, with shrapnel shredding her internal organs, including her pancreas, spleen, intestines, appendix, and kidneys.

287.    Simha was in surgery for seven hours and was in a coma for two weeks.

288.    As a result of her injuries, Simha's shoulders are shaped differently, and her movement is limited. She still has shrapnel in her body including one piece in her chest and two pieces in her back.

289.    She suffered extensive damage to her mouth, and her broken teeth needed to be repaired. She also required surgery to lift and repair her sinuses.

290.    Simha continues to receive treatment twice each week, has limited mobility, and has multiple scars on her body from ball bearings that were packed into the missile delivery system to maximize civilian deaths and injuries.

291.    She suffers from pain in her stomach, legs, and hands as well as severe headaches and tinnitus. Since the attack her vision has deteriorated.

292.    Simha remains sensitive to noise, suffers from blood clots and embolisms, and has

cracked ribs that have never fully healed.

293. Apart from her physical injuries, Simha has received psychological and psychiatric treatments for depression, anxiety, and nightmares.

294. Zivie Tamam is Aryeh Tamam's 50 year-old widow. At the time of the attack she was in the shelter with her mother-in-law and children.

295. Zivie also went outside the shelter after the first attack ended. Zivie actually saw the second missile coming in as Aryeh was walking back to her.

296. Zivie was injured by the explosion when shrapnel entered through her back and came out through her front torso near the stomach. She still has residual physical pain to this day and currently receives psychological as well as psychiatric care.

297. She is severely limited in her physical activity and had to return to the hospital to have her wounds drained and still requires follow up treatment.

298. Etgar Tamam is the 11 year-old son of Aryeh and Zivie Tamam. Etgar watched the missile strike that killed his father and uncle and injured his mother, sister and aunt. As a result Etgar receives psychological and psychiatric care.

299. Immediately after the attack occurred, Etgar saw his wounded sister, mother, and father and he ran over to his father crying "Don't die, I love you," but was unable to help him.

300. Noa Tamam is the 9 year-old daughter of Aryeh and Zivie Tamam. Noa witnessed the attack that killed her father and uncle and injured her mother and aunt.

301. Noa herself was physically injured in the attack and underwent surgery to remove shrapnel from her body. She still has residual physical pain to this day and also undergoes psychological treatment.

302. Mordechai Tamam is the brother of Aryeh and Tiran Tamam. During the attack

he was in the bomb shelter with his mother, brothers Aryeh and Tiran, and his sister. He was an eyewitness to the second attack that killed his brothers and critically injured his sister.

303. After the second missile hit, Mordechai saw that Aryeh was still breathing although he was unable to speak. Mordechai initially believed that Aryeh had not been badly injured and ran over to Tiran.

304. Tiran told Mordechai that he had been badly wounded and was going to die.

305. In addition to extreme emotional distress, because of Mordechai's proximity to the missile's point of impact, he continues to suffer from hearing problems. Since the event Mordechai receives psychological and psychiatric care.

306. Plaintiffs Yona Tamam, Asif Tamam and Nir Tamam are Tiran Tamam's widow and sons. Asif Tamam is 8 years-old and Nir Tamam is 7 years-old.

307. At the time of the attack, Yona was with her two children, Nir and Asif, in a temporary camp that had been set up in southern Israel for residents of the north who were fleeing from the Hizbullah missile attacks.

308. At 3:30 p.m. on the day of the attack, Yona spoke with Tiran over the phone. During their conversation Tiran told her that he would call her back later. Yona's cell phone battery was dying so she went to recharge the battery. At 4:05 p.m. Tiran called and left a message.

309. When Yona tried to return his call, Tiran did not answer his phone, which was very unusual. Yona began telephoning the entire family, including Simha, who also did not answer the telephone.

310. Yona finally reached Zivie, who told her that Tiran and Aryeh were in an ambulance. An official at the camp told her that Tiran had been injured and that an official of

the Israeli Red Cross would be meeting with her shortly. The representative came, as did a police official, at which point Yona became hysterical.

311. Although Tiran's death had already been broadcast on the news, Yona still remained unaware of that fact. Shortly thereafter, Yona received a call from her mother, who assumed that Yona already knew that Tiran was dead. It was from that conversation with her mother that she finally realized that her husband had been killed. Since Tiran's death, Yona, Asif and Nir have received psychological care. Asif also receives psychiatric treatment as well.

## THE ZRIBI FAMILY

312. Shimon Zribi was 44 years old when he and Mazal Zribi, his 15 year-old daughter, were murdered. Mazal Zribi was a high school student.

313. Plaintiffs' Sido Zribi and Biyida Zribi are the parents of Shimon Zribi and the grandparents of Mazal Zribi.

314. Plaintiffs Rachela Zribi, Dina Azran and Simha Dana are the sisters of Shimon Zribi.

315. Plaintiffs Amnon Zribi, Mordekhay Zribi, and Israel Zaribi are the brothers of Shimon Zribi.

316. Shimon and Mazal were killed outside their building in Acco.

317. After the first missiles struck, they left the building to see what had happened and while standing outside another missile struck killing both father and daughter.

318. Rachela Zribi was in her home at the time of the attack and received a call from her sister telling her that a missile had fallen on Avraham Ben Shoshan Street. Rachela headed to her parents' home, but on her way there, she spoke on the phone with her sister-in-law, Linda (Shimon's wife), who told Rachela that she had witnessed terrible things but did not elaborate.

319. When Rachela arrived at her parents' building she called her brother Mordekhay. Then she proceeded with her parents and brother Amnon to Shimon's building, where they found out what had happened.

320. Mordekhay Zribi (40 years-old), is Shimon Zribi's brother. He and Shimon were neighbors. At the time of the attack, Mordekhay was watching television.

321. When Rachela called him and told him that no one could reach Shimon, Mordekhay went downstairs to find out what had happened. At that point security personnel informed him that his brother and niece had been killed.

322. At the time of the attack, Biyida, Sido, and Amnon Zribi were together in the bomb shelter of Biyida and Sido's building. There was a television in the shelter, and they heard that there was an explosion on Avraham Ben Shoshan Street.

323. When they heard that a man and his daughter had been killed in the attack, Biyida attempted to telephone her son and daughter-in–law, who lived on the same street, but no one answered. Rachela Zribi came to their building and told her family that she received a call from Linda, who had told her that she had seen terrible things. They all then proceeded to Avraham Ben Shoshan Street where Shimon lived and confirmed that Shimon and Mazal were dead.

324. Israel Zaribi is Shimon Zribi's brother. He was in the bomb shelter of his building when his sister Rachela called him and told him that Shimon and niece Mazal had been killed in the attack.

325. Dina Azran is Shimon Zribi's sister. The day before the attack that killed her brother and niece, a Hizbullah missile fell next to her home. Because Dina and her son were traumatized by the closeness of the missile to their home they left and traveled to Herzliya with Simha Dana and her children.

326.   The following evening Dina, her son, Simha, and Simha's children, saw their family members crying on television but did not know what had taken place. On Simha and Dina's trip back to Acco, Rachela called and told Dina that Shimon and thier niece Mazal had been killed in the attack. Dina did not tell this to Simha because her son was travelling with them. When Simha returned to Acco, her brother Israel told her the bad news.

**F.     AUGUST 13, 2006 MISSILE ATTACK**

327.   Madi Khiyatt, 83, was murdered on August 13, 2006.

328.   Madi was at his home with his wife, Jamila, and his daughter, when a Hizbullah missile struck a nearby storage room. Madi was critically injured by shrapnel and later died of his injuries.

329.   Plaintiff Emil Khiyatt is Madi Khiyatt's son. Neighbors informed Emil and his brother that their father had been taken to the hospital in Nahariya. At the hospital Emil learned that his father had died of his injuries.

**G.     AUGUST 13, 2006 MISSILE ATTACK ON BASMAT TIVON**

330.   On August 13, 2006, Plaintiff Marwan Zubidat was standing in the yard next to his parent's home in Basmat Tivon, where he lives together with his parents and sister.

331.   While Marwan was standing in the yard with his cousin and his sister, Plaintiff Adan Zubidat, a Hizbullah launched missile landed next to his parent's home.

332.   Marwan landed on the ground on his back. He does not remember what happened next.

333.   Marwan next found himself in Rambam Hopsital in Haifa together with the other people who were injured.

334.   The muscle in Marwan's right forearm was injured. Marwan's right hand, which

is his dominant hand, was injured from the missile attack.

335.    In additional to his physical injury, Marwan also suffers from emotional and mental distress.

336.    On August 13, 2006, Plaintiff Adan Zubidat was standing in the yard next to her parent's home in Basmat Tivon, where she lives together with her parents and brother, Plaintiff Marwan Zubidat.

337.    While she was in the yard, together with her brother Marwan, and her cousin, a Hizbullah launched missile landed next to her parent's home.

338.    Adan landed on the ground on her back. She does not remember what happened next.

339.    Adan next found herself in Rambam Hopsital in Haifa together with the other people who were injured.

340.    Adan left elbow was injured, and her left hand is her dominant hand.

341.    In additional to her physical injury, Adan also suffers from depression which causes nightmares. She also suffers from emotional distress.

## V.    **DEFENDANTS' FINANCIAL ASSISTANCE TO HIZBULLAH VIOLATES INTERNATIONAL NORMS ACCEPTED BY THE CIVILIZED WORLD**

342.    Genocide, crimes against humanity, war crimes, and terrorism are universally recognized as violations of customary international law. Hizbullah, which perpetrated all of these crimes in the context of its overall mission to destroy Israel and kill Jews, did so with the intent to intimidate or coerce a civilian population.

343.    Defendants are liable for the aforementioned violations of international law because they conspired with, aided and abetted, intentionally facilitated, were complicit in, and/or recklessly disregarded Hizbullah's conduct, including the intentional murder and

attempted murder of the Plaintiffs as set forth herein.

## A.    GENOCIDE

344.    Hizbullah's stated objectives are to destroy Israel and ethnically cleanse the territory of the State of Israel of its Jewish population.

345.    In furtherance of its stated objectives, Hizbullah launched missile attacks on civilian communities in Israel.

346.    Hizbullah's expressed goal of specifically targeting unarmed civilian Jews is buttressed by the locations of the attacks (including schools, hospitals, businesses, and homes) and by Nasrallah's express language before, during, and after the attacks, as alleged *supra*.

347.    Because Hizbullah killed and caused serious bodily injury and/or mental harm to Israelis with intent to destroy, in whole or in substantial part, a national, ethnical, racial, or religious group, and because Hizbullah also deliberately inflicted on Israelis, including Plaintiffs, conditions of life calculated to bring about their physical destruction in whole or in part, Hizbullah's conduct satisfies the definition of genocide established by international law and United States law as codified by 18 U.S.C. § 1091.

348.    As alleged above, Hizbullah has developed and implemented a sophisticated financial structure through which it seeks to accomplish its goals, and is demonstrative of Hizbullah's widespread and systematic efforts to specifically target the Israeli civilian population.

349.    Hizbullah's intent to commit genocide is not only manifested by its conduct, but by its public statements both before Nasrallah took leadership of the organization and during his tenure.

350.    Genocide has been recognized as a crime by the following international legal

authorities:

        i.       The Convention on the Prevention and Punishment of the Crime of Genocide;

        ii.      The Statute of the International Criminal Tribunal for the Former Yugoslavia;

        iii.     The Statute of the International Criminal Tribunal for Rwanda; and

        iv.     The Rome Statute of the International Criminal Court.

## B.    CRIMES AGAINST HUMANITY

351.   Hizbullah committed crimes against humanity when, with intent to participate in a widespread and systematic attack on Israeli civilians, it launched a full scale missile attack on civilian communities in Israel thereby murdering, seriously injuring and causing Plaintiffs great suffering.

352.   Hizbullah's intent to commit crimes against humanity is not only manifested by its conduct, but by its public statements both before Nasrallah took leadership of the organization and during his tenure.

353.   Hizbullah's terrorist attacks, in which it murdered and seriously injured Plaintiffs, were part of a systematic and widespread attack on a civilian population, in furtherance of Hizbullah's overarching goal of destroying the State of Israel and effectuating the ethnic cleansing of the State of Israel for the purpose of removing and/or slaughtering its Jewish inhabitants.

354.   Hizbullah's attacks were systematically committed. Its bombings required a high degree of careful planning, coordination, funding, and orchestration.

355.   Hizbullah's attacks involved recruitment of trained militiamen, the provision, maintenance, storage and concealment of various missiles, and the targeting of Plaintiffs and

other members of the Israeli civilian population.

356.    As alleged above, Hizbullah has developed and implemented a sophisticated financial structure through which it seeks to accomplish its goals, and is demonstrative of Hizbullah's widespread and systematic efforts to specifically target the civilian population of Israel.

357.    Hizbullah's attacks were widespread in nature. Plaintiffs and the entire Israeli civilian population were targeted, and many unarmed innocents were injured or killed, including men, women, and children.

358.    Crimes against humanity have been recognized by the following international legal authorities:

      i.     The Charter of the International Military Tribunal;

      ii.     The Statute of the International Criminal Tribunal for the Former Yugoslavia;

      iii.     The Statute of the International Criminal Tribunal for Rwanda; and

      iv.     The Rome Statute of the International Criminal Court.

## C.    WAR CRIMES

359.    Hizbullah committed war crimes in the context of an armed conflict with Israel as alleged *supra*. During the 2006 Conflict, in the course of Hizbullah's efforts to kill Jews and destroy the State of Israel, it launched approximately 3,900 missiles at civilian targets in Israel. Hizbullah's attacks intentionally struck civilian schools, hospitals, homes, and businesses. Plaintiffs were all civilians, who were not engaged in armed conflict at the time they were attacked.

360.    Hizbullah's conduct satisfies the definition of war crimes as defined by international law and United States law as codified by 18 U.S.C. § 2441.

361. As alleged above, Hizbullah has developed and implemented a sophisticated financial structure through which it seeks to accomplish its goals, and is demonstrative of Hizbullah's widespread and systematic efforts to specifically target the civilian population of Israel.

362. As alleged above, Nasrallah acknowledges and justifies killing Israeli civilians because he believes "these acts are completely legitimate, since there are no innocent civilians in Israel."

363. Hizbullah's intent to commit war crimes is not only manifested by its conduct, but by its public statements both before Nasrallah took leadership of the organization and during his tenure.

364. War crimes have been recognized as violations of international law by the following international legal authorities:

      i.     International Criminal Tribunal for the former Yugoslavia;

      ii.    International Criminal Tribunal for Rwanda;

      iii.   International Criminal Court;

      iv.   The Hague Convention and Annexed Regulations;

      v.    The Nuremberg Charters; and

      vi.   Protocol I Additional to the Geneva Conventions of 1949.

## D.    TERRORISM

365. Hizbullah committed premeditated politically-motivated attacks on Israel when it launched full scale missile attacks for the purpose and intent of instilling fear, targeting political opponents, causing death or serious bodily injury, causing extensive destruction of such places, facilities or systems where such destruction resulted in or was likely to result in major economic

loss, and generally terrorizing civilian communities.

366.    Hizbullah's intent to commit terrorist attacks is not only manifested by its conduct, but by its public statements both before Nasrallah took leadership of the organization and during his tenure.

367.    Hizbullah is a known terrorist organization and has been designated as such by the United States, as alleged *supra*.

368.    Defendants had actual or constructive notice of Hizbullah's terrorist objectives both prior to and during the period in which they supplied it with financial assistance.

369.    By intentionally, knowingly, or with willful blindness providing financial services to Hizbullah in furtherance of its terrorist objectives, Defendant has directly violated customary international law.

370.    As alleged above, Hizbullah has developed and implemented a sophisticated financial structure through which it seeks to accomplish its goals, and is demonstrative of Hizbullah's widespread and systematic efforts to specifically target Israel's civilian population.

371.    Providing material support to terrorists and committing terrorist attacks have been recognized as international crimes by the following international legal authorities:

> i.     1999 International Convention for the Suppression of the Financing of Terrorism;
>
> ii.    1997 International Convention for the Suppression of Terrorist Bombings; and
>
> iii.   United Nations Security Council Resolution 1566.

## COUNT ONE

### FINANCING OF TERRORISM

#### (As a violation of the Alien Tort Claims Act, 28 U.S.C. § 1350)

372.     Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

373.     Providing financial services to a terrorist organization has been universally recognized as a clear and definite violation of international law that is universally accepted and of mutual concern to the civilized world.

374.     Defendants unlawfully and willfully collected, distributed, and transmitted funds (and other meaningful financial assistance) with the knowledge or intent that they be used, in whole or in part, to carry out acts that included using explosives in a place of public use intending to cause death or serious bodily injury to unarmed civilians for the purpose of intimidating a civilian population or compelling a government to do or abstain from doing any act.

375.     Defendants intended to aid, knew of, and/or consciously or recklessly avoided knowing of Hizbullah's terrorist objectives both prior to and during the period in which they supplied it with financial assistance.

376.     Defendants' financial assistance was used to acquire needed materials, sustain violent and unlawful operations, encourage participation, and execute terrorist objectives.

377.     Defendants: (a) committed tortious acts in concert or pursuant to a common design with Hizbullah; or (b) knew or consciously avoided knowing that Hizbullah's conduct was unlawful yet provided Hizbullah with substantial assistance or encouragement; or (c) gave

71

substantial assistance to Hizbullah in accomplishing its tortious result and each Defendant's own conduct, separately considered, breached duties to the Plaintiffs.

378.     Defendants' material support of Hizbullah was a proximate cause of Plaintiffs' injuries. Defendants intended to aid Hizbullah, knew, or consciously and/or recklessly avoided knowing that their support would result in deadly attacks of the kind that caused Plaintiffs' injuries.

379.     Financing terrorism violates customary international law, the criminal laws of the United States, including 18 U.S.C. §§ 2339B and 2339C, the criminal statutes of New York, the criminal laws of Israel, and the international treaties, agreements, conventions and resolutions alleged *supra*.

380.     Defendants' conduct establishes a private cause of action under the Alien Tort Claims Act because financing terrorism is a violation of customary international law.

381.     Plaintiffs and their family members suffered death or serious physical and/or mental injuries as a proximate result of Defendants' conduct.

**WHEREFORE,** Plaintiffs, demand judgment in their favor against Defendants and demand damages in an amount to be determined by a jury, not less than the statutory amount of $75,000, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again engaging in material support of terrorism in violation of the law of nations.

## COUNT TWO

### GENOCIDE

### (Conspiracy Liability in Violation of the
### Customary International Law Under the Alien Tort
### Claims Act, 28 U.S.C. § 1350)

382.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

383.    Genocide has been universally recognized as a clear and definite norm of international law that is universally accepted and of mutual concern to the civilized world.

384.    Defendants conspired with Hizbullah to commit genocide in that they provided material financial services which bankrolled Hizbullah's missile attacks that killed and caused serious bodily injury or mental harm to Israelis with intent to destroy, in whole or in substantial part, a national, ethnical, racial, or religious group.

385.    Defendants intended to aid, knew of, and/or consciously or recklessly avoided knowing of Hizbullah's genocidal mission because Hizbullah and its network of charitable fronts act with an openly and publicly-stated united purpose of eradicating the State of Israel.

386.    Defendants (a) committed tortious acts in concert or pursuant to a common design with Hizbullah; or (b) knew or consciously avoided knowing that Hizbullah's conduct was a breach of duty yet provided Hizbullah with substantial assistance or encouragement; or (c) gave substantial assistance to Hizbullah in accomplishing its tortious result and each Defendant's own conduct, separately considered, breached duties to Plaintiffs.

387.    Genocide is a violation of the Alien Tort Claims Act, universally recognized and accepted customary international law, the common law and penal statutes of the United States, and common law of New York, the laws of Israel, and the international treaties, agreements,

73

conventions and resolutions described *supra*.

388.    Defendants are liable for the aforementioned violations of international law because they conspired with Hizbullah with a common design to commit genocide or knowing of Hizbullah's genocidal mission gave substantial assistance or encouragement pursuant to and in furtherance of a common scheme to commit genocide.

**WHEREFORE,** Plaintiffs, demand judgment in their favor against Defendants and demand damages in an amount to be determined by a jury, not less than the statutory amount of $75,000, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again contributing to, facilitating, or conspiring to commit a campaign of genocide in violation of the law of nations.

## COUNT THREE

### GENOCIDE

#### (Aider and Abettor Liability in Violation of the Customary International Law Under the Alien Tort Claims Act, 28 U.S.C. § 1350)

389.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

390.    Defendants are liable for the aforementioned violations of international law in that they aided and abetted Hizbullah by intentionally facilitating the planning, preparation or execution of Hizbullah's conduct by providing organized and systematic financial and other practical assistance, encouragement or moral support that had a substantial effect on the perpetration of the attacks, intending, knowing, or consciously or recklessly avoiding knowing

74

that their actions would assist Hizbullah in the commission of the attacks.

391.    Defendants knew or consciously avoided knowing that Hizbullah's conduct was a breach of duty yet provided Hizbullah with substantial assistance or encouragement and/or gave substantial assistance to Hizbullah in accomplishing its tortious result and each Defendant's own conduct, separately considered, breached duties to Plaintiffs.

392.    Genocide is a violation of the Alien Tort Claims Act, universally recognized and accepted customary international law, the common law and penal law of the United States, the statutes and common law of New York, the laws of Israel, and the international treaties, agreements, conventions and resolutions described *supra*.

**WHEREFORE,** Plaintiffs, demand judgment in their favor against Defendants and demand damages in an amount to be determined by a jury, not less than the statutory amount of $75,000, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again contributing to, facilitating, or aiding and abetting a campaign of genocide against the people of the State of Israel in violation of the law of nations.

## COUNT FOUR

### CRIMES AGAINST HUMANITY

#### (Conspiracy Liability in Violation of the Customary International Law Under the Alien Tort Claims Act, 28 U.S.C. § 1350)

393.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

394.    Crimes against humanity have been universally recognized as a clear and definite

norm of international law that are universally accepted and of mutual concern to the civilized world.

395.     The terrorist attacks Hizbullah intentionally committed against Plaintiffs and the Israeli civilian population, constitute crimes against humanity in violation of the law of nations.

396.     Defendants conspired with Hizbullah to commit crimes against humanity in that they provided material financial services which bankrolled Hizbullah's missile attacks that intentionally killed Israeli civilians, persecuted such persons on political, racial, or religious grounds, and committed other inhumane acts against them, where the acts were part of a widespread or systematic attack against a civilian population.

397.     Defendants intended to aid, knew of, and/or consciously or recklessly avoided knowing of Hizbullah's mission because Hizbullah and its network of charitable fronts act with an openly and publicly-stated united purpose of eradicating the State of Israel.

398.     Defendants are liable for the aforementioned violations of international law in that they conspired with Hizbullah under a common design to commit crimes against humanity or knowing of Hizbullah's mission gave substantial assistance or encouragement pursuant to and in furtherance of a common scheme to commit crimes against humanity.

399.     Defendants committed tortious acts in concert or pursuant to a common design with Hizbullah.

400.     Crimes against humanity violate the Alien Tort Claims Act, universally recognized and accepted customary international law, the laws of Israel, and the international treaties, agreements, conventions and resolutions described *supra*.

401.     Plaintiffs and their family members suffered death or serious physical and/or mental injuries as a proximate result of Defendants' conduct.

**WHEREFORE,** Plaintiffs, demand judgment in their favor against Defendants and demand damages in an amount to be determined by a jury, not less than the statutory amount of $75,000, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again engaging in crimes against humanity in violation of the law of nations.

## COUNT FIVE

### CRIMES AGAINST HUMANITY

**(Aider and Abettor Liability in Violation of the
Customary International Law Under the Alien Tort
Claims Act, 28 U.S.C. § 1350)**

402.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

403.    Hizbullah, aided and abetted by Defendants' material support, committed crimes against humanity because they killed one or more civilians, persecuted such persons on political, racial, or religious grounds, and committed other inhumane acts against them, where the acts were part of a widespread or systematic attack against a civilian population.

404.    Defendants made Hizbullah's attacks possible by providing necessary financial services that bankrolled its violent and unlawful objectives.

405.    Defendants intended to aid, knew of, and/or consciously or recklessly avoided knowing of Hizbullah's mission because Hizbullah and its network of charitable fronts act with an openly and publicly-stated united purpose of eradicating the State of Israel.

406.    Defendants are liable for the aforementioned violations of international law in that they aided and abetted Hizbullah by intentionally facilitating the planning, preparation or

execution of Hizbullah's conduct by providing organized and systematic financial and other practical assistance, encouragement or moral support that had a substantial effect on the perpetration of the attacks, intending, knowing, or consciously or recklessly avoiding knowing the fact that their actions would assist Hizbullah in the commission of the attacks.

407.    Defendants knew or consciously avoided knowing that Hizbullah's conduct was a breach of duty yet provided Hizbullah with substantial assistance or encouragement and/or gave substantial assistance to Hizbullah in accomplishing its tortious result and each Defendant's own conduct, separately considered, breached duties to Plaintiffs.

408.    Crimes against humanity violate the Alien Tort Claims Act, universally recognized and accepted customary international law, the laws of Israel, and the international treaties, agreements, conventions and resolutions described *supra*.

409.    Plaintiffs and their family members suffered death or serious physical and/or mental injuries as a proximate result of Defendants' conduct.

**WHEREFORE,** Plaintiffs demand judgment in their favor against Defendants and demand damages in an amount to be determined by a jury, not less than the statutory amount of $75,000, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again engaging in crimes against humanity in violation of the law of nations.

## COUNT SIX

### WAR CRIMES

### (Conspiracy Liability in Violation of the
### Customary International Law Under the Alien Tort
### Claims Act, 28 U.S.C. § 1350)

410.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

411.    War crimes have been universally recognized as a clear and definite norm of international law that is universally accepted by the civilized world.

412.    Defendants conspired with Hizbullah to commit war crimes in that they provided material financial services which bankrolled Hizbullah's attacks thereby ignoring the rules of distinction and gravely breaching the international standards of armed conflict when they engaged in the targeted and willful killing and injuring of civilians.

413.    Defendants made Hizbullah's attacks possible by providing necessary financial services that bankrolled its violent and unlawful objectives.

414.    Defendants intended to aid, knew of, and/or consciously or recklessly avoided knowing Hizbullah's mission because Hizbullah and its network of charitable fronts act with an openly and publicly-stated united purpose of eradicating the State of Israel.

415.    Defendants are liable for the aforementioned violations of international law in that they conspired with Hizbullah under a common design to commit war crimes or knowing of Hizbullah's mission gave substantial assistance or encouragement pursuant to and in furtherance of a common scheme to commit war crimes.

416.    Defendants committed tortious acts in concert or pursuant to a common design with Hizbullah.

417. War crimes violate the Alien Tort Claims Act, customary international law and the international treaties, agreements, conventions and resolutions alleged *supra*.

418. Plaintiffs and their family members suffered death or serious physical and/or mental injuries as a proximate result of Defendants' conduct.

**WHEREFORE,** Plaintiffs, demand judgment in their favor against Defendants and demand damages in an amount to be determined by a jury, not less than the statutory amount of $75,000, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again engaging in war crimes in violation of the law of nations.

## COUNT SEVEN

## WAR CRIMES

### (Aider and Abettor Liability in Violation of the Customary International Law Under the Alien Tort Claims Act, 28 U.S.C. § 1350)

419. Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

420. Hizbullah, aided and abetted by Defendants' material support, committed war crimes by ignoring the rules of distinction and gravely breaching the international standards of armed conflict when they engaged in the targeted and willful killing and injury of civilians.

421. Defendants made Hizbullah's attacks possible by providing necessary financial services that bankrolled its violent and unlawful objectives.

422. Defendants intended to aid, knew of, and/or consciously or recklessly avoided knowing of Hizbullah's mission because Hizbullah and its network of charitable fronts act with

an openly and publicly-stated united purpose of eradicating the State of Israel.

423.    Defendants are liable for the aforementioned violations of international law in that they aided and abetted Hizbullah by intentionally facilitating the planning, preparation or execution of Hizbullah's conduct by providing organized and systematic financial and other practical assistance, encouragement or moral support that had a substantial effect on the perpetration of the attacks, intending, knowing, or consciously or recklessly avoiding knowing that their actions would assist Hizbullah in the commission of the attacks.

424.    Defendants knew or consciously avoided knowing that Hizbullah's conduct was a breach of duty yet provided Hizbullah with substantial assistance or encouragement and/or gave substantial assistance to Hizbullah in accomplishing its tortious result and each Defendant's own conduct, separately considered, breached duties to Plaintiffs.

425.    War crimes violate the Alien Tort Claims Act, customary international law and the international treaties, agreements, conventions and resolutions alleged *supra*.

426.    Plaintiffs and their family members suffered death or serious physical and/or mental injuries as a proximate result of Defendants' conduct.

**WHEREFORE,** Plaintiffs, demand judgment in their favor against Defendants and demand damages in an amount to be determined by a jury, not less than the statutory amount of $75,000, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again engaging in war crimes against the people of the State of Israel in violation of the law of nations.

## COUNT EIGHT

### TERRORISM

#### (Under Conspiracy Liability in Violation of the Customary International Law Under the Alien Tort Claims Act, 28 U.S.C. § 1350)

427.     Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

428.     Terrorism has been universally recognized as a clear and definite violation of international law that is universally accepted by the civilized world.

429.     Defendants conspired with Hizbullah to commit terrorism by providing material financial services which bankrolled Hizbullah's objectives including engaging in acts intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a Government or an international organization to do or to abstain from doing any act.

430.     Acts of terrorism violate customary international law, the penal statutes and common law of the United States, the penal statutes and common law of New York, the laws of Israel, and the international treaties, agreements, conventions and resolutions previously alleged.

431.     Defendants made Hizbullah's terrorist attacks possible by providing critical financial services that bankrolled its violent and unlawful objectives.

432.     Defendants are liable for the aforementioned violations of international law in that they conspired with Hizbullah under a common design to commit terrorism or knowing of Hizbullah's mission gave substantial assistance or encouragement pursuant to and in furtherance of a common scheme to commit terrorism.

433.    Plaintiffs and their family members suffered death or serious physical and/or mental injuries as a proximate result of Defendants' conduct.

**WHEREFORE,** Plaintiffs, demand judgment in their favor against Defendants and demand damages in an amount to be determined by a jury, not less than the statutory amount of $75,000, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again engaging in or being involved in terrorist attacks in violation of the law of nations.

## COUNT NINE

## TERRORISM

### (Aider and Abettor Liability in Violation of the Customary International Law Under the Alien Tort Claims Act, 28 U.S.C. § 1350)

434.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

435.    Defendants intended to aid, knew of, and/or consciously or recklessly avoided knowing of Hizbullah's mission because Hizbullah and its network of charitable fronts act with an openly and publicly-stated united purpose of eradicating the State of Israel.

436.    Defendants are liable for the aforementioned violations of international law in that they aided and abetted Hizbullah by intentionally facilitating the planning, preparation or execution of Hizbullah's conduct by providing organized and systematic financial and other practical assistance, encouragement or moral support that had a substantial effect on the perpetration of the attacks, intending, knowing, or consciously or recklessly avoiding knowing that their actions would assist Hizbullah in the commission of the attacks.

437.    Plaintiffs and their family members suffered death or serious physical and/or mental injuries as a proximate result of Defendants' conduct.

**WHEREFORE,** Plaintiffs, demand judgment in their favor against Defendants and demand damages in an amount to be determined by a jury, not less than the statutory amount of $75,000, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again engaging in or being involved in terrorist attacks in violation of the law of nations.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

(a)    Accept jurisdiction over this action;

(b)    Enter judgment against each Defendant and in favor of each Plaintiff for compensatory damages in amounts to be determined at trial by a jury;

(c)    Enter judgment against each Defendant and in favor of each Plaintiff for punitive damages to the extent permitted by law;

(d)    Enter judgment against each Defendant and in favor of each Plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees to the extent permitted by law;

(e)    Enter an Order declaring that each Defendant has violated the customary international law, the Antiterrorism Act, 18 U.S.C. § 2331 et seq. and N.Y. Penal Law § 470.21 et seq; and

(f)    Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: February 17, 2008

Respectfully submitted,

OSEN LLC
700 Kinderkamack Road
Oradell, New Jersey 07649
Telephone: (201) 265-6400
Facsimile: (201) 265-0303

By:

Cindy T. Schlanger (cts@osen.us)
Gary M. Osen (gmo@osen.us)
Joshua D. Glatter (jdg@osen.us)
Aaron Schlanger (as@osen.us)
Ari Ungar (au@osen.us)

*Counsel for Plaintiffs*

TURNER & ASSOCIATES, PA
C. Tab Turner (tab@tturner.com)
4705 Somers Avenue, Suite 100
North Little Rock, AR 72116
(Pro Hac Vice to be filed)

# Exhibit A

# Front page of receipts

*Unofficial Translation*

**Donation Receipt**

No. 415626 (Second receipt is numbered:  034500)

[Organization's logo]

Date:  [Redacted]

The Organization for Support of the Islamic Resistance thanks the honorable Mr.
[Redacted] for his contribution in the amount of:

For:
Subscription☐     Collection Box **X**     Donation☐     Other…

Recipient's signature: [Redacted]

Note:  It is required that the representative sign the card and confirm the date of validity.

# Back Page of Receipts

The Organization for Support of the Islamic Resistance reminds [its contributors of] the
following projects:

1. Monthly subscription plan.
2. Collection box project for the children and homes.
3. Al Quds replica project for display in stores and businesses.
4. Support for a mujahid project.
5. Equipping a mujahid project.
6. Contribution to the cost of a rocket. [Number is circled and marked by an x in ink].
7. Contribution to the cost of bullets.
8. Donations in kind project for (food, household items, clothing, shoes, etc.).
9. [Illegible text].

The Organization for Support to the Islamic Resistance authorizes the legal receipt of tithing
and alms from every authority.

Contact the administration:  142
Contact the administration:  556943 (on Second receipt numbered:  034500)
Beirut:  556941/01.
The South:  743848/0? (on Second receipt numbered:  034500)
The Biqa':  374379/08.
The North:  437567/06.

# Exhibit B





# ايصال قبض

N° [illegible]4500 التاريخ

هيئة دعم المقاومة الإسلامية تشكر

السيد

على مساهمته بمبلغ

بواسطة: اشتراك [ ] هبة [X] تبرع [ ] غير ذلك

توقيع المستلم: ..........

ملاحظة: يرجى الطلب من المندوب ابراز بطاقته والتأكد من تاريخ صلاحيتها



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
ZIVIE TAMAM, *et al.*,                          :
                                                :
                          Plaintiffs,           :       Case No. 08-cv-6156 (JFK)
                                                :
       -against-                                :
                                                :
FRANSABANK SAL, *et al.*,                       :
                                                :
                          Defendant.            :
                                                :
-------------------------------------------------------------x

## AFFIDAVIT OF SERVICE

I, Aaron Schlanger, hereby certify that I am over the age of 18 years, am employed by the

law firm of OSEN LLC, and that on February 17, 2009, I caused PLAINTIFFS' AMENDED

COMPLAINT to be served in accordance with the Federal Rules of Civil Procedure, and/or the

Local Rules of the United States District Courts for the Southern and Eastern Districts of New

York, upon the following counsel for each defendant by electronic mail:

## COUNSEL FOR FRANSABANK S.A.L. AND BANQUE LIBANAISE POUR LE COMMERCE

Lawrence S. Hirsh (lhirsh@deweyleboeuf.com)
Jonathan Siegfried (jsiegfried@deweyleboeuf.com)
Dewey & LeBoeuf LLP
1301 Avenue of the Americas
New York, NY 10019

## COUNSEL FOR BANQUE LIBANO-FRANÇAISE SAL

Mark G. Hanchet (mhanchet@mayerbrown.com)
Christopher J. Houpt (choupt@mayerbrown.com)
Alex Lakatos (alakatos@mayerbrown.com)
Mayer Brown LLP
1675 Broadway
New York, NY 10019

**COUNSEL FOR BANK OF BEIRUT SAL**

Brian H. Polovy (BPolovoy@Shearman.com)
Daniel M. Segal (Dan.Segal@Shearman.com)
Shearman & Sterling LLP
599 Lexington Avenue, Room 518
New York, NY 10022

Tai H. Park (tpark@parkjensen.com)
Park & Jensen LLP
369 Lexington Avenue, 16th Floor
New York, New York 10017

**COUNSEL FOR MIDDLE EAST AFRICA BANK**

Joshua L. Dratel (jdratel@joshuadratel.com)
2 Wall Street, 3rd Floor,
New York, New York 10005

Edward B. MacMahon Jr. (ebmjr@verizon.net)
1307 New Hampshire Ave., NW, 2nd Floor
Washington, D.C. 20036

Aaron Schlanger