UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ZIVIE TAMAM et al.,<br><br>                    Plaintiffs,<br><br>       - against -<br><br>FRANSABANK SAL,<br>BANQUE LIBANAISE POUR LE<br>COMMERCE,<br>BANK OF BEIRUT SAL,<br>BANQUE LIBANO-FRANÇAISE SAL,<br>MIDDLE EAST AFRICA BANK, and<br>JOHN DOES 1-100,<br><br>                    Defendants. | **08-cv-6156 (JFK)**<br><br>**ECF Case** |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BANQUE LIBANO-FRANÇAISE SAL'S MOTION TO DISMISS THE COMPLAINT

MAYER BROWN LLP
Mark Hanchet
Christopher J. Houpt
1675 Broadway
New York, New York  10019
(212) 506-2500

MAYER BROWN LLP
Alex Lakatos
1909 K Street N.W.
Washington, DC  20006-1101
(202) 263-3000

*Attorneys for Defendant*
*Banque Libano-Française SAL*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ZIVIE TAMAM et al.,

               Plaintiffs,

    - against-

FRANSABANK SAL,
BANQUE LIBANAISE POUR LE COMMERCE,
BANK OF BEIRUT SAL,
BANQUE LIBANO-FRANÇAISE SAL,
MIDDLE EAST AFRICA BANK, and
JOHN DOES 1-100,

               Defendants.

**08-cv-6156 (JFK)**

**ECF Case**

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BANQUE LIBANO-FRANÇAISE SAL'S MOTION TO DISMISS THE COMPLAINT

MAYER BROWN LLP
Mark Hanchet
Christopher J. Houpt
1675 Broadway
New York, New York  10019
(212) 506-2500

MAYER BROWN LLP
Alex Lakatos
1909 K Street N.W.
Washington, DC  20006-1101
(202) 263-3000

*Attorneys for Defendant*
*Banque Libano-Française SAL*

# TABLE OF CONTENTS

**Page**

Preliminary Statement...................................................................................... 1

Argument ........................................................................................................... 4

I.    This Court Lacks Personal Jurisdiction Over BLF ....................................... 4

    A.    Plaintiffs Do Not Adequately Allege Jurisdiction Under C.P.L.R § 302 ............. 4

    B.    The Complaint Also Fails To Allege Minimum Contacts ..................................... 6

II.    Plaintiffs Fail To State a Claim under the ATS ........................................... 9

    A.    Plaintiffs' Claims Fail To Meet The *Sosa* Standard ........................... 10

    B.    Plaintiffs Fail To State A Claim For Aiding And Abetting ................................ 11

        1.    Plaintiffs fail to allege that BLF provided "substantial assistance"......... 12

        2.    Plaintiffs fail to allege that BLF acted with the requisite intent ............. 14

    C.    Plaintiffs Fail To State A Claim For Conspiracy........................................... 15

        1.    Plaintiffs' conspiracy claims are not actionable under the ATS............. 15

        2.    Plaintiffs fail to allege the elements of conspiracy ................................. 17

    D.    Plaintiffs Fail To State A Claim For "Financing Terrorism" ............................ 18

        1.    Plaintiffs fail to plead the elements required by the Terrorism Financing Convention........................................................................ 19

        2.    "Financing Terrorism" is not an actionable norm under these circumstances .................................................................................... 21

Conclusion ....................................................................................................... 25

# TABLE OF AUTHORITIES

Page

<u>Cases</u>

*Asahi Metal Indus. Co. v. Super. Ct.,*
480 U.S. 102 (1987)..................................................................................7

*Ball v. Metallurgie Hoboken-Overpelt, S.A.,*
902 F.2d 194 (2d Cir. 1990)......................................................................4

*Bell Atl. v. Twombly,*
550 U.S. 544, 127 S. Ct. 1955 (2007)....................................1, 9, 13, 15, 20, 21

*Bryan v. United States,*
524 U.S. 184 (1998)................................................................................20

*Burnett v. Al Baraka Inv. & Dev. Corp.,*
274 F. Supp. 2d 86 (D.D.C. 2003)........................................................9, 13

*Calder v. Jones,*
465 U.S. 783 (1984)..................................................................................9

*Carmichael v. United Techs.,*
835 F.2d 109 (5th Cir. 1988) ..................................................................21

*Casio Computer Co. v. Sayo,*
No. 98 CV 3772 (WK), 2000 WL 1877516 (S.D.N.Y. Oct. 13, 2000) ..................8

*Celton Man Trade, Inc. v. UTEX S.A.,*
No. 84 Civ. 8179 (WCC), 1986 WL 6788 (S.D.N.Y. June 12, 1986) ..................5

*Chambers v. Time Warner, Inc.,*
282 F.3d 147 (2d Cir. 2002)......................................................................2

*Chang v. Gordon,*
No. 96 CIV. 0152(JFK), 1997 WL 563288 (S.D.N.Y. Sept. 8, 1997)..................4

*Daventree Ltd.  v. Republic of Azerbaijan,*
349 F. Supp. 2d 736 (S.D.N.Y. 2004)......................................................5

*E.I.C., Inc. v. Bank of Virginia,*
166 Cal. Rptr. 317 (Cal. Ct. App. 1980) ..................................................8

*First Nationwide Bank v. Gelt Funding Corp.,*
27 F.3d 763 (2d Cir. 1994).....................................................................21

*Flores v. S. Peru Copper Corp.,*
414 F.3d 233 (2d Cir. 2003)....................................................................24

# TABLE OF AUTHORITIES

**Page**

### Cases (cont'd)

*Fontanetta v. Am. Bd. of Internal Med.,*
421 F.2d 355 (2d Cir. 1970) ..................................................................5

*Graphic Controls Corp. v. Utah Med. Prods., Inc.,*
149 F.3d 1382 (Fed. Cir. 1998).............................................................6

*Hamdan v. Rumsfeld,*
548 U.S. 557 (2006).................................................................15, 16

*Holness v. Mar. Overseas Corp.,*
676 N.Y.S.2d 540 (1st Dep't 1998) .........................................................6

*In re Brooklyn Navy Yard Asbestos Litig.,*
971 F.2d 831 (2d Cir. 1992)................................................................17

*In re Sinaltrainal Litig.,*
474 F. Supp. 2d 1273 (S.D. Fla. 2006) .......................................................17

*In re Terrorist Attacks on Sept. 11, 2001,*
538 F.3d 71 (2d Cir. 2008)...............................................................8, 9

*In re Terrorist Attacks on September 11, 2001,*
349 F. Supp. 2d 765 (S.D.N.Y. 2005),
*aff'd,* 538 F.3d 71 (2d Cir. 2008) .......................................................13, 23

*Int'l Housing Ltd. v. Rafidain Bank Iraq,*
712 F. Supp. 1112 (S.D.N.Y. 1989),
*rev'd in part on other grounds,* 893 F.2d 8 (2d Cir. 1989).....................................7

*Iqbal v. Hasty,*
490 F.3d 143 (2d Cir. 2007),
*cert. granted sub nom. Ashcroft v. Iqbal,* 128 S. Ct. 2931 (2008) .........................14

*Italian Int'l Bank Ltd. v. Banco Industrial de Venezuela C.A.,*
No. 80 Civ 5288, 1984 WL 438 (S.D.N.Y. June 6, 1984).......................................8

*Jazini v. Nissan Motor Co.,*
148 F.3d 181 (2d Cir. 1998)................................................................4

*Johnson Elec. N. Am., Inc.  v. Bank of Wales,*
No. 90 Civ. 6683, 1991 WL 20006 (S.D.N.Y. Feb. 8, 1991) .................................5

*Kashi v. Gratsos,*
790 F.2d 1050 (2d Cir. 1986)................................................................17

# TABLE OF AUTHORITIES

Page

**Cases (cont'd)**

*Khulumani v. Barclay Nat'l Bank, Ltd.,*
504 F.3d 254 (2d Cir. 2007),
*aff'd sub nom. Am. Isuzu Motors, Inc. v. Ntsebeza,*
128 S. Ct. 2424 (2008) ................................................................11, 14, 15, 17, 18

*Leema Enters., Inc. v. Willi,*
575 F. Supp. 1533 (S.D.N.Y. 1983) ...........................................................................7

*Mastafa v. Australian Wheat Bd., Ltd.,*
No. 07 Civ. 7955 (GEL), 2008 WL 4378443 (S.D.N.Y. Sept. 25, 2008) ...........9, 12, 15, 21

*Mora v. New York,*
524 F.3d 183 (2d Cir. 2008),
*cert. denied,* No. 08-106, 2008 WL 2882181 (U.S. Oct. 14, 2008).....................................23

*Nemetsky v. Banque de Developpement de la Republique du Niger,*
64 A.D.2d 694 (2d Dep't 1978),
*aff'd,* 401 N.E.2d 388 (N.Y. 1979) ...........................................................................5

*Presbyterian Church of Sudan v. Talisman Energy, Inc.,*
453 F. Supp. 2d 633 (S.D.N.Y. 2006) ...............................................................11, 16, 21

*Ratzlaf v. United States,*
510 U.S. 135 (1994) ...........................................................................20

*Ryan v. Hunton & Williams,*
99-CV-5938, 2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000) ...............................................12

*Semi Conductor Materials, Inc. v. Citibank Int'l PLC,*
969 F. Supp. 243 (S.D.N.Y. 1997) ...........................................................................5

*Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC,*
450 F.3d 100 (2d Cir. 2006) ...........................................................................6

*Sosa v. Alvarez-Machain,*
542 U.S. 692 (2004).......................................................10, 11, 16, 17, 18, 21, 22, 23, 24

*Stutts v. De Dietrich Group,*
No. 03-CV-4058 (ILG), 2006 WL 1867060 (E.D.N.Y. June 30, 2006).................13, 14, 18

*Ungar v. Islamic Republic of Iran,*
211 F. Supp. 2d 91 (D.D.C. 2002) ...........................................................................18

# TABLE OF AUTHORITIES

**Page**

**Cases (cont'd)**

*United States v. Elusma,*
849 F.2d 76 (2d Cir. 1988)..................................................................................15

*United States v. Yousef,*
327 F.3d 56 (2d Cir. 2003)..................................................................................23

*Verlinden B.V. v. Cent. Bank of Nigeria,*
488 F. Supp. 1284 (S.D.N.Y. 1980),
*rev'd on other grounds,* 461 U.S. 480 (1983) ...................................................6

*Weiss v. Nat'l Westminister Bank PLC,*
453 F. Supp. 2d 609 (E.D.N.Y. 2006) ...............................................................12

*World-Wide Volkswagen Corp. v. Woodson,*
444 U.S 286 (1980)...............................................................................................7

## Statutes and Rules

FED. R. CIV. PRO. 4(k)...........................................................................................4

FED. R. CIV. PRO. 12.............................................................................................1

Genocide Convention Implementation Act of 1987
Pub. L. No. 100-606, 102 Stat. 3045 (codified at 18 U.S.C. § 1091)..................16

N.Y. C.P.L.R. § 301..............................................................................................4

N.Y. C.P.L.R. § 302........................................................................................4, 5, 6

18 U.S.C. § 1092..................................................................................................16

28 U.S.C. § 1350..................................................................................................10

## Other Authorities

Cambridge Dictionary Online................................................................................10

International Convention for the Suppression of the Financing of Terrorism (1999)

Merriam-Webster Online...................................................................................19, 20

United Nations Document A/AC.252/1999/INF/2, Annex (Mar. 26, 1999) ...............20

United Nations Document A/C.6/54/WG.1/INF/1 (Nov. 9, 1999)...........................20

Defendant Banque Libano-Française SAL ("BLF"), submits this memorandum of law in support of its motion, pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), to dismiss the Complaint.[1]

## PRELIMINARY STATEMENT

All of the plaintiffs in this case are Israeli citizens. Compl. ¶ 31. All of the defendants are Lebanese banks. *Id.* ¶¶ 32-41. All of plaintiffs' alleged injuries occurred in Israel as a result of rocket attacks into Israel from Lebanon during the July 2006 war. Plaintiffs allege that the rockets were fired by Hizbullah, which is based in Lebanon (*id.* ¶¶ 5, 9), and were acts of genocide, crimes against humanity, war crimes, and terrorism. *Id.* ¶¶ 3, 6. Plaintiffs further allege that various other organizations (*id.* ¶¶ 66-68) – including the Islamic Resistance Support Organization ("IRSO") (*id.* ¶ 13) – served as fronts for Hizbullah. Neither Hizbullah nor any of those organizations is a defendant in this case. Despite the total absence of any connection to this District, and despite their utter inability to articulate what role BLF allegedly played in these attacks, plaintiffs seek unspecified damages against, among others, BLF. Plaintiffs' Complaint must be dismissed for lack of personal jurisdiction and failure to state a claim.

BLF is one of the larger banks in Lebanon, with a history dating back to the French Mandate. Compl. ¶¶ 3, 9. BLF maintains a policy against conducting business with any political or military organization, which includes but is not limited to Hizbullah, the IRSO, and similar entities. Although the Complaint spans 83 pages and contains more than four hundred paragraphs, it makes just four fleeting allegations concerning BLF. First, it alleges that BLF "transmits the majority of its U.S. dollar wire transfers through correspondent banks," supposedly Bank of New York and Citibank. *Id.* ¶ 40. Second, the Complaint notes that BLF's

---

[1]  A copy of the Complaint is attached as Exhibit A to the accompanying Declaration of Mark G. Hanchet dated November 26, 2008 ("Hanchet Decl.").

2006 Annual Report describes its Know Your Customer and anti-money laundering policies. *Id.* ¶ 167.

Third, it alleges that from January 2003 to August 2006, the IRSO had an account at the "Hreik Neighborhood" branch of BLF. *Id.* ¶ 77(b).  Fourth, the Complaint cites an MSNBC article[2] that describes a phone conversation between a reporter and an individual identified only as a "Hizbullah Facilitator" who directed the reporter to wire funds to an account at "the Lebanese French Bank." *Id.* ¶ 2 (according to the facilitator, the amount would then reach the "Mujahadeen").  The article goes on to explain that, after being alerted to the possible misuse of the account, which was held in the name of an individual, BLF closed it.  A BLF spokesperson explained to MSNBC:

> "With regard to the account referred to in your message, it appears that the said account belongs to an individual person and shows insignificant movements and balances.  Following the information in your e-mail, our Compliance Unit has closed the said account," says Lebanese-French Bank official Maurice Iskandar.
>
> He adds that the bank  . . . will not "open any account for, deal with, or transact on behalf of, any political or military organisation or their affiliated entities and/or known individuals."

Hanchet Decl. Ex. B.  Thus, these last two allegations, read together with the article incorporated by reference in the Complaint, indicate that, consistent with BLF's policy against doing business with political or military organizations, when BLF was informed that the individual who opened the account might not be using it for personal purposes, BLF closed the account.

On the basis of these allegations – the only ones concerning BLF – plaintiffs purport to

---

[2]  Compl. ¶ 82 (citing MSNBC report dated July 25, 2006, *available at* http://www.msnbc.msn.com/id/14015377).  A complete copy of the report is attached as Exhibit B to the Hanchet Declaration.  "For purposes of [Rule 12], the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.  Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) (citations and internal quotation marks omitted).

state nine claims for relief under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350: a novel tort labeled "financing of terrorism" (Count 1); aiding and abetting genocide, crimes against humanity, war crimes, and terrorism (Counts 3, 5, 7 and 9); and conspiracy to commit genocide, crimes against humanity, war crimes, and terrorism (Counts 2, 4, 6 and 8).

Although plaintiffs assert personal jurisdiction under C.P.L.R. § 302 and Federal Rule of Civil Procedure 4(k) (Compl. ¶¶ 28-29), they base this assertion on nothing more than correspondent banking relationships. Courts in this District (and elsewhere) repeatedly have held that such relationships are insufficient, under both C.P.L.R. § 302 and due process, to support jurisdiction, even as to claims arising out of the correspondent relationships. Plaintiffs do not, and cannot, allege that BLF has any operations in New York or that it purposefully has availed itself of the privilege of doing business here. Nor can they allege that BLF's correspondent accounts had anything to do with the Hizbullah attacks. Therefore, plaintiffs' Complaint must be dismissed for lack of personal jurisdiction.

Even if this Court could assert jurisdiction over BLF, the Complaint still must be dismissed because it fails to state a claim under the ATS. The Complaint is rife with vague assertions and innuendo, but nowhere do plaintiffs articulate facts sufficient to support their claims against BLF. Notably, plaintiffs do not allege that BLF *intentionally* aided Hizbullah or *agreed* with Hizbullah to facilitate its schemes, or that BLF provided substantial assistance to Hizbullah, or indeed, that BLF has any link whatsoever to the rocket attacks. These pleading failures are fatal and the Complaint should be dismissed.

## ARGUMENT

**I.    THIS COURT LACKS PERSONAL JURISDICTION OVER BLF**

To defeat a 12(b)(2) motion, the plaintiff must make "factual allegations [that] constitute a *prima facie* showing of jurisdiction." *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990). Before finding personal jurisdiction, "the Court must determine whether Plaintiffs have made the requisite showing that (1) there is a basis for jurisdiction under New York's long arm statute *and* (2) the exercise of personal jurisdiction is consistent with the Fourteenth Amendment's due process requirements." *Chang v. Gordon*, No. 96 CIV. 0152(JFK), 1997 WL 563288, at *5 (S.D.N.Y. Sept. 8, 1997) (emphasis added); *see also* Fed. R. Civ. Pro. 4(k). Here, plaintiffs' Complaint must be dismissed because their jurisdictional allegations, even if true, satisfy neither New York's long arm statute nor the Due Process Clause.

**A.    Plaintiffs Do Not Adequately Allege Jurisdiction Under C.P.L.R. § 302.**

In this case, plaintiffs make no attempt to invoke C.P.L.R. § 301; they rely only upon C.P.L.R. § 302. Compl. ¶ 28. C.P.L.R. § 302 establishes jurisdiction "[a]s to a cause of action arising from" the defendant's "transact[ing] business within the state or contract[ing] anywhere to supply goods or services in the state." C.P.L.R. § 302(a)(1). Here, the only New York transactions that plaintiffs allege are BLF's two correspondent bank relationships.[3] Compl. ¶ 40. But New York courts have held again and again that maintaining correspondent banking relationships does not constitute "transact[ing] business" under C.P.L.R. § 302.[4] *See, e.g.*,

---

[3] Plaintiffs also allege, "on information and belief" (Compl. ¶ 1) that all defendants carried out unspecified "substantial conduct in connection with the schemes detailed herein in furtherance of their conspiracy in New York." *Id.* ¶ 29. The Complaint identifies neither the acts nor the actors. Vague and conclusory allegations such as these are legally insufficient. *See Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185-86 (2d Cir. 1998) (holding that "conclusory non-fact-specific jurisdictional allegations" are insufficient).

[4] We assume that plaintiffs intend to assert jurisdiction under Section 302(a)(1). They do not allege any tortious act committed by BLF "within" New York State (C.P.L.R. § 302(a)(2)), any "injury . . . within the state" (*id.* § 302(a)(3)), or that BLF "owns, uses, or possesses any real property situated within the state." *Id.* § 302(a)(4).

*Johnson Elec. N. Am., Inc.   v. Bank of Wales*, No. 90 Civ. 6683, 1991 WL 20006, at *2 (S.D.N.Y. Feb. 8, 1991) ("Courts have repeatedly held that the mere existence of a correspondent bank relationship between a foreign bank and a New York correspondent bank is an insufficient basis for asserting personal jurisdiction over the foreign bank under the . . . 'transaction of business' [C.P.L.R. § 302] test."); *Celton Man Trade, Inc. v. UTEX S.A.*, No. 84 Civ. 8179 (WCC), 1986 WL 6788, at *4 (S.D.N.Y. June 12, 1986) ("It is also well settled that the existence of a correspondent banking relationship between a foreign bank and a New York correspondent bank does not subject the foreign bank to jurisdiction"). Courts even have held that jurisdiction is absent when the cause of action arises directly out of correspondent relationships. *See, e.g.*, *Daventree Ltd.  v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 762 (S.D.N.Y. 2004) (finding "alleg[ations] that defendant [bank] maintained a correspondent bank account in New York, through which funds were transferred in connection with the . . . scheme [at issue]" insufficient under 302(a)(1) and (a)(2)); *Nemetsky v. Banque de Developpement de la Republique du Niger*, 64 A.D.2d 694, 694 (2d Dep't 1978) ("Even if the trade acceptance [at issue in the case] were . . . part of the correspondent bank relationship, that relationship does not itself provide the basis for long arm jurisdiction under CPLR 302."), *aff'd*, 401 N.E.2d 388 (N.Y. 1979).

Moreover, even if a correspondent relationship could constitute "transact[ing] business" under C.P.L.R. § 302 (which it cannot), jurisdiction fails for the independent reason that plaintiffs do not allege any connection between their claims and BLF's alleged correspondent relationships in New York. *See Semi Conductor Materials, Inc. v. Citibank Int'l PLC*, 969 F. Supp. 243, 246 (S.D.N.Y. 1997). C.P.L.R. § 302 requires a *"direct relation* between the cause of action and the in-state conduct." *Fontanetta v. Am. Bd. of Internal Med.*, 421 F.2d 355, 357 (2d Cir. 1970) (emphasis added). "A connection that is 'merely coincidental' is insufficient to

support jurisdiction." *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006) (jurisdiction is lacking where "the injuries sustained . . . [bear] such an attenuated connection to the New York activity upon which the plaintiffs attempted to premise jurisdiction that the disputes could not be characterized as having 'arisen from' the New York activity"). "This nexus test appears to be interpreted very narrowly by the highest court in the state of New York court and therefore by the federal courts as well." *Graphic Controls Corp. v. Utah Med. Prods., Inc.*, 149 F.3d 1382, 1386 (Fed. Cir. 1998).

Here, plaintiffs allege no connection whatsoever between the alleged "funds transfers through correspondent banks in New York" (Compl. ¶ 29) and their alleged injuries.  They do not explain who transferred what funds to whom or how the alleged transfers relate to BLF, let alone what connection the transfers have to the Hizbullah attacks.  In an analogous case, the First Department held that a defendant's contracting *in* New York with New York counterparties did not establish C.P.L.R. § 302 jurisdiction over claims by a third party for injuries incurred while performing the contract out-of-state.  *See Holness v. Mar. Overseas Corp.*, 676 N.Y.S.2d 540, 544 (1st Dep't 1998).  Even if read generously, the Complaint in this case alleges at most that transfers to an IRSO account *incidentally* passed through New York correspondent banks.[5]  No wrongdoing is alleged to have occurred in the United States, and plaintiffs have failed to carry their burden under C.P.L.R. § 302.

B.    **The Complaint Also Fails To Allege Minimum Contacts.**

Even if the plaintiffs could satisfy C.P.L.R. § 302(a)(1), they would also have to show

---

[5]  The fact is, exercising jurisdiction on these token contacts would have dramatic effects.  As this Court observed in a related context, "New York would be detrimentally served by a decision subjecting foreign customers of its banks to the in personam jurisdiction of American courts" based on their patronage of New York banks, because customers so exposed "would have little hesitancy or difficulty in designating banks in foreign lands [instead of U.S. banks]." *Verlinden B.V. v. Cent. Bank of Nigeria*, 488 F. Supp. 1284, 1298 (S.D.N.Y. 1980), *rev'd on other grounds*, 461 U.S. 480 (1983).

that the exercise of jurisdiction satisfies the Due Process Clause.  Due process requires that a defendant have "minimum contacts" with the "forum State . . . such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S 286, 291-92, 297 (1980).  The Supreme Court has specifically warned that "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *Asahi Metal Indus. Co. v. Super. Ct.*, 480 U.S. 102, 115 (1987) (internal quotation marks omitted).

Courts in this District have held overwhelmingly that correspondent banking relationships are insufficient to establish constitutional minimum contacts, even when the claims are alleged to arise out of those relationships.  For instance, in *Leema Enterprises, Inc. v. Willi*, this Court held that it lacked jurisdiction where "[t]he only connection between the alleged fraud, the Bank, and the United States was the [defendant] Bank's passive receipt of the second $250,000 payment [in the transaction that was the 'subject of this dispute'] at one of the New York correspondent bank accounts." 575 F. Supp. 1533, 1534, 1537 n.1 (S.D.N.Y. 1983); *id.* ("This transfer could have been made to an account anywhere in the United States, or anywhere in the world for that matter. That alone, however, obviously would not confer personal jurisdiction over the defendant in that jurisdiction automatically."). This Court concluded that the "mere maintenance of correspondent bank accounts *to facilitate international financial transactions or money transfers* . . . is not enough to confer this court with personal jurisdiction over the defendant." *Id.* at 1537 (emphasis added).

Likewise, in *International Housing Ltd. v. Rafidain Bank Iraq*, this Court held that it lacked jurisdiction over an Iraqi bank even though the defendant bank itself "directed [that the] payment [in dispute] be made in the United States" correspondent account. 712 F. Supp. 1112,

1118-20 (S.D.N.Y. 1989) ("Courts have generally held correspondent bank accounts alone to be insufficient to confer personal jurisdiction over a defendant."), *rev'd in part on other grounds*, 893 F.2d 8 (2d Cir. 1989); *see also Italian Int'l Bank Ltd. v. Banco Industrial de Venezuela C.A.*, No. 80 Civ. 5288, 1984 WL 438, at *3 (S.D.N.Y. June 6, 1984) (holding that "jurisdiction cannot properly be predicated on the existence of correspondent New York banking relationships and the use of those correspondents to effectuate payments" relating to plaintiff's claims). To hold otherwise would dramatically lower the minimum contacts requirement:

> [M]ost banks of any size maintain correspondents in all major regions of the country and in selected areas overseas. It would be a distortion of due process to hold that a state acquires general personal jurisdiction over an out-of-state bank (as opposed to *in rem* jurisdiction) merely because the bank has a correspondent relationship with a bank within the state . . . .

*E.I.C., Inc. v. Bank of Virginia*, 166 Cal. Rptr. 317, 320 (Cal. Ct. App. 1980).

This Court has found that even wire transfers to New York accounts directed by the defendant itself do not establish jurisdiction. *See Casio Computer Co. v. Sayo*, No. 98 CV 3772 (WK), 2000 WL 1877516, at *26 (S.D.N.Y. Oct. 13, 2000) ("Although . . . the wire transfers [allegedly in furtherance of RICO conspiracy] reached bank accounts in the United States, such conduct by defendants does not satisfy the level of minimum contacts required to assert personal jurisdiction over them."). Plaintiffs point to no act by which BLF can be said to have purposely availed itself of the privilege of conducting activities in New York; even if plaintiffs had alleged that transfers directly relevant to their claims had passed through New York (and they have not), such allegations still would not be sufficient to satisfy constitutional minimum contacts.

In fact, the Second Circuit has held that even direct donations to al Qaeda do not establish liability in New York for terrorist attacks committed here:

> Even if the Four Princes were reckless in monitoring how their donations were spent, or could and did foresee that recipients of their donations would *attack targets in the United States*, that would be insufficient to ground the

exercise of personal jurisdiction. . . . Rather, the plaintiffs have the burden of showing that the Four Princes engaged in "intentional, and allegedly tortious, actions . . . expressly aimed" at residents of the United States.

*In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 94-95 (2d Cir. 2008) (emphasis added) (quoting *Calder v. Jones*, 465 U.S. 783, 789 (1984)).  Here, the plaintiffs allege only that BLF provided routine commercial services.  They fail to allege that the services resulted in any wrongdoing in the United States.  They allege no harm in the United States or to its citizens, and they certainly do not allege that BLF "expressly aimed" its conduct at the United States.

## II.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE ATS

A complaint must be dismissed under Rule 12(b)(6) where it fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1974 (2007).  "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964-65 (internal quotation marks and alterations omitted). The inflammatory nature of plaintiffs' allegations makes strict adherence to the *Twombly* standard particularly important in this case.  As one court has explained when holding that similar terrorism allegations against a foreign bank were insufficient:

> The use of the privileged medium of a lawsuit to publicly label someone an accomplice of terrorists can cause incalculable reputational damage. Placing that person in a situation in which he must retain counsel and defend himself has dramatic economic consequences as well. . . .  [G]iven the extreme nature of the charge of  terrorism, fairness requires extra-careful scrutiny of plaintiffs' allegations as to any particular defendant, to ensure that he – or it – does indeed have fair notice . . . and that no inferences are accepted that are unsupported by the facts set out in the [complaint].

*Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 103-04 (D.D.C. 2003); *see also*

*Mastafa v. Australian Wheat Bd., Ltd.,* No. 07 Civ. 7955 (GEL), 2008 WL 4378443 (S.D.N.Y. Sept. 25, 2008) (dismissing ATS aiding and abetting claims for failure to meet the *Twombly*

standard).  Plaintiffs violate these principles by failing to articulate any plausible basis for relief.

Relying solely upon the ATS, which confers jurisdiction for "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States," 28 U.S.C. § 1350, plaintiffs advance nine claims against BLF:  four for allegedly aiding and abetting Hizbullah, four for allegedly conspiring with Hizbullah, and one for allegedly funding Hizbullah.  None of these allegations states a valid claim under the ATS.

## A.     Plaintiffs' Claims Fail To Meet The *Sosa* Standard.

In *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), the Supreme Court, addressing the ATS for the first time, emphasized the statute's limited reach and warned courts to take extreme caution in applying it.  The ATS is solely a jurisdictional statute—it does not create any cause of action.  *Id.* at 712.  Moreover, when the Act was enacted in 1789, its *jurisdictional* grant enabled federal courts to entertain only "a modest set of actions" for three international law offenses that were well-established at the time:  piracy, assaults on ambassadors, and violations of safe passage.  *Id.* at 720.  The *Sosa* Court found "no basis to suspect that Congress had any examples in mind beyond those torts." *Id.* at 724.

Although *Sosa* did not foreclose the possibility that ATS might encompass offenses that were not part of the law of nations in the 18th century, the Court established a strict test for exercising jurisdiction over such claims.  Under *Sosa*, no new claim is permissible unless, at a minimum, it rests on a "norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms [such as piracy] we have recognized." 542 U.S. at 725.  This rigid threshold requirement derives from the fact that the federal courts have "no congressional mandate to seek out and define new and debatable violations of the law of nations," but instead must stand as "vigilant doorkeep[ers]" and exercise "great caution in adopting the law of nation to private rights." *Id.* at 728-29.

Accordingly, the ATS reaches only an exceedingly "narrow," "modest," and "limited" class of claims. *Id.* at 715, 720, 721, 724, 729.

The claims that plaintiffs have made here go far beyond *Sosa*'s mandate. In the teeth of the Supreme Court's repeated admonitions for restraint, plaintiffs ask this Court to recognize an expansive theory of liability that far exceeds anything recognized by present-day norms of international law. They seek to hold BLF, a Lebanese bank with no alleged (or actual) relationship with Hizbullah, liable for Hizbullah rocket attacks, based on the scant allegation that BLF conducted routine banking business, not with Hizbullah, nor even with the IRSO, but, according to the MSNBC article, with an individual, and that individual may have attempted to misuse an account. The alleged conduct occurred at a time when no nation, including the United States (Compl. ¶ 142(h)), is alleged to have blacklisted the IRSO or otherwise recognized it as linked to Hizbullah. For multiple reasons, such broad-based allegations cannot support any cause of action under the ATS.

**B.      Plaintiffs Fail To State A Claim For Aiding And Abetting.**

Four of plaintiffs' claims (Counts 3, 5, 7, and 9) allege that BLF aided and abetted international law violations committed by Hizbullah. These claims do not satisfy the Second Circuit's strict post-*Sosa* standard for aiding and abetting liability. In *Khulumani v. Barclay National Bank, Ltd.*, 504 F.3d 254 (2d Cir. 2007), *aff'd sub nom. Am. Isuzu Motors, Inc. v. Ntsebeza*, 128 S. Ct. 2424 (2008), the Second Circuit held that aiding and abetting is permissible under the ATS only where "the defendant (1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of that crime." *Id.* at 277 (Katzmann, J., concurring); *id.* at 333 (Korman, J., concurring in relevant part); *see also Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F. Supp. 2d 633, 668 (S.D.N.Y. 2006) (holding that aiding and abetting under

the ATS requires the "intent to assist" the "specific violation" and a "substantial effect upon the success of the criminal venture"). Here, plaintiffs fail to plead these elements. Counts 3, 5, 7, and 9 all must be dismissed.

**1.   Plaintiffs fail to allege that BLF provided "substantial assistance."**

Plaintiffs' allegation that "all of the named Defendants maintained accounts, collected and distributed funds and provided other financial services to IRSO" (Compl. ¶ 77) describes nothing more than routine banking activity that, as a matter of law, fails to meet the "substantial assistance" threshold. "The mere maintenance of a bank account and the receipt and transfer of funds do not . . . constitute substantial assistance." *Weiss v. Nat'l Westminister Bank PLC*, 453 F. Supp. 2d 609, 621 (E.D.N.Y. 2006). In *Weiss*, plaintiffs who were victims of HAMAS terrorism in Israel alleged that the defendant bank had "collected, received, transmitted, and provided millions of dollars on behalf of Interpal [a charity controlled by HAMAS] to agents of HAMAS." *Id.* at 622. The court held that such allegations were insufficient, relying on a series of cases establishing that "'affirmative acts of opening accounts, approving various transfers and then closing the accounts . . . do not constitute substantial assistance.'" *Id.* at 621 (quoting *Ryan v. Hunton & Williams*, 99-CV-5938, 2000 WL 1375265, at *9 (E.D.N.Y. Sept. 20, 2000)).

Similarly, in *Mastafa*, Kurdish widows whose husbands were imprisoned, tortured and killed in Iraq alleged that defendant bank BNP Paribas had disbursed funds from an escrow account to the Australian Wheat Board, which used some portion of the funds to pay kickbacks to the regime of Saddam Hussein. The funds were alleged to have "aided and abetted" the abuse of plaintiffs' spouses. *Mastafa* concluded that these allegations were insufficient to state a claim for relief, emphasizing that aiding and abetting liability requires, among other things, that the defendant "substantially assist in the commission of the principal violation." 2008 WL 4378443 at *4 (internal quotation marks omitted).

Once again, in *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765 (S.D.N.Y. 2005), *aff'd*, 538 F.3d 71 (2d Cir. 2008), the court dismissed in their entirety complaints against several bank defendants for allegedly aiding and abetting Al Qaeda in its commission of the 9/11 terrorist attacks, based on allegations that the banking defendants "acted as instruments of terror in raising, facilitating and transferring money to terrorist organizations." 349 F. Supp. at 831 (internal quotation marks omitted). Rejecting these claims, the court held: "there [is] no support 'for the proposition that a bank is liable for injuries done with money that passes through its hands in the form of deposits, withdrawals, check clearing services, or any other routine banking service.'" *Id.* at 832 (quoting *Burnett*, 274 F. Supp. 2d at 109); *see also Stutts v. De Dietrich Group*, No. 03-CV-4058 (ILG), 2006 WL 1867060, at *12 (E.D.N.Y. June 30, 2006) (rejecting aiding and abetting allegations against bank defendants accused of provided banking services that facilitated Iraq's unlawful acquisition of chemical weapons).

In contrast to plaintiffs' vagueness about any substantial assistance provided by BLF and the relevance of BLF's correspondent accounts to the attacks, they are quite clear about where Hizbullah actually gets its money and weapons from: Iran. The Complaint asserts that Hizbullah received "$100 to $200 million in funding a year from Iran," plus Iranian "weapons, intelligence, and logistical support" (Compl. ¶ 53), and consequently, during the 2006 rocket attacks at issue, "Hizbullah principally deployed . . . Iranian built missiles." (*id.* ¶ 186). In light of these allegations (which have nothing to do with BLF), it would strain credulity to conclude that a BLF account, allegedly maintained not for Hizbullah itself, but rather for an individual possibly acting for the IRSO who may have tried to misuse the account, could have amounted to "substantial assistance" to Hizbullah in its alleged commission of genocide, war crimes, crimes against humanity and terrorism. This theory of liability simply does not pass muster under

13

*Twombly*'s rule that plaintiffs must allege facts sufficient "to render the claim *plausible*." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007), *cert. granted sub nom. Ashcroft v. Iqbal*, 128 S. Ct. 2931 (2008).

**2.     Plaintiffs fail to allege that BLF acted with the requisite intent.**

Under *Khulumani*, to state a viable aiding and abetting claim under the ATS, plaintiffs must allege not merely defendant's substantial assistance to an underlying violation of international law, but also actions taken "with the *purpose* of facilitating the commission of *that* crime." 504 F.3d at 377 (Katzmann, J., concurring) (emphasis added). Plaintiffs do not venture to expressly allege that BLF provided banking services with the purpose of facilitating grievous acts of genocide, war crimes, crimes against humanity or terrorism. Plaintiffs aver only that "[e]ach Defendant herein intentionally, knowingly, recklessly, or with willful blindness provided services to one of Hizbullah's most infamous and lethal fundraising organizations, the [IRSO]." Compl. ¶ 13.[6] For a variety of independent reasons, plaintiffs' putative scienter allegations are fatally flawed.

First, plaintiffs' allegations of a range of possible states of mind, from actual intent to mere recklessness, does not satisfy the *Khulumani* standard. *See also Stutts*, 2006 WL 1867060, at *6 (holding that complaint did not adequately allege knowledge based on a "wide-sweeping allegation that defendants 'knew, or reasonably should have known'" that their banking services were supporting the Hussein regime's use of chemical weapons).[7]

---

[6] *See also, e.g.,* Compl. ¶ 22 ("Defendants provided Hizbullah with substantial assistance intentionally, knowingly, recklessly, and/or with willful blindness."); *id.* ¶ 367 ("Defendants are liable for the aforementioned violations of international law in that they aided and abetted Hizbullah . . . intending, knowing, or consciously or recklessly avoiding knowing that their actions would assist Hizbullah in the commission of the attacks.").

[7] Thus, they allege only that information on IRSO's support for Hizbullah was publicly available. *E.g.,* Compl. 81 ("the IRSO makes no attempt to hide its true colors"); *id.* 85 ("the IRSO openly offered prospective donors the opportunity to earmark funds toward different types of terrorist activities"). But plaintiffs' intended implication, that BLF *should* have known that IRSO was a bad actor, cannot substitute for pleading facts showing that BLF intended to support Hizbullah's international law offenses. Even the suggestion that BLF should have known that the IRSO

Second, plaintiffs have not alleged that BLF had the intent to support the *crimes at issue*, *i.e.*, genocide, terrorism, war crimes or crimes against humanity.  An intent to provide financial services (Compl. ¶ 13) is not the same, and is not sufficient.  *See Khulumani*, 504 F.3d at 277 (Katzmann, J., concurring); *United States v. Elusma*, 849 F.2d 76, 78 (2d Cir. 1988) (holding, in domestic criminal law context, that "an aider and abetter must share in the principal's essential criminal intent"); *Mastafa*, 2008 WL 4378443, at *4 (holding that "aiding the Hussein *regime* is not the same thing as aiding and abetting its alleged human rights abuses") (emphasis added).

Third, plaintiffs' scattershot scienter allegations are nothing but naked legal conclusions – for example that "Defendants provided Hizbullah with substantial assistance intentionally, knowingly, recklessly, and/or with willful blindness" (Compl. ¶ 22); "Defendants knew or consciously avoided knowing that Hizbullah's conduct was a breach of duty" (*id.* ¶ 368) – devoid of supporting factual details.  Under *Twombly*, such paltry, conclusory allegations are insufficient (*see* 127 S. Ct. at 1964-65) and do not adequately support the conclusion that BLF acted with knowledge or intent.

C.     **Plaintiffs Fail To State A Claim For Conspiracy.**

Running parallel to plaintiffs' aiding and abetting claims but faring no better are four claims that BLF "conspired" with Hizbullah to commit genocide, crimes against humanity, war crimes and terrorism (Counts 2, 4, 6, and 8).  These conspiracy claims also must be dismissed.

1.     **Plaintiffs' conspiracy claims are not actionable under the ATS.**

The most basic problem with the conspiracy claims is that conspiracy is not an actionable violation of international law in the circumstances presented in this case.  In *Hamdan v.*

---

supported Hizbullah is dubious.  As the Complaint acknowledges, the U.S. government did not blacklist the IRSO until *after* all of the attacks alleged in the Complaint had occurred (*compare* Compl. ¶ 142(h) *with id.* ¶¶ 202, 212, 216, 263, 316), which belies plaintiffs' suggestion that BLF even should have known of the IRSO's support for Hizbullah.

*Rumsfeld*, 548 U.S. 557 (2006), the Supreme Court observed that international law recognizes conspiracy in only two limited circumstances: "conspiracy to commit genocide and common plan to wage aggressive war." *Id.* at 610; *see id.* at 611-12.  Following *Hamdan*, this Court has held that "liability under the ATS for participation in a conspiracy may only attach where the goal of the conspiracy was either to commit genocide or to commit aggressive war." *Presbyterian Church of Sudan*, 453 F. Supp. 2d at 664-65 (rejecting claim for conspiracy to commit crimes against humanity).  Thus, plaintiffs' claims for conspiracy to commit crimes against humanity (Count 4), war crimes (Count 6), and terrorism (Count 8), fail at the first step of the *Sosa* analysis and must be dismissed.

Plaintiffs' claim of conspiracy to commit genocide (Count 2) fails for a different reason. When Congress enacted the Genocide Convention Implementation Act of 1987, it made genocide a criminal offense. *See* Pub. L. No. 100-606, 102 Stat. 3045 (codified at 18 U.S.C. § 1091).  At the same time, however, Congress made clear that its decision provided no authorization for private parties to pursue civil claims for genocide, stating that the creation of criminal liability was not to "be construed as creating any substantive or procedural right enforceable by law by any party in any proceeding." 18 U.S.C. § 1092.

This congressional determination is fatal to plaintiffs' bid to have this Court recognize a private cause of action under the ATS for conspiracy to commit genocide.  As *Sosa* explained, courts should generally "look for legislative guidance before exercising innovative authority over substantive law" (542 U.S. at 726), and "a decision to create a private right of action is one better left to legislative judgment in the great majority of cases." *Id.* at 727.  The force of these warnings is most compelling where, as here, a court would be acting not just against a backdrop of congressional silence, but contrary to "a clear indication from the political branches that a

'specific, universal, and obligatory' norm against genocide is *not* to be enforced through a private damages action." *Id.* at 749 (Scalia, J., concurring) (emphasis in original).

### 2.    Plaintiffs fail to allege the elements of conspiracy.

Even if conspiracy to commit the underlying crimes were actionable under the ATS (and it is not), plaintiffs, in any case, fail to plead the elements of any "conspiracy."   The Second Circuit has made clear that "joint participation pursuant to an agreement . . . to commit a tort is necessary to impose liability on those acting in concert." *Khulumani*, 504 F.3d at 317 (Korman, J., concurring in relevant part) (citing *In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 841 (2d Cir. 1992)).   Plaintiffs' allegations fall well short of this standard.

An agreement is the *sine qua non* of a conspiracy. *See Kashi v. Gratsos*, 790 F.2d 1050, 1055 (2d Cir. 1986).   Plaintiffs do not allege that BLF and Hizbullah entered into any agreement; at most, plaintiffs allege that BLF's conduct indirectly was helpful to Hizbullah:  "Defendants conspired with Hizbullah to commit genocide in that they provided material financial services which bankrolled Hizbullah's missile attacks . . . ." Compl. ¶ 361.   There is no allegation of any actual agreement.  *Cf. In re Sinaltrainal Litig.*, 474 F. Supp. 2d 1273, 1289 (S.D. Fla. 2006) ("Alleging that the Defendants 'affirmatively acted to benefit from the civil war by making arrangements to have the paramilitaries target their union leaders' is a far cry from alleging that Defendants actually conspired with the paramilitaries to orchestrate hostilities.").   In the absence of an unequivocal mutual agreement, there can be no conspiracy.

Further, plaintiffs would have to allege an agreement "to commit a tort." *Khulumani*, 504 F.3d at 317 (Korman, J., concurring).   Plaintiffs' failure in this regard is hardly surprising; the idea that BLF *agreed* to commit genocide (or any of the other torts listed), on its face, is absurd and implausible.   Plaintiffs' futile effort to plead around this defect also fails:  "Defendants intended to aid, knew of, and/or consciously or recklessly avoided knowing of Hizbullah's

genocidal mission." Compl. ¶ 362. "Recklessly avoid[ing] knowing" about genocide is worlds apart from agreeing to commit it. For this independent reason, therefore, plaintiffs' conspiracy claims fail. *See, e.g., Stutts*, 2006 WL 1867060, at *14 (dismissing conspiracy count where "[t]he complaint provides no basis to conclude that the Bank Defendants . . . and Saddam Hussein shared a common goal relating to the proliferation and use of chemical weapons"); *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 100 (D.D.C. 2002) (same).

### D.    Plaintiffs Fail To State A Claim For "Financing Terrorism."

Unable to fit the square peg of BLF's alleged conduct into the round hole of secondary liability, plaintiffs try to cure the defect by pleading an innovative theory of direct liability: "financing terrorism," which purports to impose liability for the same conduct that, as discussed above, fails to constitute either aiding and abetting or conspiracy. *See* Compl. ¶¶ 350-58. The Court should reject this attempted end-run around established limits on ATS liability.

The Second Circuit in *Khulumani* would not have grappled at length with whether the ATS allows aiding and abetting liability, and the proper standard for it,[8] if plaintiffs unable to plead aiding and abetting could nevertheless impose liability based on the same conduct under a different rubric. Thus, just as plaintiffs' other claims fail for lack of scienter, the absence of substantial assistance, and an insufficient connection between BLF's alleged acts and Hizbullah's alleged misconduct, so too must their "financing terrorism" claim fail.

More broadly, even if plaintiffs had pleaded those elements, their claim still would fail under *Sosa* because there is no universally recognized, clear, and definite norm proscribing the specific conduct alleged here. Whatever the possible contours of an ATS claim for "financing terrorism," there can be no actionable norm as boundless as what plaintiffs assert in this case.

---

[8] *Compare Khulumani*, 504 at 287-88 (Hall, J., concurring) *with id.* at 277 (Katzmann, J., concurring) *and id.* at 330 (Korman, J., concurring in part & dissenting in part).

1.   **Plaintiffs fail to plead the elements required by the Terrorism Financing Convention.**

In asserting their claim for "financing terrorism," plaintiffs rely on the International Convention for the Suppression of the Financing of Terrorism, adopted in December 1999, *available at* http://untreaty.un.org/english/Terrorism/Conv12.pdf (the "Convention"). *See* Compl. ¶ 348. The Convention describes an offense that occurs when a person "unlawfully and willfully, provides or collects funds with the intention that they should be used or in the knowledge that they are to be used, in full or in part, in order to carry out" a prohibited act of terrorism. Convention Art. 2(1). Even assuming that the Convention could create an actionable international law violation under the ATS, which under these circumstances it does not (*see infra*), plaintiffs fail to allege that BLF's conduct falls within what the Convention prohibits.

First, plaintiffs fail to allege that BLF acted with the *mens rea* required by the Convention, which insists upon actual knowledge or intent that the funds provided will be used to carry out acts of terrorism. Instead, plaintiffs allege merely that "[d]efendants intended to aid, knew of, and/or consciously *or recklessly avoided knowing* of Hizbullah's *terrorist objectives* both prior to and during the period in which they supplied it with financial assistance." Compl. ¶ 352 (emphases added). As described above, allegations covering a scienter range that includes recklessly avoiding knowing of Hizbullah's terrorist objectives is not sufficient to plead BLF's knowledge or intent with respect to terrorist acts. Moreover, it is clear from the language of the Convention that even knowledge that Hizbullah had "terrorist objectives" would not be enough to impose liability. The *mens rea* required by the Convention focuses not on general objectives, but on specific terrorist activity; a person must have the intent, or at least actual knowledge, that the relevant funds he provided or collected would in fact be used *to carry out a prohibited act of terrorism. See* Convention Art. 2. Plaintiffs' allegations do not make this showing.

19

Second, the Convention is violated only if the defendant acted "willfully and unlawfully." The term "willfully" imposes a heightened scienter requirement, which requires proof that the party in question "acted with knowledge that his conduct was unlawful." *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994); *cf. Bryan v. United States*, 524 U.S. 184, 191 (1998) ("When used in the criminal context, a 'willful' act is one undertaken with a 'bad purpose.'").[9] Plaintiffs' bare and wholly conclusory allegation that BLF acted "unlawfully and willfully" (Compl. ¶ 351) is insufficient. *See Twombly*, 127 S. Ct. at 1964-65. The Complaint contains no factual allegations from which it is plausible to conclude that BLF provided financial services to the IRSO knowing that doing so was *unlawful*. To the contrary, plaintiffs do not even allege that Lebanon, Israel, or the United States had blacklisted the IRSO at the relevant time.

Third, under the Convention, the *actus reus* of "financing terrorism" is (1) to "provide or collect funds" that (2) "are to be used, in full or in part, in order to carry out" a prohibited act of terrorism. Convention Art. 2. Here, neither requirement is met. The plain meanings of the terms "provide" and "collect" are to "give" and to "gather,"[10] a reading fully consistent with the Convention's prohibition on terrorist "financing," a term that means "to raise or provide funds or capital for."[11] Plaintiffs, however, do not allege that BLF raised or gathered funds for Hizbullah. Instead, they allege that BLF maintained accounts and provided other financial services to IRSO, which they claim is affiliated with Hizbullah. *See, e.g.*, Compl. ¶ 77. That is far from alleging

---

[9]   The "unlawfully and willfully" requirement likely was included in the Convention to address the Red Cross's concern that it might otherwise violate the Convention by providing assistance under its mandate. *Cf.* United Nations Documents A/AC.252/1999/INF/2, Annex (Mar. 26, 1999), and A/C.6/54/WG.1/INF/1 (Nov. 9, 1999), *available at* http://www.un.org/depts/dhl/index.html, then insert document number into "Catalogue Quick Search" and follow link).

[10]   "Provide" means "to give someone something that they need." Cambridge Dictionary Online, available at http://dictionary.cambridge.org/define.asp?key=63696&dict=CALD. "Collect" means "to gather together from a variety of places or over a period of time." *Id.*, available at http://dictionary.cambridge.org/define.asp?key=14905&dict=CALD.

[11]   *See* Merriam-Webster OnLine, at http:www.meriam-webster.com/dictionary/finance[2].

that BLF *provided* funds *to*, or *collected* funds *for*, Hizbullah.   Moreover, even if plaintiffs

alleged that BLF provided or collected funds, that would not satisfy the additional requirement

that the funds provided be used for an act of terrorism.  *Cf. Mastafa*, 2008 WL 4378443, at *4

("aiding the Hussein regime is not the same thing as aiding and abetting its alleged human rights

abuses").

Fourth, plaintiffs have not pleaded facts sufficient to show that BLF's alleged conduct

was the proximate cause of their injuries.   Causation is an indispensable requirement of any ATS

claim.  *See Presbyterian Church of Sudan*, 453 F. Supp. 2d at 668 (holding that "causation issues

. . . affect each [of plaintiffs' ATS] claim[s]"); *see also Carmichael v. United Techs.*, 835 F.2d

109, 115 (5th Cir. 1988) (dismissing ATS claim because "[plaintiff] simply cannot demonstrate

any causal connection between Price Waterhouse's conduct and his prolonged imprisonment").

"Central to the notion of proximate cause is the idea that a person is not liable to all those who

may have been injured by his conduct, but only to those with respect to whom his acts were a

substantial factor in the sequence of responsible causation, and whose injury was reasonably

foreseeable or anticipated as a natural consequence."  *First Nationwide Bank v. Gelt Funding*

*Corp.*, 27 F.3d 763, 769 (2d Cir. 1994) (internal quotation marks omitted).  But plaintiffs do not

plead any facts showing that the alleged BLF account was even *in* the chain of causation, let

alone a "substantial factor" in that chain.   Plaintiffs merely recite the legal standard (*e.g.*, Compl.

¶ 355), which is not enough.  *Twombly*, 127 S. Ct. at 1964-65.

### 2.      "Financing Terrorism" is not an actionable norm under these circumstances.

Plaintiffs' terrorist financing claim fails for an even more fundamental reason.   In the

circumstances of this case, the norm that plaintiffs seek to apply against BLF is not sufficiently

universal and definite to satisfy the strict standard articulated in *Sosa*.   BLF is not arguing that a

claim for financing terrorism can *never* be actionable under the ATS, nor does the Court need to reach that question.  Instead, BLF is arguing that, whatever the proper parameters of such norm, it is not so boundless as to encompass the routine banking conduct alleged here.

    *Sosa* makes clear that a court deciding whether to recognize a new cause of action under the ATS must focus on the specific conduct at issue, not just on the general theory of liability that the plaintiffs allege.  Thus, in *Sosa* itself, the Supreme Court rejected the plaintiff's claim for "arbitrary detention" based on its conclusion that "a single illegal detention of less than a day, followed by the transfer of custody to lawful authorities and a prompt arraignment, violates no norm of customary international law so well defined as to support the creation of a federal remedy."  542 U.S. at 738.  In so holding, the Court did not say that arbitrary detention *never* could be actionable; instead, it found that under the particular circumstances at issue, there was no broad-based international consensus that the defendant's conduct was unlawful.

    So too here, this Court need not conclude that "financing terrorism" can never be actionable under the ATS, no matter what the circumstances, in order properly to reject plaintiffs' present claims.  Instead, it is enough to hold that, even if true, BLF's alleged maintenance of a single neighborhood account, for an individual or entity that at the relevant time was not alleged to have been blacklisted, followed by the prompt closing of the account upon learning about its possible misuse, violates no norm of customary international law so well defined as to support the creation of a federal remedy.

    U.S. courts repeatedly have rejected attempts to sue banks based on allegations that they provided routine financial services to terrorist organizations.  One of the leading cases makes clear that "there [is] no support for the proposition that a bank is liable for injuries done with money that passes through its hands in the form of deposits, withdrawals, check clearing

22

services, or any other routine banking service." *In re Terrorist Attacks on Sept. 11, 2001*, 349 F.
Supp. 2d at 832 (internal quotation marks omitted).  That U.S. courts have rejected such liability
is strong evidence that such conduct is beyond the scope of any actionable norm for financing
terrorism.  *See United States v. Yousef*, 327 F.3d 56, 92 n.25 (2d Cir. 2003) ("[I]t is highly
unlikely that a purported principle of customary international law in direct conflict with the
recognized practices and customs of the United States and/or other prominent players in the
community of States could be deemed to qualify as a *bona fide* customary international law
principle.").

     The practical considerations that the Supreme Court invoked in *Sosa* further support the
conclusion that any norm against financing terrorism simply cannot be as broad as what plaintiffs
assert.  *See* 542 U.S. at 732-33 (instructing courts to consider, before creating a new ATS claim,
"the practical consequences of making that cause available to litigants in the federal courts").
*Sosa*, in rejecting plaintiffs' proposed cause of action, expressed concern about the
"breathtaking" implications of a rule that "would support a cause of action in federal court for
any arrest, anywhere in the world, unauthorized by the law of the jurisdiction in which it took
place." *Id.* at 736; *see also Mora v. New York*, 524 F.3d 183, 209 (2d Cir. 2008) (declining to
allow an ATS claim for imprisonment without notification of certain rights because "the label
enemy of the human race would never fit" a violator) (internal quotation marks and alterations
omitted), *cert. denied*, No. 08-106, 2008 WL 2882181 (U.S. Oct. 14, 2008).  The claim that
plaintiffs seek to pursue here suffers from similar defects:  it would allow an ATS suit against
any bank, for any transaction, anywhere in the world, even if *authorized* by the law of the
jurisdiction in which it took place and involving a party not blacklisted by any government, if the
party in question has been *accused* of terrorist ties.

Indeed, under international law as plaintiffs seek to define it, banks, in deciding with whom to conduct business, would not be permitted to rely on any internationally recognized consensus on which groups are terrorist affiliates (or even on the U.S. blacklist). Banks could instead be held liable for violating international law whenever plaintiffs were able, with the benefit of hindsight, to find something in "television and website advertisements" (Compl. ¶ 19), or "English and Arabic . . . donation program[s]" (*id.* ¶ 85), or "testimony before Congress" (*id.* ¶ 81), to support a challenge to the bonafides of one of the bank's alleged customers. This would create the same practical problems that so alarmed the Supreme Court in *Sosa* and precisely the type of "vague and amorphous" obligation that the Second Circuit has rejected as viable basis for an actionable norm of international law. *See Flores v. S. Peru Copper Corp.,* 414 F.3d 233, 254 (2d Cir. 2003) (holding that "right to life" and "right to health" were not actionable norms of international law).

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed, with prejudice, as against

BLF.

Dated: November 28, 2008
       New York, New York

MAYER BROWN LLP

Mark G. Hanchet
Christopher J. Houpt
1675 Broadway
New York, NY 10019
Telephone:  (212) 506-2695
Facsimile:  (212) 849-5695

Alex C. Lakatos
1909 K Street, NW
Washington, DC  20037-1128
Telephone:  202-263-3312
Facsimile:  202-663-5312

*Attorneys for Defendant*
*Banque Libano-Française SAL*