UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
ZIVIE TAMAM et al.,                :
                                   :
                 Plaintiffs,       :
                                   :
     -against-                     :      **Opinion and Order**
                                   :      No. 08 Civ. 6156 (JFK)
FRANSABANK SAL, BANQUE LIBANAISE   :
POUR LE COMMERCE, BANK OF BEIRUT   :
SAL, BANQUE LIBANO-FRANÇAISE SAL,  :
MIDDLE EAST AFRICA BANK, and JOHN  :
DOES 1-100,                        :
                                   :
                 Defendants.       :
----------------------------------X

<u>APPEARANCES</u>:

     <u>For Plaintiffs</u>:
          Gary M. Osen, Esq.
          Joshua D. Glatter, Esq.
          Cindy T. Schlanger, Esq.
          Aaron Schlanger, Esq.
          Ari Ungar, Esq.
          OSEN LLC

     <u>For Defendants Fransabank SAL and</u>
     <u>Bank Libanaise Pour le Commerce</u>:
          Jonathan D. Siegfried, Esq.
          Lawrence S. Hirsh, Esq.
          DEWEY & LEBOEUF LLP

     <u>For Defendant Bank of Beirut SAL</u>:
          Brian H. Polovoy, Esq.
          Daniel M. Segal, Esq.
          SHEARMAN & STERLING LLP

          Tai H. Park, Esq.
          PARK & JENSEN LLP

     <u>For Defendant Bank Libano-Française SAL</u>:
          Mark Hanchet, Esq.
          Christopher J. Houpt, Esq.
          MAYER BROWN LLP

For Defendant Middle East and Africa Bank:
    Edward B. MacMahon, Jr., Esq.
    LAW OFFICE OF EDWARD B. MACMAHON, JR.

    Joshua L. Dratel, Esq.
    LAW OFFICES OF JOSHUA L. DRATEL, P.C.

**JOHN F. KEENAN, United States District Judge:**

Plaintiffs are fifty-seven Israeli citizens who were injured in or survive family members killed in missile attacks launched by Hizbullah, a Lebanese terrorist organization, in July and August of 2006. Plaintiffs brought suit under the Alien Tort Claims Act ("ATCA") against five foreign banks, Fransabank SAL, Bank Libanaise Pour le Commerce, Bank of Beirut SAL, Bank Libano-Française SAL, and Middle East and Africa Bank ("Defendants"), claiming that their provision of certain financial services to parties associated with Hizbullah constituted terrorism financing as well as conspiracy and aiding and abetting Hizbullah to commit genocide, crimes against humanity, war crimes, and terrorism. Before the Court are Defendants' motions to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). For the reasons set forth below, the motions are granted.

## I. BACKGROUND

### A. Hizbullah

The following facts as alleged in the Amended Complaint are taken as true for the purposes of this motion. Hizbullah is an

extremist organization that originated in Lebanon in the early 1980s.  Funded, trained, and armed by Iran, Hizbullah has committed numerous acts of violence and terrorism in its attempt to destroy the state of Israel.  Most relevant to the Plaintiffs' claims, on July 12, 2006, Hizbullah operatives crossed from Lebanon into Israel and ambushed an Israeli military patrol.  This assault sparked a thirty-four day conflict between Israel and Hizbullah during which Hizbullah launched approximately 3,900 missiles at civilian areas in Israel.  Missile attacks during this period resulted in serious injuries to several Plaintiffs and the deaths of many more Israelis, whose survivors join the present lawsuit.

Since its inception, Hizbullah has evolved into a highly structured organization operating through a network of departments which handle everything from terrorist and paramilitary activities to the administration of social services, financial services, and media services.  The Amended Complaint highlights several groups associated with Hizbullah which allegedly further the terrorist mission, including:  (1) the Islamic Resistance Support Organization ("IRSO"), a Hizbullah-controlled fundraising operation that solicits and collects donations primarily used to purchase weapons; (2) the Wounded Association, also known as the Charitable Society for the Help of the Wounded and Crippled of the War in Lebanon (the

"Wounded Association"), a social services organization that
provides financial and medical assistance to injured Hizbullah
fighters; (3) the Martyrs Foundation Charitable Social Society
(the "Martyrs Foundation"), a group that pays stipends to the
families of Hizbullah fighters killed in battle; (4) Jihad Al-
Bina, a construction company operated by Hizbullah for its own
as well as Lebanese civilian construction projects; (5) Yousser
Company for Finance and Investment, the unofficial treasury that
holds and invests Hizbullah's assets; and (6) Al-Manar, a
Lebanese satellite television network, and Al-Nour, a Lebanese
radio station, both of which are operated by Hizbullah in order
to broadcast propaganda, raise money, and recruit volunteers.

The Amended Complaint devotes numerous pages to describing
the worldwide recognition of Hizbullah and related front groups
as terrorist organizations.  For instance, in 1995, President
Clinton signed an Executive Order naming Hizbullah and several
of its leaders Specially Designated Terrorists.  In 1997, the
United States designated Hizbullah as a Foreign Terrorist
Organization.  Several other countries, including Canada, the
Netherlands, and Israel, followed suit.  In 2001, President Bush
signed an Executive Order naming Hizbullah a Specially
Designated Global Terrorist ("SDGT"); on March 23, 2006, Al-
Manar and Al-Nour became SDGTs; on August 29, 2006, the IRSO was
designated an SDGT; and from late 2006 to early 2007, Yousser

Company for Finance and Investment, Jihad Al-Bina, and the Martyrs Foundation were named SDGTs.

The Amended Complaint also cites to several public sources to establish the notoriety of various groups' (for example, the IRSO and Al-Manar) association with Hizbullah. These include news articles, U.S. Congressional testimony and Treasury Department statements, and an MSNBC report in which a journalist posed as a prospective donor responding to an advertisement on Al-Manar and was directed to send contributions to the "Lebanese-French Bank." (Am. Compl. ¶ 82).

### B. Defendants

Defendants are several Lebanese banks operating in Lebanon that allegedly provided financial services to organizations affiliated with Hizbullah.

Fransabank SAL ("Fransabank") is a Lebanese bank established in Beirut in 1921. It provides a range of retail, commercial, corporate, and international banking services, including U.S. dollar wire transfers effectuated through correspondent banks including the Bank of New York and JPMorgan Chase Bank, which are located in New York. From January 2003 to August 2006, Fransabank maintained an account for and provided financial services to the Wounded Association as well as the IRSO at its Cheiah Branch in Lebanon.

Banque Libanaise Pour le Commerce ("BLC Bank") is a Lebanese bank established in 1950.  It operates thirty-four branches in Lebanon, and in August 2007, Fransabank acquired a majority of BLC Bank's capital.  BLC Bank also sends U.S. dollar wire transfers through correspondent banks including Wachovia Bank, the Bank of New York, and JPMorgan Chase Bank.  From January 2003 to August 2006, BLC Bank maintained an account and provided financial services to the IRSO in Al-Shiyah, Lebanon and to Al-Manar and/or its parent company.

Bank of Beirut SAL ("Bank of Beirut") is one of the largest banks operating in Lebanon.  It provides various retail banking services, and it sends U.S. dollar wire transfers through correspondent banks including American Express Bank, Ltd., JPMorgan Chase Bank, and the Bank of New York.  From January 2003 to August 2006, Bank of Beirut maintained an account and provided financial services to the IRSO in its Al-Ghabiri branch in Lebabnon and to Al-Manar and/or its parent company.

Banque Libano-Française SAL ("Banque Libano-Française") is a leading private bank in Lebanon.  It offers a wide variety of banking services, such as retail, commercial, corporate, investment, and private banking.  It submits its U.S. dollar wire transfers through correspondent banks including the Bank of New York and Citibank.  From January 2003 to August 2006, Banque

Libano-Française maintained an account and provided financial services to the IRSO in the Hreik Neighborhood of Beirut.

Middle East and Africa Bank ("MEAB") has five locations in Lebanon. It effects U.S. dollar wire transfers through correspondent banks including Wachovia Bank, which is located in New York. From January 2003 to August 2006, MEAB maintained an account and provided financial services to the IRSO.

Plaintiffs also name 100 John Doe defendants, who allegedly maintained accounts and provided financial services to the Martyrs Foundation, Jihad Al-Bina, and Yousser Company for Finance and Investment.

### C.    The Amended Complaint

The Lebanese pound is pegged to the U.S. dollar, and U.S. dollars are widely used and accepted in Lebanon. The Amended Complaint alleges that three-quarters of deposits in Lebanese banks are denominated in U.S. dollars. Lebanese banks generally acquire U.S. currency either through the Central Bank of Lebanon clearinghouse or through correspondent banking relationships in other countries. As discussed above, Defendant banks maintained several correspondent bank accounts in New York.

In relation to those accounts, Defendant banks, as well as their U.S. correspondent banks, were obligated to implement Know Your Customer and Anti Money Laundering procedures. Know Your Customer practices include verifying a customer's identity and

confirming that the customer is not involved in illegal activities or included on sanctions lists in connection with suspected terrorist activities, money laundering, fraud, or other crimes. The Amended Complaint cites public statements on BLC Bank's website and in Fransabank's 2006 Annual Report in which the banks discuss their customer identification and anti money laundering policies in support of the overriding allegation that Defendants "intentionally, knowingly, recklessly, and/or with willful blindness" provided Hizbullah with "regular, systematic, and unfettered access to U.S. currency, thus enabling Hizbullah to rapidly access funds to purchase missiles and other weapons." (Am. Compl. ¶¶ 22, 24).

Thus, Plaintiffs' theory of the case is a long causal chain linking Hizbullah missile attacks to banks in Lebanon to New York through a series of money transfers. Plaintiffs allege that named Defendants maintained bank accounts and provided financial services for several Hizbullah front groups, notably the IRSO. Defendant banks also maintained correspondent bank accounts abroad in order to facilitate currency conversion and international financial transactions. Since Lebanon has a dollarized economy, Plaintiffs deduce that Hizbullah needed U.S. dollars to purchase weapons. Thus, front groups like the IRSO had money in their Lebanese bank accounts exchanged for dollars through a correspondent bank in New York. The IRSO then

presumably sent the U.S. dollars to Hizbullah, and Hizbullah used those dollars to buy the missiles which later injured or killed Plaintiffs and their relatives in Israel.

## II. DISCUSSION

### A.    12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction

On a Rule 12(b)(2) motion to dismiss, plaintiff bears the burden of establishing jurisdiction over a foreign defendant. In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 206 (2d Cir. 2003); Kernan v. Kurz-Hastings, Inc., 175 F.3d 236, 240 (2d Cir. 1999).  As no discovery has yet taken place, to survive a motion to dismiss the plaintiff must plead "factual allegations [that] constitute a prima facie showing of jurisdiction."  Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990).  A prima facie showing of jurisdiction "does not mean that plaintiff must show only some evidence that defendant is subject to jurisdiction; it means that plaintiff must plead facts which, if true, are sufficient in themselves to establish jurisdiction."  Bellepointe, Inc. v. Kohl's Dep't Stores, Inc., 975 F. Supp. 562, 564-65 (S.D.N.Y. 1997).  Thus, the Court "assumes the truth of the plaintiff's factual allegations for purposes of the motion and challenges their sufficiency."  Ball, 902 F.2d at 197.  However, the court need not "draw 'argumentative inferences' in the plaintiff's favor,"  Mende v.

Milestone Tech., Inc., 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003) (quoting Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994)), and "conclusory non-fact-specific jurisdictional allegations" or a "legal conclusion couched as a factual allegation" will not establish a prima facie showing of jurisdiction. Jazini v. Nissan Motor Co., Ltd., 148 F.3d 181, 185 (2d Cir. 1998).

### 1. Federal Rule of Civil Procedure 4(k)(1) and N.Y. C.P.L.R. 302(a)(1)

Plaintiffs ask the Court to exert personal jurisdiction over five Lebanese banks pursuant to F.R.C.P. 4(k)(1), which provides that "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." Accordingly, the jurisdictional inquiry is two-fold: first, the court looks to the law of the forum state – here, New York - to determine whether it may exert personal jurisdiction over the foreign defendant; if so, the court then considers whether subjecting the defendant to personal jurisdiction comports with the requirements of due process. See Best Van Lines, Inc. v. Walker, 490 F.3d 239, 242 (2d Cir. 2007); Arrowsmith v. United Press Int'l, 320 F.2d 219, 223 (2d Cir. 1963) (en banc).

The New York long-arm statute confers personal jurisdiction over a foreign defendant that "transacts any business within the state" where the plaintiff's claim arises from that business activity. N.Y. C.P.L.R. 302(a)(1). A foreign defendant is subject to personal jurisdiction under C.P.L.R. 302(a)(1) where it "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." McKee Elec. Co., Inc. v. Rauland-Borg Corp., 20 N.Y.2d 377, 382 (N.Y. 1967); see also Ehrenfeld v. Bin Mahfouz, 9 N.Y.3d 501, 508 (N.Y. 2007). "Not all purposeful activity, however, constitutes a 'transaction of business' within the meaning of C.P.L.R. 302(a)(1), and jurisdiction will not extend to cover defendants with nothing more than petty contacts to the state." Sills v. Ronald Reagan Presidential Found., Inc., No. 09 Civ. 1188, 2009 WL 1490852, at *6 (S.D.N.Y. May 27, 2009) (quoting Fischbarg v. Doucet, 9 N.Y.3d 375, 380 (N.Y. 2007)). Therefore, to determine whether a defendant has sufficiently transacted business in New York to invoke C.P.L.R. 302(a)(1), the court must consider the totality of the circumstances. Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 787 (2d Cir. 1999).

Furthermore, the plaintiff's claim must arise from the alleged business activity in New York. In order for a claim to "arise from" a business transaction in New York, there must be

11

an "'articulable nexus' or a 'substantial relationship' between transactions occurring within the state and the cause of action sued upon." Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 23 (2d Cir. 2004) (quoting Kronisch v. United States, 150 F.3d 112, 130 (2d Cir. 1998)); Beacon Enters., Inc. v. Menzies, 715 F.2d 757, 764 (2d Cir. 1983) ("[S]ection 302(a)(1) . . . requires a direct relation between the cause of action and the in-state conduct as an important condition of acquiring jurisdiction over the non-domiciliary defendant." (internal quotation and citation omitted)); McGowan v. Smith, 52 N.Y.2d 268, 272 (N.Y. 1981). "A connection that is 'merely coincidental' is insufficient to support jurisdiction" under C.P.L.R. 302(a)(1). Best Van Lines, 490 F.3d at 249 (quoting Solé Resort, S.A. de C.V. v. Allures Resorts Mgmt., LLC, 450 F.3d 100, 103 (2d Cir. 2006)).

Plaintiffs argue that Defendants are subject to personal jurisdiction on the basis of alleged wire transfers through correspondent banks in New York converting foreign currency to U.S. dollars. As an initial matter, courts in this district have routinely held that merely maintaining a New York correspondent bank account is insufficient to subject a foreign bank to personal jurisdiction. See, e.g., Daventree Ltd. v. Republic of Azerbaijan, 349 F. Supp. 2d 736, 762 (S.D.N.Y. 2004) (holding that foreign defendant's maintenance of New York correspondent bank account through which it transferred funds

pursuant to a racketeering scheme did not give rise to personal jurisdiction under C.P.L.R. 302); Johnson Elec. N. Am., Inc. v. Bank of Wales, PLC, No. 90 Civ. 6683, 1991 WL 20006, at * 2 (S.D.N.Y. Feb. 8, 1991) ("[T]he mere existence of a correspondent bank relationship between a foreign bank and a New York correspondent bank is an insufficient basis for asserting personal jurisdiction over the foreign bank . . . under the less demanding 'transaction of business' test."); Celton Man Trade, Inc. v. Utex, S.A., No. 84 Civ. 8179, 1986 WL 6788, at *4 (S.D.N.Y. June 12, 1986); Taub v. Colonial Coated Textile Corp., 387 N.Y.S.2d 869, 870 (1st Dep't 1976).

Plaintiffs assert that it is not merely the existence, but rather Defendants' use of correspondent bank accounts, that gives rise to personal jurisdiction in this case. Defendants strenuously dispute this claim, arguing that the Amended Complaint fails to allege actual transfers from Hizbullah front group accounts in Lebanon through correspondent banks in New York. This point is well-taken. Although Plaintiffs allege that Fransabank, as well as the John Doe defendants, maintained bank accounts and provided services to the Wounded Association, the Martyrs Foundation, Jihad Al-Bina, Yousser Company for Finance and Investment, and Al-Manar, there are no allegations that any money from any of these accounts was exchanged for U.S. dollars through a correspondent bank in New York. Instead, the

Amended Complaint: (1) establishes that the Defendants maintained correspondent bank accounts to facilitate foreign currency conversion; and (2) concludes that because Lebanon has a dollarized economy, Hizbullah and its front groups needed U.S. dollars to fund their operations. The missing link between these two propositions – i.e., the actual transfer of money through New York – is the only factual predicate on which this Court could potentially base its jurisdiction. Although reasonable inferences will be drawn in the Plaintiffs' favor, the Court cannot make the speculative leap required in order to confer jurisdiction on the basis of those accounts.

After closely parsing the ninety-four page Amended Complaint, the Court can find only one relevant jurisdictional allegation. Specifically, Plaintiffs claim that "[o]n information and belief, Defendants processed funds and cleared U.S. dollars for IRSO's direct benefit through the United States in this District." (Am. Compl. ¶ 17). While the processing of IRSO funds through correspondent banks may indicate that Defendants purposefully availed themselves of business opportunities in New York, the use of correspondent accounts in New York nonetheless cannot form the basis of personal jurisdiction because the Amended Complaint does not set forth a "substantial relationship" between the correspondent bank accounts and Hizbullah's terrorist activity.

Courts have found this substantial relationship between correspondent bank accounts and the plaintiff's claim where the use of the correspondent account was "at the very root of the action." Correspondent Servs. Corp. v. J.V.W. Invs. Ltd., 120 F. Supp. 2d 401, 405 (S.D.N.Y. 2000).  Conversely, as the Second Circuit explained:

> In cases where claims have been dismissed on jurisdictional grounds for lack of a sufficient nexus between the parties' New York contacts and the claim asserted, the event giving rise to the plaintiff's injury had, at best, a tangential relationship to any contacts the defendant had with New York.  In fact, in those cases, the injuries sustained and the resulting disputes bore such an attenuated connection to the New York activity upon which the plaintiffs attempted to premise jurisdiction that the disputes could not be characterized as having "arisen from" the New York activity.

Solé Resort, 450 F.3d at 104.

Plaintiffs rely on two cases in support of their argument that use of the New York correspondent accounts can establish personal jurisdiction under C.P.L.R. 302(a)(1).  However, in both of these cases, the plaintiffs had some connection to the money transferred through the New York accounts, and thus the use of said accounts for money transfers was clearly "at the very root" of the action.  For example, in Correspondent Services, a third party plaintiff corporation formed in Dominica alleged that a Bahamian bank made unauthorized securities purchases with the corporation's money.  120 F. Supp. 2d at 403.

The court exerted personal jurisdiction over the Bahamian bank pursuant to C.P.L.R. 302(a)(1) because the bank made the unauthorized purchases and eventually delivered the securities to the third party plaintiff through a correspondent account in New York.  Id. at 404-05.  There, the conduct tying the foreign parties to New York – the unauthorized purchase and delivery of securities using a correspondent account – was the same conduct forming the basis of the third party plaintiff's claim. Similarly, in Dale v. Banque SCS Alliance S.A., plaintiff insurance companies sued a Swiss bank that maintained correspondent bank accounts in New York where the bank used those New York accounts to launder money a third party stole from plaintiffs.  No. 02 Civ. 3592, 2005 WL 2347853, at *1 (S.D.N.Y. Sept. 22, 2005).  There, the court established personal jurisdiction over plaintiffs' RICO and fraud claims because the foreign defendant maintained "several correspondent bank accounts in New York that it used to effect a number of the funds transfers that are the subject of this action."  Id. at *3 (emphasis added).[1]

    Plaintiffs allege that the conduct giving rise to their claims is Defendants' transfer of money through correspondent

_____

[1] Plaintiffs' additional reliance on Parex Bank v. Russian Savings Bank, 116 F. Supp. 2d 415 (S.D.N.Y. 2000) is misplaced, as that case did not involve a jurisdictional analysis under C.P.L.R. 302(a)(1).

accounts for conversion to U.S. dollars. However, unlike the cases they cite, Plaintiffs here had no association with the money transferred, and they suffered no financial loss as a result of the services provided in New York. It is clear that the events giving rise to the physical injuries and deaths for which Plaintiffs seek redress are missile attacks in Israel, not funds transfers in New York. Cf. Johnson v. Ward, 4 N.Y.3d 516, 519 (N.Y. 2005) (rejecting jurisdiction over negligence claim under C.P.L.R. 302(a)(1) where "Plaintiffs' cause of action arose out of defendant's allegedly negligent driving in New Jersey, not from the issuance of a New York driver's license or vehicle registration"). Plaintiffs attempt to connect the dots between New York and the Hizbullah missile attacks with a series of conclusory allegations and inferences: Hizbullah must have purchased missiles and other weapons in U.S. dollars; those same missiles and weapons must have been used in the 2006 attacks on Israeli civilian areas; Hizbullah must have obtained the U.S. currency to pay for the weapons from the IRSO; the IRSO must have obtained its U.S. currency from Defendants. Although the Court accepts as true that at some point Defendants obtained U.S. dollars from correspondent accounts in New York, "a defendant may not be subject to personal jurisdiction under CPLR § 302(a)(1) simply because [its] contact with New York was a link in a chain of events giving rise to the cause of action."

*Siverls-Dunham v. Lee*, No. 05 Civ. 7518, 2006 WL 3298964, at *10
(S.D.N.Y. Nov. 13, 2006) (quoting *Talbot v. Johnson Newspaper Corp.*, 511 N.Y.S.2d 152, 154 (3d Dep't 1987), *aff'd*, 71 N.Y.2d
827 (1988).  The use of New York correspondent accounts plainly
is not "at the very root" of this action.

Plaintiffs ineffectively argue that Defendants'
correspondent bank accounts in New York are "an essential
component of the challenged tortious conduct" because
"Defendants' use of corresponding bank accounts in New York for
dollar clearing was both critical to the banks themselves, and
also, by extension, critical to Hizbullah and its departments
which rely on U.S. dollars and easy, dependable access to U.S.
currency." (Pl. Omnibus Mem. at 15).  Underlying Plaintiffs'
argument is the faulty assumption that U.S. dollars can only be
obtained in the United States.  Although Plaintiffs allege that
they believe at some point in time IRSO money cleared through a
correspondent bank in New York, the Amended Complaint itself and
documents attached thereto detail several alternate channels
through which the IRSO and Hizbullah may have obtained U.S.
dollars.  First, Plaintiffs allege that "[a]ll checks in U.S.
Currency are cleared in Lebanon through the Central Bank of
Lebanon." (Am. Compl. ¶ 150) (emphasis added).  Additionally,
Plaintiffs attach to the Amended Complaint print outs from
Defendants' websites listing each of their correspondent banking

18

relationships.[2] For example, along with American Express Bank, Ltd., JPMorgan Chase Bank, and Bank of New York, the Bank of Beirut can also obtain U.S. currency through correspondent bank accounts with the National Bank of Egypt (located in Cairo), the Bank of Ceylon (located in Sri Lanka), and the British Arab Commercial Bank (located in London). (Schlanger Decl., Ex. F). Similarly, BLC Bank has U.S. dollar correspondent banking relationships with BLC Bank (France) S.A. (located in Paris), the Housing Bank for Trade and Finance (located in Amman, Jordan), the Bank of the Philippine Islands (located in the Philippines), the National Commercial Bank (located in Saudi Arabia), and the Bank of Ceylon. (Schlanger Decl., Ex. E). Although the currency is unspecified, Banque Libano-Française maintains fourteen additional correspondent bank accounts, and Fransabank maintains at least eleven additional correspondent bank accounts in countries all over the world. (Schlanger Decl., Exs. C, D).

While it may be true that U.S. dollars fund at least some of Hizbullah's operations, given the worldwide availability of U.S. currency, it does not follow that New York (or even the United States) is essential to the provision of said currency. Cf. In re Terrorist Attacks on Sept. 11, 2001, 538 F.3d 71, 96

---

[2] Documents attached to the complaint are considered part of the pleadings when deciding a motion to dismiss. See Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007).

(2d Cir. 2008) (declining "to say that the provision of financial services to an entity that carries out a terrorist attack on United States citizens could make [defendant] . . . subject to the jurisdiction of American courts," even though "[i]t may be that, but for access to financial institutions, al Qaeda could not have funded its terrorist attacks"); Johnson, 4 N.Y.3d at 519 ("The relationship between the negligence claim and defendant's possession of a New York [driver's] license and registration at the time of the accident is too insubstantial to warrant a New York court's exercise of personal jurisdiction over defendant. The negligent driver could have had a license from any state, or no license – that defendant had a New York license and registration is merely coincidental. As such, plaintiffs cannot rely on C.P.L.R. 302(a)(1) to establish long-arm jurisdiction."). Without any additional facts linking Defendants to the state of New York, the Amended Complaint and supporting documentation indicate that Defendants' connection to the forum is, at best, coincidental, and that connection is so far removed from Plaintiffs' claims that the Court cannot find a basis for personal jurisdiction under C.P.L.R. 302(a)(1).

## 2. N.Y. C.P.L.R. 302(a)(2)

The New York long-arm statute also confers personal jurisdiction over a foreign defendant that "commits a tortious act within the state" where the plaintiff's claim arises from

that tortious conduct. N.Y. C.P.L.R. 302(a)(2). The Court will assume for the moment that the alleged transfer of money is a tortious act. Contrary to Plaintiffs' assertions, it is well settled that the defendant must commit the tort while physically present in New York in order to be subject to jurisdiction under C.P.L.R. 302(a)(2). See Bensusan Restaurant Corp. v. King, 126 F.3d 25, 29 (2d Cir. 1997); see also Overseas Media, Inc. v. Skvortsov, 277 F. App'x 92, 95 (2d Cir. 2008); Bank Brussels Lambert, 171 F.3d at 790; Daventree, 349 F. Supp. 2d at 762. The Court declines to restrict the Bensusan decision to trademark infringement cases, particularly in light of Judge McLaughlin's Practice Commentary to C.P.L.R. 302(a)(2), which counsels that New York courts would lack jurisdiction over a foreign defendant even "if a New Jersey domiciliary were to lob a bazooka shell across the Hudson River at Grant's tomb." See also Northrop Grumman Overseas Serv. Corp. v. Banco Wiese Sudameris, No. 03 Civ. 1681, 2004 WL 2199547, at *12 n.13 (S.D.N.Y. Sept. 29, 2004) ("[T]he Court of Appeals decided Bensusan Restaurant after the Banco Nacional case and nevertheless held that physical presence is required. Thus, following Second Circuit precedent, I find that actual physical presence is required under § 302(a)(2).").

Plaintiffs argue that "[b]ecause the Defendants (and their customers) require U.S. dollars, it is more than plausible that

funds transferred by, or to, accounts held by each Defendant for Hizbullah's and its agents' benefit passed through New York." (Pl. Omnibus Mem. at 20). However, New York law requires the physical presence in the forum state of the alleged tortfeasor, not the money transferred. As the Amended Complaint sets forth no facts establishing that any of the defendant banks maintain branch offices in New York or that any representative of any of the Lebanese banks ever set foot on U.S. soil, personal jurisdiction under C.P.L.R. 302(a)(2) will not lie.

Since Plaintiffs have not made a *prima facie* showing of long-arm jurisdiction under New York law, the Court need not embark on a due process analysis of Defendants' contacts with the forum state. See Best Van Lines, 490 F.3d at 242 (finding that courts need to undergo a Fourteenth Amendment due process investigation "[i]f, but only if" personal jurisdiction is statutorily permissible); Beacon Enters., 715 F.2d at 764 n.6.

### 3. Federal Rule of Civil Procedure 4(k)(2)

Alternatively, Plaintiffs ask the Court to assert jurisdiction under Federal Rule of Civil Procedure 4(k)(2). "Rule 4(k)(2) is designed to 'fill a gap in the enforcement of federal law' for courts to exercise personal jurisdiction over defendants 'having sufficient contacts with the United States to justify the application of United States law . . . but having insufficient contact with any single state to support

22

jurisdiction under state long-arm legislation.'" *Daventree*, 349
F. Supp. 2d at 760 (quoting Fed. R. Civ. P. 4(k)(2) Adv. Comm.
Note (1993)).  Rule 4(k)(2) provides that jurisdiction is proper
where: (1) the plaintiff's cause of action arises under federal
law; (2) the defendant is not subject to the jurisdiction of any
one state; and (3) sufficient contacts with the United States
exist such that the exercise of personal jurisdiction over the
defendant is consistent with the requirement of due process.
*Porina v. Marward Shipping Co., Ltd.*, 521 F.3d 122, 127 (2d Cir.
2008); *Daventree*, 349 F. Supp. 2d at 760.  As Plaintiffs bring
their causes of action pursuant to the ATCA, the claims arise
under federal law.  *See* *In re S. Afr. Apartheid Litig.*, 643 F.
Supp. 2d 423, 434 (S.D.N.Y. 2009).  As to the second element,
although the Court has already found that Defendants are not
subject to personal jurisdiction in New York, Plaintiffs have
not certified that Defendants are not subject to jurisdiction in
any other state.  Additionally, Plaintiffs have not established
that Defendants have sufficient contacts with the United States
as a whole so as to satisfy the Fifth Amendment Due Process
Clause.

The federal due process analysis consists of two steps:
the "minimum contacts" test and the "reasonableness" inquiry.
*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567
(2d Cir. 1996).  Plaintiff must establish that defendant had

sufficient contacts with the forum such that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). The minimum contacts test requires plaintiff to allege jurisdictional facts sufficient to show that defendants "purposefully directed their activities at residents of the forum and the litigation results from alleged injuries that arise out of or related to those activities," Daventree, 349 F. Supp. 2d at 763, such that defendants could reasonably foresee being haled into court in the forum. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). Next, the Court considers five factors in evaluating the reasonableness of exerting jurisdiction: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 129 (2d Cir. 2002). The weaker plaintiff's showing of minimum contacts, the more emphasis the court should place on the reasonableness inquiry. Id.

Plaintiffs propose essentially the same set of facts in support of jurisdiction under Rule 4(k)(2) as they did for jurisdiction under the C.P.L.R. – that is, Defendants' maintenance of correspondent accounts in New York. The mere maintenance of a correspondent account in New York no more establishes minimum contacts with the United States than it does provide a basis for the exercise of long-arm jurisdiction. See Northrop Grumman, 2004 WL 2199547, at *15 (even though defendant purposefully availed itself of the privilege of conducting business in the forum, exercise of jurisdiction would not comport with due process where defendant's "only purposeful contacts with New York are its demands for payment under the L/C and the maintenance of correspondent banking relationships in New York"); Leema Enters., Inc. v. Willi, 575 F. Supp. 1533, 1536 (S.D.N.Y. 1983) (finding that the maintenance of correspondent bank account into which money connected to fraud was deposited did not constitute sufficient contacts with New York to satisfy due process); see also Daventree, 349 F. Supp.2d at 764 ("[T]he norm of 'fundamentals of substantial justice' does not accord with a finding of minimum contacts where a non-resident bank engages in wire transfers or cash withdrawals [in the United States] on behalf of its clients as part of the financial process."); Casio Computer Co., Ltd. v. Sayo, No. 98 Civ. 3772, 2000 WL 1877516, at *26 (S.D.N.Y. Oct. 13, 2000)

("Although . . . the wire transfers [in furtherance of alleged
RICO conspiracy] reached bank accounts in the United States,
such conduct by defendants does not satisfy the level of minimum
contacts required to assert personal jurisdiction over them.").
Furthermore, the Court has already established that Plaintiffs'
injuries are not substantially related to the U.S. correspondent
accounts such that their claims arise from the alleged currency
transfers.

Plaintiffs also contend that by undertaking mandatory
U.S.A. PATRIOT Act certifications in connection with New York
correspondent accounts, Defendants purposely availed themselves
of the privilege of doing business in the United States.
However, Plaintiffs themselves point out that "every foreign
bank maintaining a correspondent account with U.S. banks must
file a certification with each institution with which it
maintains a correspondent account." (Pl. Omnibus Mem. at 22)
(emphasis added). If these PATRIOT Act certifications were
sufficient minimum contacts to satisfy due process, every
foreign bank that opens a correspondent account in the United
States would be subject to jurisdiction. Clearly, that is not
the case. Moreover, the fact that these PATRIOT Act
certifications require foreign banks to designate a proxy to
accept service of process by the U.S. government does not
indicate that Defendants should reasonably foresee being haled

into a U.S. court, especially not by Israeli citizens injured by Lebanese terrorists in Israel.  See Int'l Housing Ltd. v. Rafidain Bank Iraq, 712 F. Supp. 1112, 1119 (S.D.N.Y. 1989), rev'd on other grounds, 893 F.2d 8 (2d Cir. 1989) ("The absence of any direct United States contact other than the use of the correspondent bank account does not support a conclusion that [defendant] could have reasonably anticipated litigation regarding this transaction in the United States.").  As the correspondent accounts are the sum total of Defendants' alleged contacts with the United States, Plaintiffs have not established minimum contacts with the United States to make the exercise of specific jurisdiction constitutionally permissible.

Moreover, litigating this entirely foreign claim in the United States will be burdensome to Defendants, all of which operate in Lebanon.  The forum is no more convenient to Plaintiffs, all of whom reside in Israel.  Although some documents may be held by the correspondent banks in New York, most of the witnesses and evidence are located in Israel and Lebanon.  It is clear that the center of this controversy is the Middle East.

The most important consideration in this case is the United States' interest in adjudicating this dispute.  None of the parties are American citizens or entities incorporated, residing, or doing business anywhere in the United States.  The

Hizbullah-related accounts are held in Lebanon. The missile attacks and resulting injuries all occurred in the Middle East. The only real link to this country arises because of its currency. But, as discussed above, U.S. dollars are easily obtained through correspondent banks worldwide, making the only alleged contact with the United States purely incidental. Cf. Lan Assocs. XVIII, L.P. v. Bank of Nova Scotia, No. 96 Civ. 1022, 1997 WL 458753, at *6 (S.D.N.Y. Aug. 11, 1997) ("New York, on the other hand, has virtually no link to this action. None of the parties is a citizen of New York, and no events occurred here other than an alleged wire transfer of funds, which was not significant to this action. . . . Were such a minimal contact with New York to be deemed significant, this Court, located in one of the world's largest and busiest financial centers, would be burdened with countless international financial disputes having no real, substantive link to New York."). Therefore, the United States has little to no interest in this litigation. See Rafidain Bank Iraq, 712 F. Supp. 2d. at 1119-20 (S.D.N.Y. 1989) ("The absence of an American party to this dispute as well as the absence of any contractual provision requiring activity to occur in the United States further constrict any interest the United States has in providing a forum for [plaintiff's] claim."). Taking these factors together, the Court finds that

subjecting the Lebanese banks to suit in the United States is
neither reasonable nor fair.

## B.    Jurisdictional Discovery

Although the District Court has the discretion to authorize
jurisdictional discovery, discovery is not warranted where
plaintiff has failed to make a prima facie showing of
jurisdiction.  See Jazini, 148 F.3d at 186; Daventree, 349 F.
Supp. 2d at 761 ("[A] court is not obligated to subject a
foreign corporation to discovery where the allegations of
jurisdictional facts, construed most favorably in the
plaintiff's favor, fail to state a basis for the exercise of
jurisdiction or where a plaintiff's proposed discovery, if
granted, would not uncover facts sufficient to sustain
jurisdiction."); Ins. Co. of State of Pa. v. Centaur Ins. Co.,
590 F. Supp. 1187, 1189 (S.D.N.Y. 1984) ("Since not even a prima
facie showing of jurisdiction has been made, there is no purpose
in further escalating the costs of this lawsuit by granting
leave to conduct jurisdictional discovery.").

In a footnote, Plaintiffs suggest that, although
unnecessary, they may be entitled to jurisdictional discovery.
It is telling that Plaintiffs do not request discovery to try to
ferret out additional contacts between the Lebanese banks and
New York or the United States as a whole.  Instead, they note
that they may be entitled to "targeted jurisdictional discovery

to ascertain how the New York accounts are used and what role they played in moving money for Hizbullah and its agents." (Pl. Omnibus Mem. at 23 n.20). However, Plaintiffs have already set forth the role New York correspondent accounts played in this case – they exchanged foreign currency for U.S. dollars on behalf of Lebanese banks. Considering the very nature of correspondent accounts, this is the only role they could play. The Court has found that Plaintiffs' allegations regarding Defendants' maintenance and use of correspondent accounts in New York do not establish a _prima facie_ showing of personal jurisdiction in part because Plaintiffs' claims do not arise from the alleged currency transfers. Therefore, discovery regarding the correspondent accounts would be futile.

### III. CONCLUSION

Defendants' Rule 12(b)(2) motions to dismiss for lack of jurisdiction are granted. To the extent Plaintiffs have requested jurisdictional discovery, that application is denied. As this Court cannot exert personal jurisdiction over the foreign banks, it will not reach the issues presented in Defendants' Rule 12(b)(6) motions to dismiss. Although I see no way that Plaintiffs can establish jurisdiction, in an excess of caution, they are given until February 5, 2010 to replead. If no new complaint is served and filed by the close of business

that day, the case will be dismissed and stricken from the docket of this Court.

**SO ORDERED.**

Dated:     New York, New York
           January 5, 2010

_____
John F. Keenan
United States District Judge